UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
iRACING.COM MOTORSPORTS,     )
SIMULATIONS, LLC,            )
     Plaintiff,              )
                             )
     v.                      ) Civ. Action No. 05cv11639-NG
                             )
TIM ROBINSON,                )
     Defendant.              )
_____)
```
GERTNER, D.J.:

MEMORANDUM & ORDER RE:  PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
May 25, 2007

I.   **INTRODUCTION**

Plaintiff software company iRacing.com Motorsport Simulations, LLC ("iRacing") filed a complaint against defendant Tim Robinson ("Robinson") for copyright infringement, circumvention of software protections under the Digital Millennium Copyright Act ("DMCA"), and breach of contract. Robinson accessed the code for NASCAR 2003, an auto racing game owned by iRacing, made modifications to the game, and distributed the modifications over his websites.

iRacing moves for partial summary judgment as to copyright and DMCA liability only.  Robinson argues that his conduct was fair use and that he did not actually circumvent NASCAR 2003's anti-piracy measures.

For the reasons below, I **GRANT** summary judgment in favor of iRacing as to the DMCA count, and **DENY** summary judgment as to

copyright infringement, because a material factual issue remains in dispute.

**II.  BACKGROUND**

    **A.  Facts**

        **1.  The Software**

In February 2003, a software company called Papyrus released a video game titled NASCAR 2003.  The game, a simulation of NASCAR racing, received strong reviews and became popular.  On March 24, 2003, Papyrus and its parent company, Sierra, filed an application to copyright NASCAR 2003.  Ex. A to Affidavit of David Kaemmer ("Kaemmer Aff.") (document #53-2).  The software was registered as copyright number PA-1-266-286. Kaemmer Aff. at ¶ 3 (document #53).

In May 2004, Papyrus ceased operations and on May 28, 2004, all rights in the software were transferred to a company called First, LLC ("First").  Ex. B to Kaemmer Aff. (document #53-3). On May 28, 2005, First changed its name to iRacing.com Motorsport Simulations, LLC ("iRacing"), the plaintiff in this action.  Ex. C to Kaemmer Aff. (document #53-4).

At the heart of NASCAR 2003 is a file called NR2003.exe. Affidavit of Rance Delong ("Delong Aff.") at ¶ 10 (document #52). This file is an "executable," meaning that it is the program that is run by the user's computer in order to play the game. NR2003.exe consists principally of the game itself - the code

that runs the racing simulation; but NR2003.exe also includes a
copy-protection program called SecuROM.  <u>Id.</u> at ¶ 12.  When a
user runs NR2003.exe, SecuROM automatically checks to see whether
the game's CD is in the computer's drive; if the CD is not in the
drive, NR2003.exe shuts down.  <u>Id.</u>

     The first time NR2003.exe is run, the user is presented with
an End User License Agreement ("EULA"). Kaemmer Aff. at ¶ 7.  If
the user does not signal, by clicking a button, that she agrees
to the terms of the EULA, the game shuts down.  <u>Id.</u>  To play the
game, the user must agree to the terms of the EULA.  The EULA
provides in part:

> You may not, in whole or in part, copy,
> photocopy, reproduce, translate, reverse
> engineer, derive source code, modify,
> disassemble, decompile, create derivative
> works based on the Program, or remove any
> proprietary notices or labels on the Program
> without the prior consent, in writing, of
> Sierra.
>
> The Program is licensed to you as a single
> product.  Its component parts may not be
> separated for use on more than one computer.
>
> You are entitled to use the Program for your
> own use, but you are not entitled to . . .
> sell, grant a security interest in, or
> transfer reproductions of the Program to
> other parties in any way, nor to rent, lease
> or license the Program to others without the
> prior written consent of Sierra.

Ex. A to Am. Complaint (document #18-2).

2.  **Defendant's Modifications**

Defendant Robinson is a user of online racing games.  He has
run websites that facilitate discussions about racing simulations
and has hosted online multi-user auto races.  Deposition of Tim
Robinson ("Robinson Depo."), Ex. B to Affidavit of Irwin Schwartz
at 29-30, 43-45 (document #51-2).  In December 2004, First asked
a number of users and programmers, Robinson among them, to test
the unreleased beta version of NASCAR 2003.  As part of the
arrangement, Robinson was given a copy of NASCAR 2003 1.2.0.1
("beta version") to play and give feedback to First; in addition,
Robinson signed a "Confidential Disclosure Agreement" in which he
promised not to share any information about the beta version to
any third party or let any third party have access to the beta
version.  Ex. B to Am. Complaint (document #18-3).  The agreement
provided that he would be liable to First for any damage arising
from his "release of or dissemination of confidential
information, proprietary information, intellectual property or
software." Id.

Robinson also agreed to the terms of the EULA when he first
ran the beta version of NASCAR 2003 given to him by First.
Robinson Depo. at 154 (document # 51-5).

Once in possession of a copy of the beta version, Robinson
reverse-engineered the program, made various modifications, and

distributed the modified code via his websites, as described
below.

        a.    **The 2004 Modification**

First, Robinson made use of a software tool that he got from
a third party named Don Wilshe. Robinson Depo. at 99-101. The
tool, when run, made modifications to NR2003.exe (the NASCAR 2003
program) and saved the modified file on Robinson's computer as
OWSC.exe. Id. at 102-03, 105. The "OW" stands for "open-wheel"
racing, a form of auto racing using cars built differently from
those in NASCAR racing.[1] The Wilshe tool modified the NASCAR
2003 game so that its cars behaved like open-wheel cars rather
than NASCAR cars. Id. Robinson then made this new file
available, as a game called OW Racing 2004, for download on two
websites he owned and ran, called www.torn80alley.com and www.ow-
racing.com. Id. at 99-100. The file was available on his sites
from September 4, 2004, until March 15, 2005. Id.

It appears that somebody other than Robinson did all of the
work creating this modification, and then Wilshe sent it to
Robinson because Robinson operated well-trafficked sites in the
"online racing community." Robinson Depo. at 233-34 (document
#51-7). Robinson merely ran the program, which automatically
created a modified copy of the NASCAR 2003 software, and then

---

[1] "An open-wheel sprint car ('OWSC') is a single-gear car. Indy Racing
League cars are 6-gear cars. A NASCAR is a 4-gear car." Robinson Affidavit,
Ex. A to Def.'s Opp. to Mot. for S.J. ("Robinson Aff.") at ¶ 9 (document #56-
3).

placed this copy for download on his websites. Id. at 102-03, 105, 233-34. Robinson denies any understanding of how Wilshe's tool worked. Id. at 233-34.

### b. The 2005 Modification

Robinson himself then used a tool called Ultra Edit, which allowed him to view the code that made up the NASCAR 2003 software. Answer to Amended Complaint ("Ans.") at ¶ 44 (document # 19). He combed through over a million lines of code to locate the few lines that governed the simulation of the NASCAR cars' physical properties - "spring rates, shock rates, weight distribution, maximum weight allowed, gas, fuel cell size, fuel cell location, and front and rear wing adjustments." Id. at 208-11, 226-28. Then, by trial and error, he changed these lines of code to simulate the properties of open-wheel cars rather than NASCAR cars (i.e. he would change the numbers in the code, save the new version, and then run the game to see the results, repeating the process until the cars performed in compliance with the new programming). Id. at 208-11, 216-17, 233-38.

The result of his labors was a file called owr2k5_v1.0.0.1.exe ("2005 modification"). Delong Aff. at 27. The 2005 modification, like the 2004 modification, is an open-wheel racing game whose code is identical to NR2003.exe (the NASCAR 2003 file) with select lines of code altered. Robinson made the game available for download on his website ow-

racing.com, and the link was subsequently made available by
someone else on his two other websites, torn80alley.com and
first-racing-sucks.com. Robinson Depo. at 85-87, 141-42.

c.   **The NO-CD Patch**

In response to user requests on ow-racing.com, Robinson
located a pirated version of NASCAR 2003 somewhere on the
internet that had been modified so that SecuROM no longer
operated.  Robinson Depo. at 112-14, 157.  He compared the code
of this pirated version with the beta version that First had
given to him; by identifying the differences in the code, he was
able to figure out which lines of pirated code operated to shut
down SecuROM.  Id.  He isolated these lines and made them
available on torn80alley.com and ow-racing.com as "NO-CD."  Ans.
at ¶ 44.  Using NO-CD, users could run NASCAR 2003, or Robinson's
modifications of it, without having the NASCAR 2003 retail CD in
their computer's drive.  Delong Aff. at 22-23.

Robinson alleges that the NO-CD patch is not enough for a
user to run NASCAR 2003 or one of his modifications without also
having a legitimately-purchased copy of plaintiff's software.
Robinson Aff. at ¶¶ 1-7.  He maintains that, even with NO-CD
running, a user must still enter a "CD key" into her computer.
Id.  A CD key is a file saved onto a user's computer the first
time they upload the game from the CD; each time the game runs
thereafter, it first checks to see whether this file is on the

user's hard drive.  Robinson Depo. at 115.  At Robinson's
deposition, when plaintiff's attorney attempted to run NASCAR
2003 using NO-CD, he failed, though it is not clear what went
wrong.  Robinson Aff. at ¶ 7; Robinson Depo. at 231-33.

### 3.    First/iRacing's Reaction

First sent Robinson a Cease and Desist Order on March 4,
2005, informing him that OWSC.exe, owr05.exe and NO-CD were
infringements of First's copyright, and requested that he stop
making them available on his websites.  Kaemmer Aff. at ¶ 12;
Ans. at ¶ 42.  He complied, but by August 2005 he was again
offering the 2005 modification and the NO-CD patch for download
from his websites. Ans. at ¶ 44.  On August 5, 2005, First - now
called iRacing - filed this action.

### B.    Procedural History

Plaintiff iRacing filed a complaint on August 5, 2005, and
an amended complaint on September 7, 2005 (document #18).  On
August 8, 2005, iRacing moved ex parte for a temporary
restraining order that would prohibit Robinson from publishing
any of his modifications to NASCAR 2003 and would require
expedited delivery of requested discovery documents (document
#2).  I denied the ex parte motion, and on August 17, 2005 the
parties stipulated to a preliminary injunction and document
preservation order with essentially the same terms (document
#12).

On January 10, 2006, Robinson moved to dismiss the action for lack of personal jurisdiction (document ## 26, 27).  I denied the motion to dismiss on May 1, 2006 "[b]ecause the enforcement of the forum selection clause in this case would be unreasonable, and because the claims against Robinson satisfy the requirements of the Massachusetts Long Arm Statute and do not run afoul of the Constitution."

iRacing moved for partial summary judgment on August 11, 2006 (document #50).  The motion became ripe on November 6, 2006.

### C.    **The Amended Complaint**

Plaintiff's amended complaint (document #18) states five counts:

- Count 1: Copyright infringement under 17 U.S.C. § 501(a);

- Count 2: Circumvention of copyright prevention systems under 17 U.S.C. § 1201(a) (the Digital Millennium Copyright Act);

- Count 3: Seeking declaratory judgment that

  (a)  Robinson has no right to reproduce or distribute copies of NASCAR 2003 or any derivative versions;

  (b)  iRacing has exclusive rights to the source code and object code of NASCAR 2003; and

  (c)  iRacing has exclusive right to reproduce and distribute copies of its copyrighted works and derivatives thereof;

- Count 4: Breach of contract for violation of the End User License Agreement ("EULA");

- Count 5: Breach of contract for violation of the Confidential Disclosure Agreement that Robinson signed upon becoming a beta tester.

Plaintiff has moved for partial summary judgment only as to liability under Counts 1 and 2. Plaintiff does not seek summary judgment as to Counts 3, 4, and 5, or, at this stage, damages under Counts 1 and 2. The Copyright Act and the Digital Millennium Copyright Act both allow for actual or statutory damages, permanent injunctive relief, and attorneys' fees. 17 U.S.C. §§ 504, 505; 17 U.S.C. § 1203(b) & ©. If plaintiff seeks statutory damages under Counts 1 and 2 those damages must be determined by a jury. See Segrets, Inc. v. Gillman Knitwear Co., Inc., 207 F.3d 56, 66 (1st Cir. 2000) (citing Feltner v. Columbia Pictures TV, 523 U.S. 340, 355 (1998)).

## III.  DISCUSSION

### A.    Summary of Arguments

It is undisputed that plaintiff and its predecessors have owned the copyright to NASCAR 2003 since 2003, and that since then Robinson, without authorization, reverse-engineered NASCAR 2003 and distributed modifications of it that contained 99.9% of the original code. This is enough to make out a prima facie case of copyright infringement. Segrets, 207 F.3d at 60 (elements of copyright violation are (1) that plaintiff owns valid copyright in the work at issue, and (2) defendant copied or distributed

constituent elements of the work without authorization); <u>see</u> 17 U.S.C. § 106(1)-(3); 17 U.S.C. § 501(a).

Robinson's defense to copyright infringement is that his reverse-engineering, modification, and distribution of NASCAR 2003 were fair use. Plaintiff argues that Robinson waived any rights that he has under fair use doctrine when he agreed to the terms of the EULA, and, alternatively, that his conduct was not fair use under the statutory four-factor fair use analysis. <u>See</u> 17 U.S.C. § 107.

Plaintiff further argues that Robinson's development and distribution of the NO-CD patch violated the Digital Millennium Copyright Act's prohibition on technologies whose sole purpose is to circumvent software protection devices. <u>See</u> 17 U.S.C. § 1201(a)(2). Robinson argues in response that because NO-CD does not circumvent all of NASCAR 2003's protection devices, it does not violate the statute.

**B.    <u>Fair Use</u>**

The purpose of copyright is "[t]o promote the progress of science and useful arts." U.S. Const., art. I, § 8 cl. 8. Courts have long-recognized that certain applications of copyright protection would in fact defeat this purpose by "stifl[ing] the very creativity which that law is designed to foster." <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 577

(1994) (quoting <u>Stewart v. Abend</u>, 495 U.S. 207, 236 (1990)).

Congress codified this reasoning in the 1976 Copyright Act:

> [T]he fair use of a copyrighted work . . .
> for purposes such as criticism, comment, news
> reporting, teaching (including multiple
> copies for classroom use), scholarship, or
> research, is not an infringement of
> copyright.

17 U.S.C. § 107.  The statute codifies the common-law doctrine of

fair use in its entirety.  <u>Harper & Row, Publishers, Inc. v.</u>

<u>National Enters.</u>, 471 U.S. 539, 549 (1985).

Because fair use is an affirmative defense, the burden is on

Robinson to establish its elements by a preponderance of the

evidence.  <u>See</u> David Nimmer, <u>Nimmer on Copyright</u> § 13.05 (2006).

### 1.    **Whether Robinson Waived his Fair Use Defense when he Agreed to the Terms of the EULA**

Plaintiff argues that Robinson waived his right to make fair

use of NASCAR 2003 when he agreed to the terms of the EULA upon

first running the game program.  The terms of the EULA forbid a

user to "copy . . . reverse engineer, derive source code, modify,

disassemble, decompile, [or] create derivative works based on the

Program" - the very conduct that Robinson committed and now

argues is fair use.  Ex. A to Am. Complaint.  The question of

whether that conduct constituted breach of contract is not at

issue in the motion for partial summary judgment, but plaintiff

argues that the formation of the contract waived Robinson's fair

use defense to its claim of copyright infringement.

In support of its argument, plaintiff cites two cases,
Davidson & Assocs., Inc. v. Jung, 334 F. Supp. 2d. 1164 (E.D. Mo
2004) aff'd 422 F.3d 630 (8th Cir. 2005), and Bowers v. Baystate
Techs., Inc., 320 F.3d 1317, 1325 (Fed. Cir. 2003) aff'g in
relevant part Baystate Techs. Inc. v. Bowers, 81 F. Supp. 2d 152
(D. Mass. 1999) (Gorton, J.), for the rule that a defendant can
contractually waive his right to what otherwise would be fair use
of copyrighted material.  Robinson does not address this issue at
all.  Nevertheless, plaintiff's argument fails because it
mischaracterizes the rule from Davidson and Bowers.

In those two cases, as here, defendants distributed modified
versions of plaintiffs' copyrighted works after signing contracts
not to do so; as here, the plaintiffs argued that the defendants'
conduct constituted both copyright infringement and breach of
contract.  Davidson, 334 F. Supp. 2d at 1169-71, 1174; Bowers,
320 F.3d at 1320-22.  But the issue in those cases was not
whether the existence of the contracts waived the defendants'
fair use defense; it was whether the existence of the federal
statutory fair use defense preempted state contract law,
invalidating the contracts. Davidson, 334 F. Supp. 2d at 1180;
Bowers, 320 F.3d at 1323.  The courts ruled that the Copyright
Act did not preempt state contract law. Davidson, 334 F. Supp. 2d
at 1180-81; Bowers, 320 F.3d at 1323-26.  The plaintiffs were
free to proceed against the defendants for both copyright

infringement and breach of contract; the defendants could be found to have breached their contracts even if the breaching conduct was fair use.  <u>Id.</u>

The <u>Davidson</u> and <u>Bowers</u> courts did **not** hold that the existence of a contract waives a fair use defense, as plaintiff claims here.  They held that copyright and contract claims are to be considered separately.  A defendant may successfully raise a fair use defense against a copyright infringement claim while still being found in breach of a contract not to copy.  <u>Bowers</u>, 320 F.3d at 1326 ("a party bound by such a contract may [still] elect to efficiently breach the agreement in order to ascertain ideas in a computer program unprotected by copyright law.")  In fact, there was no copyright claim at issue in the summary judgment motion before the <u>Davidson</u> court, and thus that court could not possibly have reached the rule for which plaintiff seeks to use it here.

Thus, even if Robinson contractually agreed in the EULA not to reverse engineer, modify or distribute the NASCAR 2003 code, that fact would go only to breach of contract, not to fair use. It is not relevant to this motion for partial summary judgment.

### 2.  <u>Whether Robinson's Conduct Constituted Fair Use on its Merits</u>

The Copyright Act directs the Court to consider four factors in determining whether a defendant's conduct was fair use: "(1) the purpose and character of the use, including whether such use

is of a commercial nature or is for nonprofit educational
purposes; (2) the nature of the copyrighted work; (3) the amount
and substantiality of the portion used in relation to the
copyrighted work as a whole; and (4) the effect of the use upon
the potential market for or value of the copyrighted work."  17
U.S.C. § 107.

Robinson argues that his modifications of NASCAR 2003 were
transformative - i.e. that he used the copyrighted software only
as a basis for further creative development, as the fair use
exception seeks to encourage - and that his actions had no impact
on plaintiff's sales because the game was no longer sold by the
time he made his modifications available.  He also disputes
whether the NO-CD tool he made available on his websites really
allowed users to run his modifications without having a
legitimately-purchased copy of NASCAR 2003 (this issue goes more
directly to plaintiff's Digital Millennium Copyright Act claim,
but is also relevant to the modifications' market impact, insofar
as it affects how widely they could be distributed).

### a.    __Purpose and Character of the Use__

The fair use exception seeks to promote creative use of
copyrighted work for the public good.  Thus, commercial uses,
which are presumptively for the private benefit of the user, are
less amenable to being considered fair use than noncommercial
uses, which are presumptively for public benefit.  See __Sony Corp.__

v. Universal City Studios, Inc., 464 U.S. 417, 451 (1984); Harper
& Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562
(1985); MCA, Inc. v. Wilson, 677 F.2d 180, 182 (2d Cir. 1981).
Further, in keeping with the purpose of the doctrine, fair use
favors uses that "transform" the original work so as to produce
"new information, new aesthetics, new insights and
understandings." Castle Rock Ent. v. Carol Pub. Group, Inc., 150
F.3d 132, 141 (2d Cir. 1998); see, e.g. uses listed in preamble
to 17 U.S.C. § 107.

    As Robinson points out, his distribution was largely
noncommercial.  He made his modifications available for free on
his websites.  However, there is no evidence in the record as to
whether his websites hosted commercial advertising; since
internet advertisements usually record the number of visitors to
a host site, otherwise free features of the site may serve as a
draw for advertising revenue.  Thus, while it appears that
Robinson's distribution was noncommercial, further fact-finding
may reveal a commercial aspect to it.

    The central contention between the parties is the extent of
the "transformation" that Robinson made to NASCAR 2003.  Robinson
argues that, even though he changed less than a tenth of a
percent of the NASCAR 2003 code, this targeted change resulted in
significant changes in the look and feel of the game.  But even
at the level of the final product, Robinson's changes are not the

-16-

kind that the fair use exception protects.  Fair use is generally
not meant to protect "mere reproduction of a work in order to use
it for its intrinsic purpose."  Universal City Studios v. Sony
Corp. of Am., 659 F.2d 963, 970 (9th Cir. 1981) (quoting Leon
Seltzer, Exemptions and Fair Use in Copyright 24 (1978)).[2]
Robinson's product is a simulation of open-wheel auto racing.  It
consists of many elements - a user interface, options, racing
tracks, background, style, functions to simulate the physics of
the cars, and an overall game narrative.  Almost all of these,
except some details of the physics, are simply taken from NASCAR
2003 - not in order to reframe them, as a parody or critical work
does, but simply to save Robinson the work of building them up
himself.  It is as though an author wanted to write a story set
in Chicago, and as a shortcut took someone else's story set in
New York and changed the place names.  Robinson indeed created
new work when he carefully altered the variables controlling the
game, like the cars' handling, but what is at issue here is not
his new material, but the copyrighted material he took wholesale
to go along with it.  There was nothing transformative in that
copying.

---

[2] The Supreme Court rejected the Ninth Circuit's determinative use of
this principle, holding that it is sometimes possible for a fair use to
duplicate the original for its intrinsic purposes, but agreed with the Circuit
that such use was generally against the spirit of fair use. Sony Corp. v.
Universal City Studios, Inc., 464 U.S. 417, 455 n.40 (1984).  The examples
cited by the Court of non-transformative fair use were mostly uses from the
list in the preamble to 17 U.S.C. § 107.  Thus, the Ninth Circuit's
formulation continues to be a valid and insightful statement of the spirit of
fair use, though it does not state a dispositive rule.

### b.    <u>Nature of the Copyrighted Work</u>

Because copyright in general is intended to protect expression and invention rather than allow authors to establish a monopoly over the use of facts, creative works are less amenable to fair use than factual works.  See <u>Financial Information, Inc. v. Moody's Investors Service, Inc.</u>, 751 F.2d 501, 504-05 (2d Cir. 1984); <u>Acuff-Rose Music, Inc.</u>, 510 U.S. at 586 (1994); <u>Sony</u>, 464 U.S. at 455 n.40 ("copying a news broadcast may have a stronger claim to fair use than copying a motion picture.")  Plaintiffs argue, and defendant does not contest, that NASCAR 2003 is a creative work of entertainment.  It does not represent any actual car, race, or driver.  It does simulate actual racing conditions, but any realism in NASCAR 2003 is in service what is essentially a fantasy.

### c.    <u>Amount of Copyrighted Work Used</u>

The real concern under this factor is how alike the copy is to the original, both qualitatively and quantitatively.  See David Nimmer, <u>Nimmer on Copyright</u> § 13.05 (2006); <u>Maxtone-Graham v. Burtchaell</u>, 803 F.2d 1253, 1263 (2d Cir. 1986); <u>Los Angeles News Serv. v. CBS Broad., Inc.</u>, 305 F.3d 924, 940 (9th Cir. 2002) (that defendant used the "heart" of plaintiff's footage was more important than the actual number of seconds it used).  Again, Robinson's modifications contain 99.9% original code, but the more useful focus is on the amount of the original game product

he used.  He left unchanged the interface, options, setting,
style, structure, and most of the physics of the original game.
He changed only the handling and appearance of the cars.  In the
finished product - the experience of the game - what he took far
outweighs what he did not.

### d.    Effect on Potential Market

Because some uses may be transformative, productive,
critical, etc., but in effect swallow any economic benefit or
incentive to a plaintiff from its copyright, the Copyright Act
also directs the Court to consider the impact on plaintiff's
potential market of the putative fair use.  17 U.S.C. § 107(4).

Robinson argues that his modifications had no effect on the
NASCAR 2003 market because NASCAR 2003 was no longer being
offered for sale by the time he distributed his modifications.
Ex. 1 to Robinson Aff. (document # 56).  While plaintiff does not
dispute that the game was no longer for sale at that point, this
does not settle the question of Robinson's effect on the game's
*potential* market.  Plaintiff retains the copyright to NASCAR 2003
and therefore can choose to re-release it or sell the rights to
another company at any time.  This factor is not about
determining plaintiff's actual retrospective damages (which may
be irrelevant if plaintiff seeks statutory damages), but rather
the prospective effect of a ruling of fair use.  See Salinger v.
Random House, Inc., 811 F.2d 90, 99 (2d Cir. 1987) (diminution of

market value in plaintiff's works "is not lessened by the fact that their author has disavowed the intention to publish them during his lifetime . . . He is entitled to protect his opportunity to sell his letters"); Acuff-Rose Music, Inc., 510 U.S. 593 n.23.

However, this factor must still wait on the disputed factual issue of whether Robinson's NO-CD patch made it possible for users to run his modifications without purchasing a NASCAR 2003 CD.  If Robinson's open-wheel racing simulations can be played by anyone, whether they bought a copy of NASCAR 2003 or not, then they will likely have a significant impact on the potential market for NASCAR 2003; while some potential NASCAR 2003 customers might find the difference between open-wheel and NASCAR racing worth paying for, many others might choose the free download over the similar retail game.  If, on the other hand, Robinson's modifications cannot be run by anyone who has not purchased the original game, they cannot replace it on the market; indeed, they may actually augment that market by making a legitimately purchased game that much more valuable to the owner.

### e.  Conclusion as to Fair Use

On the current record, three of the four factors weigh against a finding of fair use.  However, the fourth factor cannot yet be determined.  The fourth factor carries especially great weight. See e.g. Harper & Row, 471 U.S. at 566 ("[T]his last

factor is undoubtedly the single most important factor of fair use."); <u>Robinson v. Random House, Inc.</u>, 877 F. Supp. 830, 842-43 (S.D.N.Y. 1995) ("most important of the four," "vital fourth factor"); <u>Princeton Univ. Press v. Michigan Doc. Servs.</u>, Inc., 99 F.3d 1381, 1385 (6th Cir. 1996).  If Robinson's use turns out to be utterly harmless to iRacing, that would strongly recommend in favor of allowing it as a fair use.  Thus, I **DENY** plaintiff's motion for summary judgment on Count 1.

   C.   **Digital Millennium Copyright Act**

   The Digital Millennium Copyright Act ("DMCA") provides a private cause of action when a defendant creates a device or program designed to defeat a plaintiff's anti-piracy measures. Specifically, it prohibits the use, manufacture, or distribution of

> any technology, product, service, device, component, or part thereof, that —
>
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title; [or]
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title.

17 U.S.C. § 1201(a)(2).  "A technological measure effectively controls access to a work if the measure, in the ordinary course of its operation, requires the application of information, or a

process or treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). Plaintiff argues that SecuROM is such a control, because it requires the user to insert the NASCAR 2003 CD into the computer's CD drive in order to access the game. Plaintiff further agues that Robinson therefore violated the DMCA when he created the NO-CD patch to circumvent SecuROM.

It is undisputed that NO-CD circumvents SecuROM, allowing a user to run NASCAR 2003 or one of Robinson's modifications without the NASCAR 2003 game CD in their computer at the time. It is also undisputed that NO-CD is keyed to NASCAR 2003, and has no use whatsoever other than this. But Robinson argues that even with NO-CD the user must still have a valid copy of the game:

> [The NASCAR 2003 executable] checks to see if there's some valid files associated with the games . . . So in other words there's some file associated with – that's either loaded on your PC somewhere that says I have a valid version of the game, and then this allows you to play it. If you don't have that, then you can't play it.

Robinson Depo. at 115 (document #51-4). In other words, he alleges that NO-CD only allows a user to run the game without the CD if the CD was in the drive at least once in the past.

Taking Robinson's allegations as true, it appears that there are two anti-piracy devices on NASCAR 2003 - SecuROM and the "CD key" described by Robinson - of which NO-CD circumvents only the first. Nevertheless, NO-CD disabled one of the protections on

NASCAR 2003.  It is therefore a "technology . . . primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work."  17 U.S.C. § 1201(a)(2)(A).  Furthermore, it "has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work."  17 U.S.C. § 1201(a)(2)(B).

NO-CD violates the policy of the DMCA as well as its language.  To hold that a patch only violates the DMCA if it, *by itself*, allows complete access to the target software would defeat the statute's goal of providing legal backup to software protections.  Different programmers working separately could develop tools that, put together, would circumvent all of the protections on a plaintiff's software, and the plaintiff would have no claim - even for injunctive relief - against any individual programmer.

Accordingly, I **GRANT** plaintiff's motion for summary judgment as to Count 2.

IV.  <u>CONCLUSION</u>

For the reasons above, plaintiff's motion for summary judgment as to copyright infringement (Count 1) is hereby **DENIED,** as there remains a factual dispute as to the impact of Robinson's use on the potential market for NASCAR 2003.  However,

plaintiff's motion for summary judgment as to violations of the Digital Millennium Copyright Act (Count 2) is hereby **GRANTED.**

Accordingly, Plaintiff's Motion for Partial Summary Judgment (document #50) is **GRANTED IN PART AND DENIED IN PART.**


**SO ORDERED.**

**Date:  May 25, 2007**              /s/ Nancy Gertner

                                     **NANCY GERTNER, U.S.D.C.**