UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

iRACING.COM MOTORSPORT SIMULATIONS LLC, )
a Delaware Limited Liability Company, Plaintiff )
                                                )
V.                                              )   Civil Action No.
                                                )     05-11639 NG
TIM ROBINSON, individually and d/b/a            )
www.ow-racing.com and www.torn8oalley.com,      )
and www.first-racing-sucks.com                  )
                                                )
Defendant                                       )
-------------------------------------------------

DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**Contested Facts**

Defendant contests the following facts appearing in Plaintiff's Memorandum in support of its motion for summary judgment.

P. 3:   In December 2004, iRacing trusted Robinson enough to allow him to test the beta version of another auto racing simulation computer game that iRacing was developing under the protections of the CDA.  (Am. Compl. ¶ 50, Ex. B; Answer ¶¶1, 50 (Robinson admits Ex. B to the Amended Complaint is a true and correct copy of the CDA)).  Robinson later posted in an online public forum that the CDA "wouldn't stand up in court."  (Answer ¶ 55).

Robinson did receive and test the Beta version of an auto racing simulation game that appeared to be an altered version of the original NASCAR2003 game.  Robinson Affid. ¶ 21. Robinson never did anything with the Beta version, other than to run it briefly.  Robinson Affid. ¶21-22.  Robinson never used any information from this Beta version in developing his owr2k5

file for running Open Wheel Sprint Cars. Robinson Affid. 21. Robinson already had done much of the work on his owr2k5 file to run Open Wheel Sprint Cars prior to receipt of the Beta version in December 2004. Robinson Affid. 25. Robinson never disclosed to anyone any information about the content of the Beta version. Robinson Affid. 21.

P. 4:    "Robinson apparently received a software application from a third party, Don Wilshe, which Robinson used to modify the NR2003.exe code in order to create the OW-Racing 2004 Mod. (Robinson Dep. 99:18-101:9 (received application); 102:6-103:18 (Robinson ran application to create a new modified executable); 105:1-5 (also known as Sprint Car Mod); 107:22-108:3 (Don Wilshe)).

Robinson received a file from a third party, Don "Wilshe." Robinson Affid. ¶ 12. This application was first posted on the www.torn80alley.com web site in the Fall of 2004, before Robinson acquired that web site. Robinson Affid. ¶ 16. Robinson never created an "OW-Racing 2004 Mod." Robinson Affid. ¶ 23. Robinson did not use the "Wilshe" file "to modify the NASCAR2003.exe code in order to create the owr2k5 file Robinson Affid. 23.

The Wilshe file came with instructions. Robinson Affid. ¶ 14. Robinson did not test it. Robinson Affid. ¶ 14. He just followed the instructions that came with it. Robinson Affid. ¶ 14. Robinson had no input in how the Sprint Car physics were supposed to work. Robinson Affid. ¶ 14. No one explained to Robinson how those variables were obtained. Robinson Affid. ¶ 14. What the Wilshe file modified, the values it used or anything else, Robinson has no idea. Robinson Affid. ¶ 14.

The "Wilshe" file left in tact the SecuROM™ protection that requires an NR2003 CD be present to run the game. DeLong Aff. ¶ 17; Pltf's Memo, p.4, n. 4.

P. 5:   "Purportedly in response to anonymous popular request, Robinson further modified NR2003.exe to create the owsc_nocd_temp.zip file (the 'NO-CD File'). (Robinson Dep. 112:22-114:11; 157:4-13 (Robinson created the NO-CD File because people asked for it on ow-racing.com)).

Robinson did not modify the NASCAR2003.exe to create the owsc.nocd_temp.zip file. Robinson Affid. ¶ 55, 58-59, 66. The NO-CD patch file was a stand-alone file, totally separate from the NR2003.exe. Robinson Affid. ¶ 59, 66-67.

Robinson did not create a NO-CD patch to run the NASCAR2003.exe file. NO-CD patches already were readily available to run the NR2003.exe file. Robinson Affid. ¶58-59. Robinson made a change to one of the NASCAR2003.exe NO-CD files, not to the NR2003.exe. Robinson Affid. ¶ 58, 66-68. Robinson modified an existing NR2003.exe NO-CD file that worked with the NR2003.exe, in order to make it work with the Wilshe file, to run Open Wheel Sprint Cars. Robinson Affid. 68.

Robinson did not write the NO-CD executable file; he found on the internet the previous NO-CD file .that worked with the NR2003.exe file  Robinson Affid. 66.   There are several NO-CD files still available on the internet that work with the NASCAR2003.exe file. Robinson Affid. ¶ 59.

P.7:    One of the files packaged in the OW-Racing 2005 Mod, OWR05.exe, is a modified and derivative version of NR2003.exe that circumvents the SecuROM copy protection.

The owr2k5.exe file does not circumvent the SecuROM copy protection. Robinson Affid. ¶ 74-75. The owr2k5.exe file does not contain any NO-CD file. Robinson Affid. ¶ 74-75. In order to run the owr05.exe file, a user must have NASCAR2003 installed on a hard drive, and must also have the NASCAR2003 CD disk installed in the CD drive. Robinson Affid. ¶ 76.

P. 7:   Robinson admitted that he created and operates the www.ow-racing.com, www.torn80alley.com and www.first-racing-sucks.com web sites.

Robinson did not create the www.torn80alley.com web site. Robinson Affid. ¶ 16. That web site was created by someone else. Robinson Affid. ¶ 16. Robinson did not take over that web site until about January 2005. Robinson Affid ¶ 16. At the time Robinson took over that web site, it already had available on it the "Wilshe" Open Wheel Racing 2004 Mod. Robinson Affid. ¶ 16.

P. 7:   Robinson offered the NO-CD File for free download through links at www.ow-racing.com to the file located at www.torn80alley.com.

The NO-CD file that Robinson offered only worked with the Open Wheel Racing file provided by "Wilshe." Robinson Affid. ¶ 68, 75. It did not work with the owr2k5.exe file that Robinson created. Robinson Affid. ¶ 75. Robinson never created a NO-CD file for use with the owr2K5.exe file. Robinson Affid. ¶ 74.

P. 7:   Robinson offered the OW-Racing 2004 Mod and the OW-Racing 2005 Mod for free download at www.ow-racing.com and www.torn80alley.com.

Robinson did not ever purposefully offer the owr2k5 file for free download on any site. Robinson Affid. ¶ 44-54.  It was still in development in March 2005. Robinson Affid. ¶ 46-47. It was on a file server, but there were no links to it, and nobody could find it unless they knew both the IP address of the file server and the file name. Robinson Affid. ¶ 44, 47. The owr2k5 file had not been made available on any web site prior to receipt of Steve Meyers' March 4, 2005 email. Robinson Affid. ¶ 44, 46-47. The Wilshe file was available for download in March

2005, and Robinson renamed the "Wilshe" file to make it unavailable. Robinson Affid. ¶ 42.

Thereafter Robinson never purposefully made the owr2k5 file available to anyone. Robinson Affid. ¶ 44-54. Robinson created a "dummy file" with that name that contained only sounds that he did post on www.firsst-racing-sucks.com. Robinson Affid. ¶ 51-54.

While Robinson was away on vacation during the end of July 2005-early August 2005, the real owr2k5 file did become available by a link that was created on the www.OW-Racing.com web site. Robinson Affid. ¶ 45. Robinson did not create that link Robinson Affid. ¶ 48. When it was brought to his attention, and he determined that the link had been activated, Robinson took the link down. Robinson Affid. ¶ 49.

P. 8: Several users downloaded the OW-Racing 2004 Mod and the OW-Racing 2005 Mod, as evidenced by their participation in race sessions utilizing these programs derived from NASCAR2003.

No race sessions ever were conducted using the owr2k5 file. Robinson Affid. ¶ 44. The only use made of that file was in practice sessions as part of the development work on the file. Robinson Affid. ¶ 44.

There was <u>one</u> race session of Open Wheel Sprint Cars utilizing the "Wilshe" file. Robinson Affid. ¶ 16.

**Argument**

1.  <u>There are facts in dispute that prevent the entry of summary judgment</u>

    Plaintiff has endeavored to mix into one pot all of the different events that occurred with

respect to several different files over an extended time frame.

Plaintiffs have mixed together (a) the original Open Wheel Sprint Car file, that was created by Don "Wilshe" and was posted in September 2004; (b) the NO-CD file that Robinson created to run the "Wilshe" file, (c) the owr2k5 file that Robinson and others worked on starting in November 2004, (d) and the "Beta" file that plaintiff made available to Robinson in late December 2004.

Plaintiffs have mixed together web sites that Robinson started with a web site founded by someone else that Robinson did not acquire until 2005.

Plaintiffs have suggested that Robinson created a NO-CD file to run NASCAR2003, whereas in fact Robinson used one of many pre-existing NASCAR2003 NO-CD files to run the "Wilshe" file.

Plaintiffs imply that Robinson's NO-CD file could be used to operate the owr2k5 file as well as the "Wilshe" file. Robinson's NO-CD file did not work with the owr2k5 file.

Plaintiffs imply that both the "Wilshe" file and Robinson's owr2k5 file were made generally available to the public and used for race events. Robinson's owr2k5 was never used for any hosted on line race events and was never purposefully released to the general public. The "Wilshe" file was used for one hosted race event. Robinson Affid. ¶ 16.

Plaintiffs imply that a EULA accompanied the Beta test file. It did not.


2.   Robinson has not used any of the "data that are the parameters of that simulation, which are at the core of the creative expression and a large part of the creative value manifested in NASCAR2003"

There are many race car games available. The concept of a race car game is not unique

to plaintiffs.  Plaintiffs assert that the "NR2003.exe contains the software code that implements a complex simulation of the physical behavior of a racing car on the user's computer.  (Answer ¶ 28; DeLong Aff. ¶ 11).  NR2003.exe also contains data that are the parameters of that simulation, which are at the core of the creative expression and a large part of the creative value manifested in NASCAR2003 Answer ¶ 28; DeLong Aff. ¶ 11)."  Pltf's Memo, p. 2.   The racing cars that the software emulates are NASCAR racing cars.  The <u>parameters</u> of what is simulated in the NASCAR2003 game that "are at the core of the creative expression and a large part of the creative value manifested in NASCAR2003" are the parameters of NASCAR cars that ran during the calendar year 2003 race year.  Hence, the retail packaging represents:

> Go bumper-to-bumper against every one of your 2003 NASCAR favorites on all 23 real-life tracks . . .
> . . .
> First with 2003 Drivers, Teams and Sponsors
> . . .
> Compete against a full NASCAR field of 42 drivers online

Thus, the heart of the software code in NR2003.exe is that it implements a complex simulation of the physical behavior of specific NASCAR racing cars, operated and run by specific NASCAR Drivers, Teams and Sponsors, able to exhibit those racing characteristics of NASCAR cars when operated on specific NASCAR race tracks.

Robinson has <u>not</u> used the "data that are the parameters of that simulation which are at the core of the creative expression and a large part of the creative value manifested in NASCAR2003" in creating the owr2k5 file.  Robinson Affid. ¶ 25, 28-40.  Robinson has created totally new data that are the parameters of the simulation of totally different Open Wheel Stock Cars, racing on Open Wheel Stock Car Race Tracks.  Robinson Affid. ¶ 25, 31.  This is what is at the core of Robinson's creative expression and the creative value manifested in his file.

Robinson Affid. ¶ 25, 30-34.

3.     Plaintiff should not be allowed to rely on the EULA hidden inside the NASCAR2003 Game

When Robinson purchased the NASCAR2003 game, absolutely no disclosure was made to him that the game was subject to any EULA. There are substantial disclosures in diminutive type on the back panel of the retail package, mostly describing registered trademarks of the logos appearing on this panel. Nowhere in this diminutive type is there any disclosure that the box contains limiting conditions on the sale of this retail product.

Plaintiffs saw fit to "hype" the game with all sorts of pictures and promises appearing on different panels of the retail box. At the same time, plaintiffs purposefully elected to withhold from a buyer such as Robinson any clue whatsoever to the fact that plaintiff had undisclosed conditions hidden inside the CD inside the box. Thus, at the time Robinson paid for and purchased this game, he had no notice whatsoever that plaintiff had hidden other conditions on his use of the game inside the retail package. He made his purchase decision based upon what knowledge plaintiffs had elected to make available to him.

It is hornbook law that a "contract" requires consideration. At no time after Robinson paid his money and purchased the retail game did plaintiff provide any consideration whatsoever for the additional conditions that it now seeks to impose on Robinson. If when Robinson attempted to open the game there was a screen that read something to the effect,

> This game will not open unless you first send us another $10.00; if you don't like it, you can go back and return the game to the store where you bought it

clearly such a previously-undisclosed condition would be viewed as an "unfair and deceptive act

or practice."

What plaintiff has done here is no different. Plaintiff has used graphics and text to hype its game. At the same time, plaintiff purposefully withheld disclosure of important information concerning limitations on the value of what Robinson was buying; information that a purchaser was entitled to consider in making the original buying decision. Plaintiff's action in seeking to enforce the terms of its unfair and deceptive act and practice is itself unfair.

Indeed, the terms of the EULA that plaintiff seeks to enforce were not even contained in any literature inside the box. The EULA was not "sprung" on Robinson until he physically inserted the game disk into the CD-Drive and the EULA popped up on his screen! Pltf's Amended Complaint ¶ 17-18. As plaintiff had complete control over when and how it would disclose the existence and terms of its EULA, plaintiff should not be rewarded for its marketing technique of hiding the existence and terms of the EULA until a point in time where it was improbable that anybody would re-package the game and return it to a store for an attempted refund on an opened package..

Plaintiff's attempt to enforce the EULA against Robinson is particularly arrogant where, as here, plaintiff itself has arbitrarily ignored specific provisions of its own EULA, namely,

> 11. Miscellaneous. This License Agreement shall be deemed to have been made and executed in the State of California and any dispute arising hereunder shall be resolved in accordance with the law of California. You agree that any claim asserted in any legal proceeding by one of the parties against the other shall be commenced and maintained in any state or federal court located in the State of California, County of Los Angeles, having subject matter jurisdiction with respect to the dispute between the parties. This License Agreement may be amended, altered or modified only by an instrument in writing, specifying such amendment, alteration or modification, executed by both parties.

It is the height of irony that the drafter of the document should be permitted to pick and chose

the provisions of its EULA that it can ignore or enforce. Plaintiff has elected to ignore and discard both the express provisions it created regarding enforcement of the EULA, and the express provisions it created regarding the need for mutual consent to any amendment to the EULA. Because plaintiff has decided that it does not like the EULA as drafted and thus has elected to abrogate provisions of the EULA that it does not like, in equity and good conscience plaintiff should not be allowed to enforce any of the other provisions of the EULA . If provisions of an agreement are not binding on the drafter, *a fortiori* the agreement ought not be enforceable against the other party.

We are not dealing with a "shrinkwrap" license. There was no indication on this product that there were any restrictions until the shrinkwrap was removed from the package and the disk was fired up in the PC. Not until then was there a clue that there were restrictions on one's right to develop transformative works. Pltf's Amended Complaint ¶ 17-18.

Neither of the only two California cases cited by plaintiff undermine the historic law of contract that "consideration" is required. Neither of the California cases involved a retail sale to a consumer. In <u>Wall Data v. Los Angeles Cty. Sheriff's Dept.</u>, 447 F.3f 769 (9th Cir. 2006) the Sheriff's office was very much aware of the existence and terms of the EULA when it made its purchases. It purchased a computer program that came with volume license booklets. The Sheriff's office ended up purchasing a total of 3,663 licenses. *Id.* at 774. The issue simply was whether, interpreting the terms of the EULA, it could be deemed to be using more licenses than it had purchased. In <u>Adobe Systems Inc. v. One Stop Micro, Inc.</u>, 84 F.Supp.2d 1086, defendant was a reseller of educational versions of the Adobe software. Unlike plaintiff's NASCAR game, Adobe's boxes containing the educational version were clearly and expressly marked on the

outside of the boxes, "EDUCATION VERSION – Academic ID Required." *Id* at 1088. Defendant nevertheless slit open the shrinkwrap and removed these labels before reselling them. *Ibid.*

Although paragraph 11 of the EULA that plaintiff drafted expressly recites that "This License Agreement shall be deemed to have been made and executed in the State of California and any dispute arising hereunder shall be resolved in accordance with the law of California, plaintiffs support their position with Massachusetts decisions. Like the California cases, the first of those Massachusetts cases, i.Lan Sys., Inc. v. Netscout Serv. Level Corp., 183 F.Supp.2d 328 (D. Mass. 2002) involves a dispute between two commercial entities, rather than a dispute with a retail customer. Chief Judge Young succinctly summed up what happened in the present case:

> Has this happened to you? You plunk down a pretty penny for the latest and greatest software, speed back to your computer, tear open the box, shove the CD-ROM into the computer, click on "install" and, after scrolling past a license agreement which would take at least fifteen minutes to read, find yourself staring at the following dialog box: "I agree." Do you click on the box? You probably do not agree in your heart of hearts, but you click anyway, not about to let some pesky legalese delay the moment for which you've been waiting. Is that "clickwrap" license agreement enforceable?

*Id.* at 329. In the context of the particular facts in that case, Judge Young answered the question, "Yes, at least in the case described below." *Ibid.* This is a recognition that under Massachusetts law, what may be unfair and deceptive as to a retail consumer, may not in a business to business contest.

In the case of Stacey and Susan Schacter v. Circuit City Stores, Circuit City argued that the terms of its service guide were incorporated by reference into the plaintiffs' warranty plan. May 3, 2006 Memorandum & Order of Judge Gorton. In denying Circuit City's Motion to Dismiss, Judge Gorton observed:

> Courts have held that "money now, terms later" contracts are enforceable where 1) reference to the binding terms is explicitly made and 2) the purchaser has a clear opportunity to consult those terms and return the product for a refund if he or she is dissatisfied with the conditions of sale. See, e.g., Hill v. Gateway 2000, Inc., 105 F.3d 1147 (7th Cir. 1997), cert. denied, 522 U.S. 808 (1997); i.LAN Sys., Inc. v. Netscout

Serv. Level Corp., 183 F. Supp. 2d 328 (D. Mass. 2002); 1-A Equip. Co., Inc. v. ICode, Inc., 2000 WL 33281687, No. 0057CV467 (Mass. Dist. Nov. 17, 2000).

In the present case, Robinson was not put on notice when he completed his purchase that it was subject to other terms. There was no reference whatsoever on the retail box. Robinson Affid. ¶ 3.. Compare 1-A Equip. Co., Inc. v. Icode, Inc., 2000 WL 33281687 (D. Mass. Nov. 17, 2000) where the external packaging of computer software at issue stated:

> IMPORTANT – READ CAREFULLY BEFORE OPENING THIS PACKAGING OR DOWNLOAD [sic] OR INSTALLING OR USING ANY PART OF THIS PRODUCT . . . . *IF YOU DO NOT AGREE TO THESE TERMS, DO NOT OPEN THE PACKAGING OR DOWNLOAD OR INSTALL OR USE THIS PRODUCT. . . . .*

Stacey, supra, p. 8.

4. <u>Any breach of "contract" was a breach committed by Plaintiff</u>

A "contract" requires consideration. When Robinson paid a price for the game, plaintiff's predecessor made no disclosures anywhere on the packaging that there were any licenses in the box or that there were any restrictions on what Robinson could do with his purchase. There was no disclosure made to Robinson at the point of sale that there were additional conditions hidden in the box.

When the EULA for the first time was disclosed when it popped up on Robinson's screen, there was no additional consideration given to Robinson in return for his acceptance of the additional provisions of the EULA, which he had no notice of, and hence which he had not accepted at the point of purchase. By accepting the EULA, Robinson simply was able to obtain the full benefits of what he had bargained for, and already paid for, at the point of purchase and sale.

5. The Declarations that Plaintiff Seeks are in part Misleading and Do Not Resolve the Central Issue

Plaintiff "requests a declaratory judgment that: (a) Robinson has no right to reproduce or distribute copies of NASCAR2003 or any derivative versions thereof; (b) iRacing has the exclusive right to the source code and object code of NASCAR2003; and (c) iRacing has the exclusive right to reproduce and distribute copies of its copyrighted works and derivative versions thereof. (Am. Compl. ¶ 80)" Pltf's Memo, p. 11.

These requests miss the mark. In fact, Robinson has not reproduced or distributed copies of NASCAR2003; Robinson has never looked at the "source code" or the "object code" for NASCAR2003, and Robinson has never contested iRacing's exclusive right to reproduce and distribute copies of its NASCAR2003 game. Robinson Affid.29.

With respect to Robinson's creation of the owr2k5 file, what is at issue in this case is whether Robinson's creation of a file using the physics related to Open Wheel Sprint Cars, running on tracks for Open Wheel Sports cars. rather than the physics related to the substantially different NASCAR cars is a "transformative" file.

With respect to the NO-CD file, the issue is whether modifying a pre-existing NASCAR2003 NO-CD file to open the pre-existing "Wilshe" file violated any of plaintiff's rights.

6.   The CDA Issue is Moot

The Confidential Disclosure Agreement relates to the Beta testing that took place three full years ago. Robinson participated for approximately one month, and stopped participating in January 2005. Robinson Affid. ¶ 22. Robinson did not use anything from that Beta testing in creating his owr2k5 file that already was well underway and being tested. Robinson Affid. ¶ 21, 25, 44. Plaintiff has given no indication of any intention of marketing anything along the lines of the Beta program since then. Robinson Affid. ¶ 78-79. All that plaintiff is complaining about is that Robinson posted that the CDA "would not stand up in court." The posting occurred after

plaintiff posted a message accusing the Sim Racing Community as being hackers and thieves, to which Robinson took offense. Robinson Affid. ¶ 51-52. It is hardly grounds for "making it into a federal case."

### Conclusion

Upon the foregoing points and authorities, the defendant Tim Robinson respectfully submits that plaintiff's Motion for Partial Summary Judgment should be denied.

By its attorneys,

Joseph F. Ryan BBO# 435720
Lyne Woodworth & Evarts LLP
600 Atlantic Avenue
Boston, MA 02210
Telephone 617/523-6655 - Telecopy 617/248-9877
E-mail: Jryan@LWELaw.com