UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| iRACING.COM MOTORSPORT SIMULATIONS, LLC, a Delaware Limited Liability Company, | X : : : | Civil Action No. 05-11639 NG |
| Plaintiff, | : : | |
| v. | : : | **JOINT PRETRIAL MEMORANDUM** |
| TIM ROBINSON, individually and d/b/a www.ow-racing.com, www.torn8oalley.com and www.First-Racing-Sucks.com, | : : : : : | |
| Defendant. | : X | |

Pursuant to Local Rule 16.5(d), Plaintiff iRacing.com Motorsport Simulations, LLC, formerly known as First Racing and First, LLC ("iRacing"), and Defendant Tim Robinson ("Robinson") (collectively, the "Parties") respectfully submit this Pretrial Memorandum in advance of the trial to be held on February 5, 2009.

## 1.    The Pre-Established Facts

In the December 16, 2008 Electronic Order (the "Electronic Order"), the Court held that the trial will focus on the following issues: (1) the "Effect on Potential Market" fair use factor; (2) iRacing's damages under the DMCA claim (and the copyright infringement claim if iRacing succeeds on that claim); (3) iRacing's damages for breach of the End-User License Agreement ("EULA"); (4) whether Robinson breached the Confidential Disclosure Agreement ("CDA"); and (5) if Robinson indeed breached the CDA, iRacing's damages for breach of the CDA.  The Parties will introduce evidence on these limited issues

Plaintiff's position is that most of the underlying facts of this dispute were set forth

in the Court's May 25, 2007 Order (Docket No. 60) (the "2007 Order") and September 24, 2008 Order (Docket No. 78) (the "2008 Order"), which factual findings were "established" for the purpose of trial in the Electronic Order.

Defendant's position is that some of the "facts" that appear in the Court's earlier Orders are not true, and as the true facts affect the remaining issues in the case, defendant will be introducing evidence of such facts.

## 2.   Concise Summary Of The Evidence To Be Offered

### A.   By Plaintiff

Robinson agreed to the terms of the EULA when he initially installed his copy of NASCAR® Racing 2003 Season ("NASCAR 2003").

When iRacing purchased the rights to the NASCAR 2003 software – including the intellectual property rights – in May 2004, the source code supported the capability for iRacing to create and maintain "open-wheel" racing.[1]  At that time (and at all times relevant to this action), iRacing – then known as First Racing – intended to further expand on the NASCAR 2003 source code, and planned to develop open-wheel racing versions of the software for commercial release.

In mid-to-late 2004, iRacing developed a test version of NASCAR 2003 that included open-wheel capability. In December 2004, iRacing asked a number of users and programmers, Robinson among them, to test a new version (also known as a "beta") of NASCAR 2003 (the "Beta Version").  As part of the arrangement, Robinson was provided with a copy of the Beta Version to test and supply feedback to iRacing.  In connection with iRacing's release of the Beta Version to him, Robinson signed the CDA,

---

[1]       As found by the Court, "open-wheel" racing is a form of auto racing different from NASCAR racing, using cars with exposed wheels and different gear alignments.  (2007 Order at 5).

in which he promised not to share any information about the Beta Version to any third party or let any third party have access to the Beta Version.  The CDA provided that Robinson would be liable to iRacing for any damage arising from his "release of or dissemination of confidential information, proprietary information, intellectual property or software."

In early March 2005, iRacing CEO Dave Kaemmer ("Kaemmer") posted on iRacing's website an open letter to NASCAR 2003 users (the "Open Letter"), which letter was later re-posted in numerous online forums where devotees to NASCAR 2003 (known as "sim racers") engaged in on-line posting, blogging, and discussion.  The Open Letter notified sim racers that iRacing and its financial partner, John Henry, had purchased all of the rights to NASCAR 2003, including copyrights, and in doing so, it invested substantial funds and undertook significant financial risk.  The Open Letter stated that the copyrights to NASCAR 2003 were a significant aspect of this investment, and as such iRacing would seek to protect these copyrights.  The Open Letter also outlined certain activities that iRacing believed were violations of its intellectual property rights in NASCAR 2003, including the computer "hacking" of executable software (also known as "executables", by which unauthorized parties use software programming tools to access, copy, and change the software), distribution of hacked executables, creating tools intended to hack the NASCAR 2003 executables, and the distribution of such tools.  The Open Letter also identified software modification activities that iRacing deemed acceptable with respect to NASCAR 2003, including the creation of new car graphics, track artwork, and sounds.  In the Open Letter, Kaemmer announced that iRacing would "strive to deliver the most realistic auto racing simulations possible."

3

Robinson read the Open Letter in March 2005.

At all relevant times, Robinson was the owner and operator of the *OW-Racing.com* and *Torn8oAlley.com* websites, which were devoted to sim racers.  In or around early March 2005, iRacing discovered that Robinson had distributed unauthorized modified versions of NASCAR 2003 on *OW-Racing.com* and *Torn8oAlley.com.*[2]  On March 4, 2005, iRacing's Steve Myers ("Myers") e-mailed Robinson, asking Robinson to cooperate in removing all content from his websites and forum postings that infringed on iRacing's copyrights.  Robinson responded to Myers by e-mail later that day.  In this e-mail, Robinson admitted to creating a modified version or "mod" of NASCAR 2003 and admitted that this modified version of NASCAR 2003 was intended to be "distributed freely" over the Internet among sim racers.  Furthermore, Robinson incorrectly asserted that "you bought the right to the code and the objects, not the entire product."[3]  Later that day, Myers responded to Robinson by e-mail, indicating that all of the rights to NASCAR 2003 were indeed transferred to iRacing.  As of March 7, 2005, Robinson had not responded to Myers' second March 4, 2005 e-mail, nor had Robinson complied with iRacing's request.  Accordingly, Myers sent Robinson another request that Robinson cease unauthorized distribution of NASCAR 2003.  Robinson had neither responded nor complied with Myers' e-mail take-down demands as of March 15, 2005, and as such Myers sent Robinson by e-mail a third request that Robinson take down the materials that infringed on the NASCAR 2003 copyrights.  On March 18, 2005,

---

[2]      Robinson's unauthorized modified and/or derivative versions of NASCAR 2003 included: (1) the "2004 Modification" (also known as NR2003.exe); (2) the "2005 Modification"; and (3) the "NO-CD Patch." (2007 Order at 5-7).  These modifications or "mods" all used "open-wheel" racing cars.

[3]      As found by the Court, iRacing and its predecessors in interest (Papyrus and Vivendi) have owned the copyrights to NASCAR 2003 since its release in 2003.  (2007 Order at 10).

Robinson responded to Myers by e-mail, indicating that he had "temporarily" removed the modified NASCAR 2003 versions from his website, *OW-Racing.com*.  Robinson also asked Myers for "proof" that iRacing actually owned the rights to NASCAR 2003.  In response, Myers thanked Robinson for removing the infringing NASCAR 2003 versions from Robinson's website and referred Robinson to iRacing's counsel for any further questions.

From March through June 2005, Robinson was a frequent contributor under the user name TRobinson to the online forum at the *FIRST-RACING-SUCKS.com* website, which website stated that it was "Dedicated to Dave Kaemmer, AKA the Puppet of John Henry!".  At all times relevant to this action, Robinson also owned and operated the website *FIRST-RACING-SUCKS.com*.  On March 19, 2005, Robinson posted on *FIRST-RACING-SUCKS.com* that he was "continuing down the path of being able to release the updated OWR05 mod" and "continuing work on the OWSC mod primarily." In that same posting, Robinson stated that "it is completely legal for you or me to reverse engineer, or otherwise disassemble code" – this despite express language in the EULA that prohibited reverse engineering and disassembling the NASCAR 2003 code.  (*See* 2007 Order at 3).  In this post, Robinson also disclosed the existence of iRacing's testing of the Beta Version, which testing was not public knowledge at the time.  On March 28, 2005, Robinson posted "I strongly doubt whether or not this actually makes it to court," in reference to iRacing's requests that Robinson cease his unauthorized distribution of modified versions of NASCAR 2003.

In May and June 2005, Robinson exchanged several e-mails and telephone calls with iRacing's Brett Roubinek ("Roubinek"), many of which involved discussions about

iRacing's copyrights and Robinson's redistribution of his unauthorized modified versions of NASCAR 2003.  While these discussions were mostly cordial, on certain occasions Robinson indicated that: (1) iRacing could be "sued for collusion" for attempting to stop "modders"; (2) that iRacing's position made him "want to completely rethink [his] position about releasing [another NASCAR 2003] mod"; and (3) if such a mod were released, it "would go underground, and all the money in the world would have a hard time stopping it."  Robinson also admitted to owning both *OW-Racing.com* and *Torn8oAlley.com.*

On June 8, 2005, another *FIRST-RACING-SUCKS.com* user named Tim McArthur responded to one of Robinson's posts on *FIRST-RACING-SUCKS.com,* stating that "[i]n phone conversations between [iRacing] and myself, [iRacing] made it extremely clear (and [Kaemmer] backed it up) that any NR2003.EXE-mods would be 'in direct competition' with their future product."

On July 5, 2005, Robinson posted on *FIRST-RACING-SUCKS.com* numerous non-public details regarding the testing of the Beta Version.  This information included details of iRacing's testing of the Beta Version, the number of testers, the breakdown of the testers into regional teams, and iRacing's plans to grow the beta testing.  He also disclosed that "[t]heir plans may be revolutionary, but while I was testing, it was nothing more than a modified .exe to drive a tricked up IROC car with very low HP in the 'FPA' and 'FPB' groups as they called them."  That same day, another user responded on *FIRST-RACING-SUCKS.com*: "Well, Mr. Robinson, I think you just blew the hell out of your [CDA]."  In response, Robinson stated, "I didn't really blow my [CDA], as nothing I told you has anything to do with their future plans in the strictest sense of the word. And

if I did, big whoop! … And besides, that [CDA] wouldn't stand up in court anyway."  On

July 25, 2005, Robinson posted on *FIRST-RACING-SUCKS.com* that "[t]here are still

some .. who just don't get it, have their heads so far up [Kaemmer's] ***, that they can't

see the forest for the trees … As it says at the top of this place, [Kaemmer] is just John

Henry's puppet!!"

In August 2005, iRacing discovered that Robinson was again distributing his

unauthorized modified NASCAR 2003 versions by making downloads available through

*OW-Racing.com* and *Torn8oAlley.com*, and posting hyperlinks to these download pages

on *First-Racing-Sucks.com* and *OW-Racing.com*.  In particular, when a user moused

over the download links for Robinson's unauthorized modified NASCAR 2003 versions

on the home page of *OW-Racing.com*, a graphic would appear reading: "Bite Me

FIR$T", apparently in reference to First Racing.  Another graphic link on the page

similarly displayed the message "Bite Me TWICE FIR$T".

On August 3, 2005, counsel for iRacing sent a cease-and-desist letter to the

Internet service provider hosting *OW-Racing.com,* copied to Robinson, indicating that

the website was being used for the distribution of unauthorized modified NASCAR 2003

versions, which infringed iRacing's intellectual property rights.  Notwithstanding this

take-down demand, Robinson did not disable the download links by which he was

distributing the infringing copies of his unauthorized and modified versions of NASCAR

2003, and iRacing filed this action on August 5, 2005.  On August 8, 2005, counsel for

iRacing contacted Robinson by e-mail and attached a courtesy copy of the Complaint,

which was served contemporaneously by hand.  Counsel for iRacing requested to

communicate further with Robinson's counsel.  Robinson responded by e-mail later that

day, indicating that he had not retained counsel, but that he had "renamed" the links, and thus they were no longer available.

Ultimately, the Beta Version was developed by iRacing into an on-line, subscription-based auto racing simulation called "iRacing.com", which includes open-wheel racing as an option.  The first subscribers to iRacing.com – the testers of the Beta Version – gained access to the service on June 11, 2008, and the general launch followed on August 26, 2008.  iRacing.com offers realistic simulations of motorsports with accurate tracks, vehicles, and physics-modeling.  All of the cars and tracks are officially licensed.  iRacing.com is a derivative version of NASCAR 2003.  iRacing.com uses the foundations of the NASCAR 2003 code, with certain modifications and improvements.  iRacing.com uses the physics engine, with certain improvements, derived from NASCAR 2003.  The NASCAR 2003 customer base is the primary market for iRacing.com, and many NASCAR 2003 users are now subscribers to iRacing.com.

Widespread distribution of unauthorized modified NASCAR 2003 versions could have a substantially adverse impact on the potential market for iRacing.com.  More specifically, the unauthorized distribution of Robinson's competitive versions to NASCAR 2003 could harm the potential market for iRacing.com.  Indeed, iRacing's potential consumers could opt to play Robinson's unauthorized open-wheel version of NASCAR 2003 using the same code base for free, rather than subscribe to iRacing.com using the open-wheel features of iRacing's subscription service.

During his deposition on November 15, 2005, Robinson stated that he wished he kept his notes regarding his modifications of NASCAR 2003 because he would "like to modify it some more with different models."

In prosecuting this action, iRacing has been required to expend approximately $150,000 in costs and attorneys fees, and anticipates that this figure will be approximately $170,000 after the trial is completed.

B.     By Defendant

Robinson has been a sim racing enthusiast since 1996.  He purchased several earlier versions of Papyrus NASCAR racing games.

**2003**

The NASCAR 2003 game was released by Papyrus/Sierra in February 2003, and Robinson purchased a copy of the game shortly after it became available in February 2003.   Shortly after its release, the sim racing community learned that Papyrus/Sierra no longer intended to support NASCAR 2003 or to release any future versions of the game.  Some time between March and July 2003 a group of people, mostly people who had worked for Papyrus, got together and formed a group named "Project Wildfire", for the purpose of preserving and continuing to improve on the NASCAR 2003 game. Project Wildfire had no formal connection or agreements with Papyrus/Sierra, but Papyrus lent active support to the group's efforts.   Project Wildfire's Senior Advisor was John Henry, an ardent sim racing enthusiast who now owns iRacing.

Through Project Wildfire, Papyrus  provided the sim racing community the ability to modify the NASCAR 2003 simulation and also released through Project Wildfire 3 new physics engines, a track making tool, and initialization files that can be modified in countless ways.  Papyrus unlocked the physics models for the Busch and Craftsman Truck models. Project Wildfire was dedicated to exploiting the capabilities of the tools and files it received from Papyrus in an effort to provide a very close and passionate sim

racing community further and continued enjoyment of the NASCAR Racing Series
platform.

Papyrus passed along to some people tools that enabled them to obtain the
source code to the NASCAR 2003 game.  In August, Papyrus gave Project Wildfire, to
make available to the sim racing community, a "patch"  that included a "Sandbox" tool
that enabled the user  to modify the tracks that came with NASCAR 2003, or to create
new tracks.  Through the ensuing months, Project Wildfire continued to release new
mods and other add-ons to the NASCAR 2 003 game.   None of the tools and files
released by Papyrus and Project Wildfire had any restrictions on their use.  Essentially
all of Papyrus' development work was prohibited by the terms of the EULA that
accompanied the NASCAR 2003 retail game.

Several other groups of sim racing enthusiasts developed mods and add-ons
apart from Project Wildfire that were publicly posted on respected sim racing websites.

**2004**

During January through May 2004, Project Wildfire continued to release new
tracks and other enhancements, constituting work that was prohibited by the terms of
the NASCAR 2003 game EULA.  About April 1, 2004, Sierra's license to use NASCAR
expired.  NASCAR 2003 was no longer authorized to be sold.  In June or July 2004, a
group to which Robinson belonged released an Open Wheel Racing (OWR) beta mod,
using existing PTA physics.  Track initialization files were also heavily modified.  This is
the first time that Robinson undertook any work on creating a new mod.

In the early summer of 2004, Robinson joined a group that created what became
the OWSC (Open Wheel Sprint Car) Mod.  Robinson provided the web space and test

servers that would serve as beta platforms.  The OWSC Mod used modified physics and created a different executable file, but always required that the user have a legitimate copy of the NR2003 game.

On July 3, 2004, without advance notice Project Wildfire took down all of downloads and other content on its website and announced "we have been signed on to help in the creation of a retail racing product."  In mid-September 2004, the OWSC on which Robinson worked was beta tested and released to the general public.  It was made available on Robinson's website, *www.OW-racing.com*, and it was accessible via a link from his other website, *www.torn80alley.com*.  In response to requests, Robinson created a NO-CD patch for the OWSC file in late September 2004.  All of this work was completed and posted on Robinson's website long before Robinson ever became a beta tester for First-Racing.net.

Robinson also was involved in working on updating the OWR Mod that had been released in June or July 2004 and that also was posted on Robinson's website, to be a more realistic representation of the actual Indy style cars being used.  This new version of OWR would use highly modified physics altering a huge number of parameters in the executable file to more closely represent and Indy style car.  While that work continued from mid-September 2004 into early 2005, the original OWR mod remained available on Robinson's website.

In December 2004, First-Racing.net was advertising on its website for beta testers.  Robinson earlier had completed an application to be a beta tester, in which he had disclosed his involvement with sim racing and the mods he had worked on and posted on his website.  On December 21, 2004, First-Racing.net advised Robinson he

11

had been accepted to be part of beta testing.  A precondition was that Beta testers were required to have their own copy of NASCAR 2003 Season, which Robinson had.

**2005**

In January 2005, Robinson started as a First-Racing.net  beta tester.   There was a nondisclosure agreement, but there was no EULA accompanying the files from First-Racing.  All that had to be done once Robinson received the files was to copy the files to his existing NASCAR 2003 folder.  No EULA was never presented during this beta testing.  Robinson terminated his involvement in beta testing by the end of the month, when he received divorce papers and did not have time to serve as a beta tester.

The work on the enhanced version of the OWR mod was about complete when Robinson became a beta tester (Robinson never had anything called "OW Racing 2004").   Robinson never used any information from First-Racing's beta files in his work on producing the enhanced OWR Mod.  In addition to simulating the physics of an open wheel car, 3D modeling was necessary to create an Open Wheel Car, and sounds had to be created for an Open Wheel Car, and the painting of skins to be applied to the cars, etc.  Robinson made the OWR Mod  file owr2k5_v1.0.0.1.exe available on his website, *OW-racing.com*.

In early 2005, Robinson attempted to contact Myers to advise him of OW-Racing's plan to release the final OWR Mod using modified physics.  Myers never responded to Robinson.  About the same time, a group named Team Redline released a highly modified version of NR2003 known as the GTP (Grand Touring) Mod.  Virtually everything in the game was changed, including the UI, car models, tracks, etc.  The mod used highly modified physics, and still exists today and is available for download.

12

First-Racing/iRacing allowed, and continues to allow, a NO-CD version of the GTP Mod to be circulated.  The GTP mod, much like the transformative version that Robinson created, had heavily modified physics and other modifications.   That mod still is available.

Robinson later made a NO-CD Patch to the OWR Mod file owr2k5_v1.0.0.1.exe available on his website, *OW-racing.com*, and through Robinson's website *torn80alley.com* by placing a hyperlink there to the *OW-racing.com* website.   Robinson located one of several NO-CD Patches for the NASCAR 2003 game that were available on respected sim racing websites.  Robinson did not locate a pirated version of NASCAR 2003 on line.   Robinson modified the existing NO-CD Patch for the NASCAR 2003 game so that it would work with the owr2k5_v1.0.0.1.exe file.  The NO-CD Patch that Robinson created would not work if someone tried to use it to play the original NASCAR 2003 game.  The NO-CD Patch would not work with the owr2k5_v.1.0.0.1.exe file unless one had a legitimate copy of NASCAR 2003 already installed on their computer.

In early March 2005, First-Racing sued Tim McArthur over his publishing of modified physics to the NR2003 game.   Dave Kaemmer also issued an "Open Letter" calling sim racing enthusiasts "hackers" and implying they were thieves for creating new mods and other add-ons to the NASCAR 2003 game - a game that no longer could be sold and that the creator and owner Papyrus/Sierra had all but been abandoned and encouraged the sim racing community to develop.

In March 2005, while Robinson was on a business trip to Maryland, he received an e-mail from Myers asking Robinson to remove files they considered to be an

13

infringement on their copyrighted material.  Robinson did a quick search of the

Copyright database, and found that, according to the records of the U.S. Copyright

Office, First did not own the rights to NASCAR 2003.  Nevertheless, to defuse the issue,

Robinson agreed to temporarily remove files while copyright issue was sorted out, and

he did so when he returned from his trip.

     In response to Kaemmer's derogatory Open Letter, and First's shoddy treatment

of him and other sim racing enthusiasts, Robinson created *FIRST-RACING-*

*SUCKS.com* as a forum for people to discuss First's conduct.  At the time, there still

was nothing on record at the U.S. Copyright Office to indicate that First had acquired

any rights in the NASCAR 2003 game.

     In late May 2005, First- changed its name to iRacing.  On June 5, 2005,

Kaemmer stated on First's website that the product being developed by iRacing was not

going to be based on the NASCAR 2003 game.  On June 28, 2005, iRacing's

predecessor, First, LLC, filed with the U.S. Copyright Office the assignment to it of the

copyright to the NASCAR 2003 game.  During March, April, May, June and July the files

about which First had complained remained "not available" on Robinson's websites.

The files still were on Robinson's file server and their names visible to one visiting the

download area of the website, but Robinson had removed the link to the files so that

they could not be uploaded.

     In early August, while Robinson was on vacation in Montana, a part time

administrator of his site re-posted files that he had voluntarily taken down. The files

about which First complained  never were made available on Robinson's website

*FIRST-RACING-SUCKS.com*.  The file on that website contained only a "sound" file for

the PWF PTA Mod. Robinson returned from vacation on August 6, 2005 and was greeted with Plaintiff's Complaint.

### C.    By Other Parties

The Parties do not anticipate that evidence will be presented by other parties.

## 3.    Contested Issues Of Fact

Plaintiff's position is that there are very few issues of fact that remain in this case. Pertaining to the question of whether Robinson's infringement of iRacing's copyrights was willful, the Parties believe that the following facts are still in dispute:

- Whether Robinson knew that his conduct constituted copyright infringement; and

- Whether Robinson believed, at the time of the infringements, that his conduct constituted fair use.

Pertaining to Robinson's violation of the DMCA, the following facts are in dispute:

- Whether Robinson knew his conduct was a violation of the DMCA; and

- The number of acts of circumvention that Robinson committed in violation of the DMCA.

Finally, with regard to the question of whether Robinson violated the CDA, the following facts are in dispute:

- Whether the information that Robinson posted on First-Racing-Sucks.com about the Beta Version constituted "Information" as defined by the CDA; and

- Whether the information that Robinson posted on First-Racing-Sucks.com was public knowledge at the time of the posting.

## 4.    Jurisdictional Questions

The Parties do not anticipate that any jurisdictional questions will arise at trial.

This court already determined that Massachusetts jurisdiction and venue are appropriate here.  (May 1, 2006 Electronic Order denying Motion to Dismiss for Lack of Jurisdiction).

5.    **Questions Raised By Pending Motions**

Presently, there are no pending motions before the Court, and at this time the Parties do not anticipate that any additional questions will be raised by motion. However, iRacing objects to certain of Robinson's proposed exhibits and witnesses as discussed in Section 12 herein, and may move to exclude certain evidence on the grounds discussed in Section 12.

6.    **Issues Of Law Together With Supporting Authority**

A.    Plaintiff's Issues of Law and Supporting Authority

- *Whether Robinson's infringement had an effect on the potential market for NASCAR 2003 and/or its derivative works.*  Under the Copyright Act, the fourth factor in determining the applicability of the fair use defense is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  "In determining overall market impact, courts ask two questions: (i) the extent of the market harm caused by the specific infringing incident, and (ii) 'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original.'"  Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007) (Gertner, J.) (citation omitted) (finding copyright infringement because factors weighed against finding of fair use); see also Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 567-69 (1985) (reversing finding of fair use).  "This inquiry must take account not

only harm to the original but also of harm to the market for derivative works." Harper & Row, 471 U.S. at 568. This factor is not based on a determination of the plaintiff's actual retrospective damages (which may be irrelevant if plaintiff seeks statutory damages), but rather the prospective effect of a ruling of fair use. (2007 Order at 19 (_citing_ Salinger v. Random House, Inc., 811 F.2d 90, 99 (2d Cir. 1987) (diminution of market value in plaintiff's works "is not lessened by the fact that their author has disavowed the intention to publish them during his lifetime … [h]e is entitled to protect his opportunity to sell his letters"))).

- _The calculation of iRacing's damages for Robinson's copyright infringement._ "[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). In a case where the court finds that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. 17 U.S.C. § 504(c)(2). "Infringement is willful when the infringer knew or should have known that her action was copyright infringement." Fitzgerald, 491 F. Supp. 2d at 190 (Gertner, J.). Statutory damages are not meant to be merely compensatory or restitutionary; rather such damages are intended to discourage wrongful conduct. As such, the statute permits the imposition of additional damages where an infringement is willful. Some factors that may be considered in determining willfulness include the

defendant's continuing disregard for the law, the size of the defendant's operation, the defendant's resistance to production of documents, or the defendant's intent, concealment, or basic lack of respect for others' copyrights.  Venegas-Hernandez v. Sonolux Records, 370 F.3d 183, 195-96 (1st Cir. 2004) (citation omitted) (affirming judgment of copyright infringement).

- *The calculation of iRacing's damages for Robinson's DMCA violations.* "At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just."  17 U.S.C. § 1203(c)(3)(a).  To determine the amount of statutory damages to be awarded per violation, courts look to whether the defendant had reason to believe that his acts were in violation of the DMCA.  Sony Computer Entm't Am., Inc. v. Divineo, Inc., 457 F. Supp. 2d 957, 966-67 (N.D. Cal. 2006) (entering permanent injunction and awarding statutory damages of $800 per DMCA violation).  In determining the number of DMCA violations, courts consider the number of acts of circumvention. Sony Computer, 457 F. Supp. 2d at 966-67 (awarding $2,024,000 in statutory damages, based on 224 distributions of device).  In the absence of concrete evidence as to the number of violations, the Court may, in its discretion, rely on reasonable estimates.  Sony Computer, 457 F. Supp. 2d at 966-67.

- *Whether to award iRacing its costs and attorneys fees.*  In an action for copyright infringement, the Court in its discretion may allow the recovery of full costs and may also award a reasonable attorney's fee to the prevailing party as part of the costs.

18

17 U.S.C. § 505; <u>Gamma Audio & Video, Inc. v. Ean-Chea</u>, 11 F.3d 1106, 1113-14 (1st Cir. 1993) (affirming award of attorneys fees).  In its discretion, the Court may also allow recovery of costs and reasonable attorneys fees for a violation of the DMCA.  17 U.S.C. § 1203(b)(4-5); <u>Sony Computer</u>, 457 F. Supp. 2d at 967 (awarding costs and attorneys fees).

- *Whether iRacing's counsel's attorneys fees and costs are reasonable.*  Reasonable billing rates in Massachusetts for similar firms range from $450 to $575 per hour for partners, $255 to $340 per hour for associates, and $110 to $185 per hour for paralegals for cases involving complex commercial litigation.  <u>Fronk v. Fowler</u>, No. 021216, 2007 WL 1130381, *4 (Mass. Super. Ct. Feb. 23, 2007).  Reasonable billing rates in Colorado for similar firms range from $250 to $300 per hour for mid-level associates, and average approximately $90 per hour for paralegals for cases involving complex commercial litigation.  <u>Colo. Right to Life Comm., Inc. v. Kaufman</u>, No. 03-cv-01454-WDM, 2008 WL 4197790, * 3 (D. Colo. Sept. 10, 2008) (stating hourly rate of $240 an hour for experienced associate was "liberal" and rate of $200 for inexperienced associates was reasonable).

- *Whether to enter a permanent injunction.*  A finding of liability for copyright infringement, combined with the threat of future infringement, justifies the imposition of a permanent injunction.  <u>Cipes v. Mikasa, Inc.</u>, 404 F. Supp. 2d 367, 371-72 (D. Mass. 2005) (denying motion to modify permanent injunction based on copyright infringement).

- *Whether to enter an award of nominal damages for Robinson's breach of the EULA.*
  Under California law, "[a] plaintiff is entitled to recover nominal damages for the
  breach of a contract, despite inability to show that actual damage was inflicted upon
  him, since the defendant's failure to perform a contractual duty is, in itself, a legal
  wrong that is fully distinct from the actual damages.  The maxim that the law will not
  be concerned with trifles does not, ordinarily, apply to violation of a contractual right.
  Accordingly, nominal damages, which are presumed as a matter of law to stem
  merely from the breach of a contract, may properly be awarded for the violation of
  such a right.  And, by statute, such is also the rule in California.  Section 3360 of the
  Civil Code provides: 'Where a breach of duty has caused no appreciable detriment
  to the party affected, he may yet recover nominal damages.'" Sweet v. Johnson,
  169 Cal. App. 2d 630, 632-33 (Cal. Ct. App. 1959) (internal citations omitted).

- *Whether Robinson breached the CDA.*  As iRacing is a resident of Massachusetts
  and Robinson a resident of Texas, the CDA should be governed by either
  Massachusetts or Texas law.  Massachusetts courts employ "a functional choice-of-
  law approach that responds to the interests of the parties, the States involved, and
  the interstate system as a whole." Roll Sys., Inc. v. Shupe, No. 97-12689-GAO,
  1998 WL 1785455, *3 (D. Mass. Jan. 22, 1998).  In a contract case, in the absence
  of a choice-of-law provision, the parties' rights "are determined by the local law of
  the state which, with respect to that issue, has the most significant relationship to the
  transaction and the parties." Roll, 1998 WL 1785455 at *3.  Under Massachusetts
  law, a material breach of an agreement occurs when there is a breach of an
  essential feature of the contract. Teragram Corp. v. Marketwatch.com, Inc., 444

F.3d 1, 11 (1st Cir. 2006) (finding material breach).  Under Texas law, a material

breach of contract has occurred when the breaching party's conduct deprives the

non-breaching party of a benefit it reasonably could have anticipated under the

contract.  Lazy M Ranch, Ltd. v. TXI Operations, LP, 978 S.W.2d 678, 681 (Tex.

App. 1998) (material breach occurred).

- *Whether to enter an award of nominal damages for Robinson's breach of the CDA*.
  Under Massachusetts law, if a plaintiff makes no showing of pecuniary loss, the
  plaintiff is still entitled to nominal damages in a breach of contract action.  Page v.
  New England Tel. & Tel. Co., 9 Mass. App. Ct. 916, 917 (1980) (affirming award of
  nominal damages in breach of contract case).  Under Texas law, a plaintiff may
  recover nominal damages in a breach of contract case when its legal rights have
  been invaded and it either (1) has not sustained an actual loss or (2) has sustained
  an actual loss but failed to prove the amount of the loss.  MBM Fin. Corp. v.
  Woodlands Operating Co., L.P., 251 S.W.3d 174, 180 (Tex. App. 2008) (affirming
  award of nominal damages in breach of contract case).

B.    Defendant's Issues of Law and Supporting Authority

   1.    *When conducting a fair use analysis, a court is not restricted to the four factors enumerated in the statute.*

   Fair use is a mixed question of law and fact, Harper & Row Publishers Inc. v.

Nation Enters., 471 U.S. 539, 560, 105 S.Ct. 2218.  Leadsinger V. BMG Music Pub.,

512 F.3d 522 (9th Cir. 2008).  The "fair use" analysis is a flexible one that a court

performs on a case-by-case basis. Campbell v. Acuff-Rose Music, Inc.,  510 U.S. 569,

577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (citing Harper & Row Publishers, Inc. v.

Nation Enters., 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). Perfect 10 V. Amazon.com,, 508 F.3d 1146, 1163 & 1166 (9th Cir. 2007)

Moreover, a court does not consider these factors in isolation but weighs them together, in light of the copyright law's purpose "to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works." Mattel, Inc. v. Page 530 Walking Mountain Prods., 353 F.3d 792, 799-800 (9th Cir. 2003) (citing Campbell, 510 U.S. at 575-76, 114 S.Ct. 1164).

"The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis. . . . Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." Campbell v. Acuff-Rose Music,Inc.,510 U.S. 569, 577-78, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

Robinson's good faith reliance on Papyrus/Sierra's making available tools and encouraging persons to continue to develop the NASCAR 2003 game are one of the elements to be weighed in the "fair use" analysis.  Harper & Row Publishers v. Nation Enters.,471 U.S. 539, 562-563 (1985).

2.    *Robinson's websites were not commercial sites.*

"Commercial" generally is defined as relating to the exchange or buying and selling of commodities or from the point of view of profit: having profit as the primary aim.   Robinson was not selling anything and did not stand to profit from making the work done by his groups available on his site.  Harper & Row Publishers, 471 U.S. 539, 562 (1985).The fact that one of Robinson's websites permitted one to make a donation to defray the cost of maintaining the site did not maker it commercial.  Griffith v. Fenrick,

486 F.Supp.2d 848 (W.D. Wis, 2007).  <u>American Family Life Ins. Co. v. Hagan</u>, 266 F.Supp.2d 682 (N.D. Ohio 2002).

"The crux of the profit/non-profit distinction is . . . whether the [vendor] stands to profit from exploitation of the copyrighted material without paying the customary price." <u>Harper & Row Publishers</u>, 471 U.S. at 562, 105 S.Ct. 2218 (1985).  Robinson does not stand to gain anything, because the files posted on his websites were available free of charge, and the websites were non-commercial personal sites that did not carry any advertisements or generate any income to Robinson.

   *3.     Robinson's First-Racing-Sucks.com non-commercial gripe site is protected speech.*

The purpose and character of the use of this website was for nonprofit sharing of information.  Robinson's hosting a website inviting comments about First-Racing's tactics was protected speech under the First Amendment. <u>Mattel, Inc. v. MCA Records, Inc.</u>, 296 F.3d 894, 906 (9th Cir. 2002)  <u>Playboy Enterprises v. Netscape Comm.</u>, 55 F.Supp.2d 1070.   <u>Bosley Medical Inst. v. Kremer</u>, 403 F.3d 672, 677 (9th Cir. 2005). <u>See</u> <u>TMI, Inc. v. Maxwell</u>, 368 F.3d 433 (5th Cir. 2004).

   *4.     Robinson was entitled to reverse engineer the NASCAR 2003 game*

Absent Papyrus/Sierra's clickwrap end user license agreement ("EULA"), reverse engineering of the NASCAR 2003 program is permitted under the "fair use" doctrine. <u>Sony Computer Entm't, Inc. v. Connectix Corp.</u>, 203 F.3d 956, 602 (9th Cir. 2000). <u>Bowers v. Baystate Tech, Inc.</u>, 320 F.3d 1317, 1325 (Fed. Cir. 2003).

Plaintiff's claim that Robinson agreed to the terms of Papyrus/Sierra's EULA, that prohibits reverse engineering, is a contract claim, not a breach of copyright claim.

Davidson & Associates, Inc. v. Internet Gateway, 33f F.Supp.2d 1164, 1175 (E.D. Mo. 2004). The question of whether Robinson breached the EULA is a matter of state contract law.  Netbula, LLC v. Bindview Development Corp., 516 F.Supp.2d 1137 (N.D. Cal. 2007).

The EULA provision prohibiting reverse engineering is included in the EULA solely for the benefit of Papyrus/Sierra.  The party for whose benefit the provision is made and who has the right to exact its performance, may waive the provision.   Wyler Summit v. Turner Broadcasting Sys., 135 F.3d 658, 664  (9th Cir. 1998) and cases cited. Fru-Con Cons. v. Sacramento Municipal Util. Dist. No. S-05-583 LKK/GGH (E.D. Cal. 6-15-2007).  A waiver of a provision by conduct can stem from the conduct of a duly authorized agent.  Savaglio v. Wal-Mart Stores, 149 Cal. App. 4th 588  (2007).

A right such as copyright may be waived by inaction.  Veeck v. S. Bldg. Code Congress Intern, Inc., 241 F.3d 398 (5th Cir. 2001).   Sherrod v. American Airlines, 132 F.3d 1112, 1119 n.5 (5th Cir. 1998). Copyright also may be waived as the result of particular acts, even if waiver was not the intended result. Veek, at n. 56. Norma Ribbon & Trimming, Ic. v. Little, 51 F.3d 45,48 (5th Cir. 1995).  Montwillo v. Tull, No. C07-3947 SI (N.D. Cal. 6-2-2008).The historical conduct of Papyrus/Sierra's employees over a ten year period of sanctioning and encouraging owners of the NASCAR racing games to reverse engineer the games, coupled with providing tools to assist in reverse engineering and additional mods to make such reverse engineering easier, constituted a waiver of the EULA prohibition against reverse engineering.  iRacing's owner, John Henry, was the Senior Advisor to Project Wildfire and sanctioned Project Wildfire's release of tools and other files that assisted members of the sim community to do work

inconsistent with the terms of the EULA.

Papyrus/Sierra's use of Project Wildfire top grant permission to the sim racing community to develop new mods and other add-ons is consistent with the primary objective of the Copyright laws.  The primary objective of copyright is to promote the Progress of Science and useful Arts.   Art. I., § 8, cl. 8; Twentieth Century Music Corp. v. Aiken, 422 U.S. 151 (1975).  Feist Publications, Inc. V. Rural Tel. Service Co., 499 U.S. 340, 349 (1991)  "To this end, copyright assures the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work.  Feist, 499 U.S. at 349-50.  This principle is known as the idea/expression dichotomy and applies to all works of authorship.  Id. at 350.  Meridian Project Systems v. Hardin Constr. Co., 426 F.Supp.2d 1101 (E.D. Cal. 2006).

Robinson did not have constructive notice of First-Racing's copyright until May 2005.  First LLC, did not record its assignment with the Copyright Office until May 28, 2005.   Recordation of a document in the Copyright Office is a precondition to giving all persons constructive notice of the facts stated in the recorded document.  17 U.S.C. § 205.

     5.    *There is no demonstrable likelihood of future harm from the past posting of the OWR and OWSC files*

Because Robinson made no commercial use of the files that he posted, there is no presumption of likelihood of future harm.  Cf. MacNamara v. Universal Commercial Svcs., Inc., Civ. No. 07-6079-TC (D. Ore, 9-16-2008).  Nor does loss of a licensing fee for posting the files constitute "market harm."  Fitzgerald v. CBS Broadcasting, Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007).  Because iRacing did not have any product

for sale until three years after the last date that the files were posted, the posting in 2005 had no effect on iRacing's market.  Firzgerald.   The files posted by Robinson are no substitute for the program that iRacing purports to be marketing, and the files cannot be used in conjunction with iRacing's online program.  The files are useable only in connection with the now outdated NASCAR 2003 game, which, unlike iRacing's product,  is geared to armchair race car drivers, not actual  race car drivers, which is iRacing's primary market.  iRacing's "product"  simply is not competing with the NASCAR 2003 game and  add-ons to that game.

Robinson did not work on any mods until after Papyrus/Sierra had lost their right to market the NASCAR 2003 game. The mods that he worked on can only be used in connection with the NASCAR 2003 game that never has been authorized for sale since Robinson created his mods, and that is outdated;  therefore iRacing could not lose any sales of the game.   Compare Salinger v. Random House, Inc., 811 F.2d 90, 99 (2d Cir. 1987) (owner is entitled to defer publication of his own letters).

> 6.  *After Project Wildfire announced that Papyrus/Sierra were releasing tools and encouraging further development of NASCAR 2003,  Robinson was entitled to develop mods and post files*

Robinson never did any development work on the NASCAR 2003 game until almost a year after Project Wildfire disclosed that Papyrus/Sierra were making development tools available and encouraging further development of the NASCAR 2003 game by the sim racing community.   As Papyrus/Sierra's encouraging people to undertake this work is directly contrary to the terms of the EULA, the sim racing community was warranted in concluding that the conflicting provisions of the EULA no longer were operative.

Absent the EULA, a person who has lawfully obtained the right to use the computer program may circumvent technological measures to identify and analyze those elements of the program that are necessary to achieve interoperability of an independently created program.  17 U.S.C. § 1201(f)(1).

**7.**   **Requested Amendments To The Pleadings**

If the defendant's pleading is not deemed sufficient to preserve the issue of Papyrus/Sierra's waiver of the EULA provisions, then defendant would request leave to so assert.  Otherwise, there are no requested amendments to the pleadings, and at this time the Parties do not anticipate any additional requested amendments to the pleadings.

**8.**   **Additional Matters To Aid In The Disposition Of The Action**

There are no additional matters that the Parties believe will aid in the disposition of the action.

**9.**   **The Probable Length Of The Trial**

iRacing anticipates that the trial will be approximately three to four hours in length, as discussed at the status conference held on December 15, 2008.  Robinson anticipates the trial will be two days in length.

**10.**   **Witness List**

A.   <u>By Plaintiff</u>

iRacing expects to present the direct testimony of the following witnesses by affidavit: (1) David Kaemmer, (2) Steve Myers, and (3) Irwin B. Schwartz.  Schwartz' testimony will relate primarily to iRacing's attorneys fees, which topic is relevant to iRacing's potential damages under the Copyright Act.  Each of these witnesses will be

27

made available at trial for live cross-examination, and each may be contacted through counsel for iRacing.  iRacing also anticipates cross-examining Robinson at trial.

B.    By Defendant

Robinson expects to present his own direct testimony and the testimony of Tim McArthur by affidavit.  If no agreement is reached with plaintiff's counsel as to the admissibility of certain proposed exhibits, Robinson intends to subpoena John Henry to testify.   According to counsel for Robinson, each of these witnesses will be made available at trial for live cross-examination.  Robinson also anticipates cross-examining Kaemmer and Myers at trial.  Robinson may be contacted through his counsel.

## 11.    The Proposed Exhibits

A.    By Plaintiff

iRacing expects to present the following exhibits at trial:

- Screen captures from Robinson's *OW-Racing.com* website (Bates Nos. iRacing 00001-00004; 00115-00122; 00191);

- Screen captures from Robinson's *Torn8oAlley.com* website (Bates Nos. iRacing 00005, 00123-00144);

- Screen captures from Robinson's *FIRST-RACING-SUCKS.com* website dated August 1, 2005 (Bates No. iRacing 00006).

- Screen captures of Robinson's forum posts on *FIRST-RACING-SUCKS.com* between March 2005 and August 2005, including: (1) postings by Robinson; and (2) postings by other users in order to demonstrate Robinson's state of mind (Bates Nos. iRacing 00007-00114);

- E-mails between Robinson and iRacing between March and August 2005 (Bates

Nos. iRacing 00145-00164);

- E-mails between Robinson and counsel for iRacing in August 2005 (Bates Nos. iRacing 00165-00167);

- Take-down letters from counsel for iRacing to Robinson and his website service providers from August 2005 (Bates Nos. iRacing 00168-00177);

- The CDA (Bates No. iRacing 00178);

- The EULA (Bates Nos. iRacing 00179-00184);

- The March 2005 "Open Letter to the Community" from Kaemmer to the NR2003 community (Bates Nos. iRacing 00185-00186);

- Screen captures from iRacing.com (Bates Nos. iRacing 00187-00190);

- The iRacing.com website (publicly available at http://iracing.com/);

- Robinson's Responses to Plaintiff's First Set of Interrogatories, dated November 11, 2005;

- Transcript from Robinson's November 15, 2005 Deposition; and

- Robinson's affidavits filed in this action.

iRacing intends on presenting the following evidence for the purposes of establishing iRacing's attorneys fees, which may be relevant to iRacing's damages under the Copyright Act:

- Bills, receipts, and expense summaries outlining iRacing's attorneys' fees and costs related to this action (Bates Nos. iRacing 00192-00272);

- Links to brief biographies of iRacing's counsel, including Irwin B. Schwartz, Lisa Lee Jordan, and Michael G. Andrews (publicly available at www.martindale.com); and

- iRacing's counsel's website (publicly located at www.business-litigation-associates.com).

    B.     By Defendant

Robinson expects to present the following exhibits at trial:

1.     June 5, 2003 email from Jan Kohl;

2.     Project Wildfire website text - July 2003 to July 2004;

3.     Project Wildfire website text - July 2004;

4.     August 1 & October 16, 2003 email exchanges between "Fred Anderson" and Steve Myers;

5.     About.com website text as of May 10, 2004;

6.     October 2006 Q&A from iRacing's website;

7.     *OW-racing.com* website text as of November 27, 2004;

8.     Wikipedia listing of Papyrus games;

9.     BHMotorsports 7-22-03 interview of Project Wildfire;

10.     OWR Mod for NR2003 read me file (Robinson Depn Ex. 9);

11.     December 8, 2004 First-Racing.net postings;

12.     iRacing May 5, 2008 Latest News;

13.     First-Racing.net Application Form;

14.     All email correspondence between Robinson and Meyers and Roubinek, March 4, 2005 - June 22, 2005;

15.     First-Racing.net Open Letter to the Community;

16.     June 28, 2005 U.S. Copyright Office abstract;

17.     June 10, 2005 Open Letter from First – posted on theuspits.com; and

18.    September 12, 2003 Jan Kohl to Official Pits email.

**12.    Remaining Objections To Evidence**

A.    By Plaintiff

iRacing objects to Robinson's presentation of the proposed exhibits and witnesses on five separate grounds: (1) failure to make timely disclosures pursuant to Fed. R. Civ. P. 26; (2) failure to produce documents marked as proposed exhibits in response to earlier document requests; (3) irrelevancy to the limited issues that the Court outlined for trial in the Electronic Order; (4) hearsay; and (5) potential unavailability of certain witnesses for cross-examination.[4]

**Failure To Make Timely Disclosures**

In the First Circuit, when a party fails to make timely disclosures pursuant to Fed. R. Civ. P. 26 (or supplement those disclosures in a timely manner), "the required sanction in the ordinary case is mandatory preclusion" of that evidence.  AVX Corp. v. Cabot Corp., 251 F.R.D. 70, 78-79 (D. Mass. 2008) (granting motion to strike in part and *citing* Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998) (discussing failure to disclose)).

In this action, Robinson never made initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1), and therefore never identified potential witnesses or documents as required in the early stages of this action.[5]  Furthermore, Robinson failed to properly file and serve his pretrial disclosures pursuant to Fed. R. Civ. P. 26(a)(3), as was required on December 22, 2008.  (*See* Docket No. 80 for iRacing's pretrial disclosures).  On

---

[4]    iRacing does not object to Robinson's presentation of exhibits that are also included on iRacing's exhibit list, including e-mails between iRacing and Robinson, Robinson's forum postings, and the Open Letter.

[5]    iRacing served its Initial Disclosures on Robinson on September 22, 2005.

December 30, 2008, iRacing moved to compel Robinson to produce his pretrial

disclosures (Docket No. 81), which motion this Court granted in an Electronic Order on

January 8, 2009.  On January 14, 2009, iRacing assented to Robinson's request for an

extension of time by which Robinson may submit his pretrial disclosures – until January

21, 2009.  (Docket No. 83).  The Court granted the assented-to request in an Electronic

Order on January 15, 2009.  Robinson again failed to properly serve or file his pretrial

disclosures on January 21, 2009.  Rather, counsel for Robinson sent an e-mail to

counsel for iRacing attaching an "unpolished" draft of the parties' Joint Pretrial

Memorandum on the evening of January 21, 2009, which purported to "incorporate

Defendant's disclosures as to facts, witnesses and exhibits."  This draft Joint Pretrial

Memorandum indicated Robinson's intention "to subpoena John Henry to testify" if "no

agreement is reached with plaintiff's counsel as to the admissibility of certain proposed

exhibits."  The e-mail further indicated that copies of his exhibits and a "more polished

draft" of the Joint Pretrial Memorandum would follow the next day.  Neither exhibits or a

"more polished draft" followed the next day.  Robinson finally supplemented his draft at

3:14 pm on January 26, 2009 –hours before this Joint Pretrial Memorandum was due to

the Court.  As of that time, iRacing had still yet to receive full pretrial disclosures or

copies of any of the proposed exhibits from Robinson.

Robinson's failure to make these disclosures in a timely manner has prevented

iRacing from taking discovery into any such documents (depositions, document

requests, interrogatories, requests for admissions, and third party discovery), seeking

additional related documents, reviewing the proposed documents for authenticity, using

any such evidence during the course of motion practice (including at the summary

judgment stage), and reviewing these documents in preparation for trial.  Accordingly,

the required sanction for Robinson's continued non-compliance with Fed. R. Civ. P. 26

is preclusion of any exhibits that Robinson intends to present at trial.  AVX Corp, 251

F.R.D. at 78-79.

Additionally, Robinson should not be permitted to call John Henry to testify, as he

failed to identify Henry as a witness in any disclosures.  AVX Corp, 251 F.R.D. at 78-79.

 Indeed, the present assented-to scheduling order does not provide Robinson with the

right to subpoena hostile witnesses for testimony at trial.  (Docket No. 83, granted on

January 15, 2009).  To the contrary, the scheduling order calls for such witness

testimony to be presented by way of deposition transcript, as the Parties are required to

identify depositions to be used at trial in party's case in chief.  (See Docket No. 83 at 3).

Robinson should not benefit from his failure to take Henry's deposition prior to the close

of discovery, simply so that Henry – a non-percipient witness – can authenticate

documents that Robinson should have authenticated over the three-and-a-half year

pendency of this action.  Furthermore, based on Robinson's history of harassing Henry

through Robinson's websites, it appears that Robinson may have ulterior motives in

threatening to subpoena Henry, such as further harassing Henry, who is an extremely

busy investor pre-occupied with overseeing numerous business enterprises over the

course of any given day.

### Failure To Produce Documents

If a party fails to produce documents in response to discovery requests, that

party should be prohibited from later introducing that previously-undisclosed evidence at

trial.  Fed. R. Civ. P. 37; Aerotech Res., Inc. v. Dodson Aviation, Inc., 191 F. Supp. 2d

1209, 1230 (D. Kan. 2002) (holding audiotape evidence was properly excluded at trial because, among other reasons, it was never produced during discovery).

In this case, iRacing sent a set of document requests to Robinson on September 23, 2005, requesting the production of all documents in Robinson's possession relating to, among other things: (1) NASCAR 2003, or any modifications or derivative works thereto; (2) the hex-editing or reverse engineering of NASCAR 2003; (3) the EULA; (4) Robinson's specific modifications to NASCAR 2003; (5) downloads from Robinson's websites involving any NASCAR 2003 modifications; (6) the Beta Version; and (7) communications between iRacing and Robinson.  (Docket No. 22 at Ex. B).  Robinson responded to these requests on November 21, 2005.  In late November 2005, iRacing believed that Robinson had not adequately responded to certain document requests based on certain of Robinson's online postings, and therefore iRacing moved to compel the production of certain documents.  (Docket No. 22).  Robinson opposed this motion, indicating that "he had no further documents responsive to plaintiff's document requests", at the same time indicating that he would send CDs including any additional files that may be in his possession.   (Docket No. 23 at 4).  Apparently relying on Robinson's assertions, the Court denied the motion to compel in an Electronic Order on December 15, 2005.  Thereafter, Robinson submitted some additional files to iRacing in January 2006, but since that time he has not supplemented his responses to iRacing's document requests. Nonetheless, in his supposed proposed exhibit list in Section 11(B) above, Robinson indicated that he anticipated presenting eighteen categories of documents as exhibits at trial  – many of which have not been produced to iRacing as of January 26, 2009, and many of which appear to be responsive to iRacing's earlier

document requests.[6]

Accordingly, Robinson should be precluded from presenting any exhibits that he previously failed to disclose in response to iRacing's earlier document requests.  Fed. R. Civ. P. 37; Aerotech, 191 F. Supp. 2d at 1230.

### Irrelevancy, Undue Delay, And Confusion Of The Issues

"Evidence which is not relevant is not admissible."  Fed. R. Evid. 402; U.S. v. Lewis, 284 F. App'x. 940, 942-43 (3rd Cir. 2008) (district court acted within its broad discretion in limiting the introduction of peripheral and irrelevant evidence).  Relevant evidence may be also excluded if its probative value is substantially outweighed by the danger of confusion of the issues, undue delay, and waste of time.  Fed. R. Evid. 403; Tuli v. Brigham & Women's Hosp., Inc., No. 12338-NG, 2009 WL 27303, *2 (D. Mass. Jan. 6, 2009) (granting motion to preclude certain evidence because it was outweighed by "the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

In the December 16, 2008 Electronic Order, this Court held that the trial will focus on the following issues: (1) the "Effect on Potential Market" fair use factor; (2) iRacing's damages under the DMCA claim (and the copyright infringement claim if iRacing succeeds on that claim); (3) iRacing's damages for breach of the End-User License Agreement ("EULA"); (4) whether Robinson breached the Confidential Disclosure Agreement ("CDA"); and (5) if Robinson indeed breached the CDA, iRacing's damages

---

[6]     It is difficult for iRacing to determine at this time whether Robinson has previously produced any of these documents, as Robinson has not produced copies of any of the exhibits he anticipates presenting at trial as of January 26, 2009.

for breach of the CDA.  It is not clear to iRacing how many of the proposed exhibits identified by Robinson in Section 11(B) above are in any way relevant to the five issues identified by the Court (particularly because iRacing has not yet had the opportunity to review any of these documents), and as such these exhibits should be excluded based on irrelevance.  Fed. R. Evid.  402; Lewis, 284 F. App'x. at 942-43.  Similarly, the relevancy of John Henry's testimony to the issues identified by the Court in the Electronic Order remains questionable and duplicative of Kaemmer's and Myer's testimony.  As such, Henry should not be required to testify.  Fed. R. Evid.  402. Moreover, even assuming *arguendo* that any of these documents or Henry's testimony are marginally relevant, it appears that their probative value is substantially outweighed by the danger of confusion of the issues, undue delay, and waste of this Court's time, and as such should be excluded.  Fed. R. Evid. 403; Tuli, 2009 WL 27303, at *2.

### Hearsay

The Court may not consider inadmissible hearsay at trial.  Fed. R. Evid. 802; Scott v. Macy's E., Inc., No. Civ.A.01-10323-NG, 2002 WL 31439745, * 6 (D. Mass. Oct. 31, 2002) (Gertner, J.) (excluding hearsay statement at summary judgment).  "A party who seeks admission of hearsay evidence bears the burden of proving each element of the exception that he asserts."  U.S. v. Bartelho, 129 F.3d 663, 670 (1st Cir. 1997) (holding evidence was properly excluded as hearsay and *citing* U.S. v. Omar, 104 F.3d 519, 522 (1st Cir. 1997)).

Here, many of the exhibits purportedly identified by Robinson as proposed exhibits in Section 11(B) above appear to be inadmissible hearsay, including: (1) June 5, 2003 email from Jan Kohl; (2) Project Wildfire website text - July 2003 to July 2004;

(3) Project Wildfire website text - July 2004; (5) About.com website text as of May 10, 2004; (7) Wikipedia listing of Papyrus games; (9) BHMotorsports 7-22-03 interview of Project Wildfire; and (18) September 12, 2003 Jan Kohl to Official Pits email.  If Robinson intends to introduce any of this evidence at trial, it is his burden to demonstrate that his evidence is either non-hearsay or falls within some hearsay exception, or otherwise such evidence is inadmissible.  Fed. R. Evid. 802; <u>Scott</u>, 2002 WL 31439745, at *6; <u>Bartelho</u>, 129 F.3d at 670.

### Unavailability For Cross Examination

When a witness is unavailable to be cross-examined, federal courts approve the remedy of exclusion of that party's direct testimony in order to forcefully protect the rights of cross-examination.  <u>Mathes v. Mid-Century Ins. Co.</u>, No. 4:06-CV-01161-SNL, 2008 WL 222716, *3 (E.D. Mo. Jan. 25, 2008) (if plaintiff is unable to cross-examine witness with regards to the subject matter covered on direct, the Court shall strike that witness's direct testimony in its entirety).

Here, counsel for Robinson has indicated in e-mails that both Robinson and McArthur will be available for cross-examination at trial.  However, if circumstances change and either party will be unavailable for cross examination at trial, their respective direct testimony affidavits should be excluded from evidence.  <u>Mathes</u>, 2008 WL 222716, at *3.

DATED:  January 26, 2009                    Respectfully submitted,


Tim Robinson                                iRacing.com Motorsport Simulations, LLC

By his attorney,                            By its attorneys,

 /S/  Joseph F. Ryan                         /S/  Michael G. Andrews
Joseph F. Ryan (BBO# 435720)                Irwin B. Schwartz (BBO# 548763)
Lyne Woodworth & Evarts LLP                 Michael G. Andrews (BBO# 663452)
12 Post Office Square                        Business Litigation Associates, P.C.
Boston, Massachusetts 02109                 225 Franklin Street, 26th Floor
(617) 523-6655                               Boston, Massachusetts 02110
Fax (617) 248-9877                           (617) 421-1800


## Certificate of Service

        I, Michael G. Andrews, attorney for Plaintiff iRacing.com Motorsport Simulations,
LLC, hereby certify that on this 26th day of January 2009, I filed the foregoing document
with the Clerk of the Court using the CM/ECF system, which will send notification of
such filing to: Joseph F. Ryan, Lyne Woodworth & Evarts LLP, 12 Post Office Square,
Boston, MA 02109, counsel for Defendant Tim Robinson.

                                 /s/  Michael G. Andrews
                                Michael G. Andrews