UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

iRACING.COM MOTORSPORT
SIMULATIONS, LLC
a Delaware Limited Liability Company,
                    Plaintiff,          Civil Action
                                        No. 05-11639-NG

V.

                                        February 5, 2009

TIM ROBINSON individually,
doing business as
www.First-Racing-Sucks.com
doing business as
www.ow-racing.com
doing business as
www.torn8oalley.com,
                    Defendant.

_____


TRANSCRIPT OF BENCH TRIAL DAY 1

TESTIMONY OF TIM McARTHUR AND TIM ROBINSON

BEFORE THE HONORABLE REGINALD C. LINDSAY

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210



DEBRA M. JOYCE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
617-737-4410

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF:

 4   IRWIN B. SCHWARTZ, ESQ.
     MICHAEL G. ANDREWS, ESQ.
 5   NICHOLAS R. CASSIE, ESQ.
     Business Litigation Associates, P.C.
 6   Suite 1860
     500 Boylston St.
 7   Boston, MA 02116
     617-421-1800
 8

 9   FOR THE DEFENDANT:

10   JOSEPH F. RYAN, ESQ.
     Lyne, Woodworth & Evarts LLP
11   12 Post Office Square
     Boston, MA 02109
12   617-523-6655

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open
 3    court before the Honorable Nancy Gertner, United States
 4    District Judge, United States District Court, District
 5    of Massachusetts, at the John J. Moakley United States
 6    Courthouse, 1 Courthouse Way, Boston, Massachusetts, on
 7    February 5, 2009.)
 8              *   *   *   *   *   *   *   *   *
 9         TIM McARTHUR, having been duly sworn by the
10    Clerk, was examined and testified as follows:
11         LAW CLERK:  You can be seated, please.
12         THE COURT:  So his affidavit would come in as
13    the direct examination in as far as it deals with the no
14    CD patch.
15              You want to, then, proceed to cross-examination.
16         MR. SCHWARTZ:  Thank you.
17         THE COURT:  And that would be paragraph 25.
18                    CROSS-EXAMINATION
19    BY MR. SCHWARTZ:
20    Q.   Mr. McArthur, did you download any of the
21    executables that are at issue in this case?
22    A.   No.
23    Q.   At the time?
24    A.   No.
25    Q.   And did you download the NO-CD patch from
```

1   Mr. Robinson at the time?

2   A.   I didn't need to.

3   Q.   But the answer is, no, you didn't?

4   A.   I did not; I downloaded it elsewhere.

5   Q.   You downloaded -- the precise customized NO-CD patch

6   that Mr. Robinson has testified was customized for his

7   open-wheel racing product?

8   A.   There were probably hundreds of NO-CD patches.  I'm

9   not sure which precisely was his, I never downloaded the

10   illegal versions.

11   Q.   So you have no personal knowledge at all about the

12   precise product that Mr. Robinson distributed?

13   A.   No, just hundreds of others.

14   Q.   Okay.  In your experience generally with NO-CD

15   patches, as they apply -- do you have experience with

16   those CD patches as they apply to NASCAR 2003?

17   A.   I do.  I used to release them.

18   Q.   Okay.  And the NO-CD patch for NASCAR 2003 requires

19   that a copy of NASCAR 2003 be installed on the computer

20   as a predicate to it working; isn't that right?

21   A.   You had to have a valid installation of NASCAR 2003.

22   Q.   Right.  And by the word "valid," what do you mean?

23   A.   Well, you had to have the CD purchased from the

24   store, installed just like any other user would.

25   Q.   Right.  So if I purchased one from the store and

PDF created with pdfFactory trial version www.pdffactory.com

1    installed it and then installed your NO-CD patch that

2    you were distributing and then I took it to my

3    girlfriend's house, for example -- assuming I had a

4    girlfriend at the time -- and took that NASCAR 2003,

5    installed it in her computer and then ran the NO-CD

6    patch in that computer, could I run both those games at

7    the same time?

8    A.   In a single-player format?

9    Q.   In any format?

10   A.   In all formats, absolutely not.  I am not familiar

11   with the single-player modes of NASCAR 2003.  I do think

12   it was possible to be able to do that, yes.

13   Q.   Okay.  So, in fact, the NO-CD patch, as this Court

14   has already found, did allow someone to provide multiple

15   copies of the same disk, the same software program on

16   one license?

17   A.   I'm sorry.  Can you rephrase that?

18   Q.   In other words, someone could buy one license from

19   Vivendi, install the NASCAR 2003 on one computer,

20   install the NO-CD patch on that computer, and then turn

21   around and install the same software on another computer

22   and play them both using one license.  It's possible?

23   A.   Sure, sure, anything is possible.  You can download

24   the entire NASCAR 2003 off a ware site and not have a CD

25   at all.

1   Q.   Now, let's just make sure we're talking about the

2   same thing.   When you say a "ware site", you're talking

3   about --

4   A.   Like a piracy site.

5   Q.   -- a site that supports piracy?

6   A.   Yes.

7   Q.   Did you engage in any testing of Mr. Robinson's

8   executables prior to coming here to testify?

9   A.   No.

10  Q.   Okay.   So as you sit here today, you don't know

11  whether someone using Mr. Robinson's executables and

12  Mr. Robinson's NO-CD patch could, in fact, participate

13  in a race with somebody else using the same NASCAR 2003

14  license?

15  A.   I'm sorry, you're going to need to ask that again.

16  Q.   So assuming the executables that are at issue in

17  this case, there's an open-wheel executable and there's

18  a sprint car executable, do you know for a fact that

19  someone using the NO-CD patch that he was distributing,

20  whether they could install his executables on two

21  different computers and race each other?

22  A.   Yeah, I would imagine they could have raced each

23  other, yes.

24  Q.   Okay.

25  A.   Two people with valid --

1  Q.   I beg your pardon?

2  A.   Two people with valid installations or invalid?

3  Q.   Two people with only having bought one NASCAR 2003

4  disk.

5  A.   Yeah, I believe they still could.

6  Q.   Okay.

7       Now, you, I think, as Mr. Ryan has foreshadowed,

8  you were distributing an application that modified the

9  NASCAR 2003 executable, were you not?

10  A.   In early 2004, yes.

11  Q.   And First-Racing at the time, now known as iRacing,

12  sued you to stop you from doing it?

13  A.   They attempted to.

14  Q.   They did sue you, didn't they?

15  A.   I don't remember ever appearing in court, no.

16  Q.   Were you served with a complaint?

17  A.   I was served with a complaint.

18  Q.   Did you stipulate to the entry of a permanent

19  injunction entered by the District Court in the District

20  of Massachusetts?

21  A.   For me to no longer take part in any editing actions

22  in NASCAR 2003.

23  Q.   Are you telling this Judge that you don't know

24  whether you got sued?

25  A.   To me, I'm sorry, there's a difference between a

PDF created with pdfFactory trial version www.pdffactory.com

1  lawsuit that I never showed up in court and I do.  No,

2  would I still do not consider that as being sued, I'm

3  sorry.

4  Q.   Now, did you resent iRacing for having sued you for

5  distributing that executable?

6  A.   Oh, I'm sure.  Yes.  If somebody comes after you for

7  something that they had given you permission for years

8  to do, would you not resent them?

9  Q.   Well, fortunately, my point of view is not an issue

10  in this case.

11       Do you blame John Henry?

12  A.   Do I blame John Henry?

13  Q.   For you having been sued by iRacing?

14  A.   No, I don't necessarily blame John Henry

15  particularly.

16  Q.   How much did iRacing pay you to settle that case?

17  A.   I can't discuss settlement of the case.

18  Q.   You can.

19  A.   Can I?

20  Q.   Yes.  How much did iRacing pay you to settle that

21  case?

22  A.   They didn't pay me a dime.

23  Q.   They didn't pay you a dime?

24  A.   Not a dime.  They just took care of all the attorney

25  work.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Okay.  So let me direct your attention to

2   Mr. Robinson's affidavit.  The direct testimony of

3   Mr. Robinson -- I know you don't have it in front of

4   you, so I'm going to read to you something from --

5        THE COURT:  You can put it on the document

6   camera and it will appear on his screen.

7        MR. SCHWARTZ:  Oh, the document camera.

8        (Discussion off the record.)

9        MR. SCHWARTZ:  Your Honor, if you give me a

10  minute, I just need to find the particular --

11       (Discussion off the record.)

12       MR. SCHWARTZ:  Okay.  Your Honor, I have placed

13  in front of the witness page 13 of Mr. Robinson's trial

14  affidavit.

15  BY MR. SCHWARTZ:

16  Q.   And in particular, if you look at the highlighted

17  text, which is at the end of paragraph 34, it says, "It

18  is my understanding that an out-of-court settlement was

19  reached between the parties" -- referring to the lawsuit

20  against Tim Robinson -- "with first paying a sum of

21  money to purchase Mr. McArthur's files."

22       Do you see that, Mr. McArthur?

23  A.   I can see that on the screen, yes.

24  Q.   Did First-Racing pay a sum of money to purchase your

25  files?

1    A.   I answered they did not.

2    Q.   You turned them over as part of the settlement,

3    didn't you?

4    A.   That's correct.

5    Q.   And did you ever talk with Mr. Robinson about this

6    fact?

7    A.   I, in fact, haven't talked to Mr. Robinson since

8    early 2005.

9    Q.   So Mr. Robinson is just plain wrong when he says

10   that in his affidavit?

11   A.   Obviously, yes.

12   Q.   Okay.

13           MR. SCHWARTZ:   Your Honor, may I hand the

14   witness an e-mail that was just produced to us under

15   your Honor's order compelling production?   We got it, I

16   believe, it was yesterday.

17   Q.   Mr. McArthur, do you recognize this document?

18   A.   I do.

19   Q.   This is an e-mail that you sent to Joe Ryan; is that

20   right?

21   A.   Correct.

22           MR. RYAN:   I object, your Honor.   This is no

23   relation to this NO-CD issue that he's supposedly --

24           THE COURT:   It's regular garden variety

25   impeachment.

PDF created with pdfFactory trial version www.pdffactory.com

1        MR. SCHWARTZ:  Based on bias, especially, your

2   Honor.

3        THE COURT:  All right.  You can have it.

4        MR. SCHWARTZ:  Thank you.

5   BY MR. SCHWARTZ:

6   Q.   What are you referring to in the term "gloating,"

7   sir?

8   A.   I was using your term.  That's the reason it's in

9   quotes.

10  Q.   My term?

11  A.   Yes.  From my understanding, it was -- I'm sorry,

12  iRacing's term, that I was gloating about a settlement.

13  Q.   And you say that was your intention, to have them to

14  be not happy with your gloating; is that right?

15  A.   I guess by me discussing things that you didn't

16  like, yeah, I guess it would be my intention that it

17  made you unhappy.

18  Q.   So you were trying to antagonize iRacing; isn't that

19  what you're saying here, sir?

20  A.   No.

21       MR. SCHWARTZ:  No further questions, your Honor.

22       THE COURT:  Anything?

23       MR. RYAN:  No questions, your Honor.

24       THE COURT:  Thank you very much.

25       MR. SCHWARTZ:  Have a nice flight home.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            THE WITNESS:  I'm sorry?

 2            MR. SCHWARTZ:  I said have a nice flight home.

 3            THE WITNESS:  You, too.

 4            (Recess taken.)

 5            THE COURT:  So, finally, Mr. Ryan, Mr. Robinson.

 6            TIM ROBINSON, having been duly sworn by the

 7   Clerk, was examined and testified as follows:

 8            LAW CLERK:  Please be seated.

 9            MR. RYAN:  As with the other witnesses, you have

10   his written testimony, direct testimony.

11            THE COURT:  Go on, counsel.

12            MR. SCHWARTZ:  Thank you.

13                      CROSS-EXAMINATION

14   BY MR. SCHWARTZ:

15   Q.   Good afternoon, Mr. Robinson.

16   A.   Good afternoon.

17   Q.   Did you ever talk to John Henry?

18   A.   No.

19   Q.   No.  So you never received a, quote, invitation from

20   John Henry to modify the NASCAR 2003 code?

21   A.   No.

22   Q.   No.  What about Steve Myers, did he ever give an

23   invitation to modify the NASCAR 2003 code?

24   A.   Personally?

25   Q.   Yes.
```

1   A.   No.

2   Q.   Did you talk to anyone at Project Wildfire, actually

3   talk to them or e-mail them, where they said, Go ahead,

4   modify the NASCAR 2003 code?

5   A.   I never talked to anybody personally at Project

6   Wildfire, no.

7   Q.   Okay.  What about Sierra?  Anybody at Sierra give

8   you permission to modify the NASCAR 2003 code?

9   A.   No.

10  Q.   Anybody from First-Racing or iRacing give you

11  permission to modify the NASCAR 2003 code?

12  A.   No.

13  Q.   Now, according to your affidavit, you were on

14  vacation in Montana, right, and you came back and you

15  were served with a complaint?

16  A.   That's correct.

17  Q.   How long between when you were served a complaint

18  and when you took the links that -- for the downloads,

19  you disabled those links?

20  A.   I think within a day or so.

21  Q.   Okay.  If you hadn't been served with a complaint,

22  would you have taken them down?

23  A.   If I would have discovered that they were up, yes.

24  Q.   Okay.  So your testimony is that you didn't know

25  that they were up; is that right?

1  A.   That's correct.

2  Q.   I'm going to show you on the document viewer that

3  I've learned how to use today paragraph 39.

4        THE COURT:  All of this fancy high-tech stuff

5  and the document camera is the challenge?

6        MR. ANDREWS:  That's what I've been trying to

7  tell him, your Honor.

8        MR. SCHWARTZ:  Your Honor, one of the things

9  I've learned is that technology is my enemy when it

10  comes to being in a courtroom, because it never seems to

11  work the way I want it to work, especially in trial.

12        (Discussion off the record.)

13  BY MR. SCHWARTZ:

14  Q.   In paragraph 40, actually, you see you say,

15  "Although I own the websites" -- now we're talking

16  about, what, torn8oalley and ow-racing.com?  What

17  websites are you talking about in that paragraph of your

18  affidavit, sir?

19  A.   Excuse me?

20  Q.   You see where it says, "Although I own the

21  websites"?

22  A.   Yes.

23  Q.   What websites are you referring to?

24  A.   I believe I'm referring to torn8oalley.com and

25  ow-racing.com.

1  Q.   And then you say, "Because the sites host races, in

2  my absence, other people have to be able to have access

3  to the sites."

4  A.   That would be a reference to torn8oalley.

5  Q.   You say, "It was a mistake by a part-time

6  administrator while I was away on vacation that led to

7  the re-posting of the link."

8        First off, what link are you referring to there?

9  A.   A link to download either the owr2K5 or the NO-CD

10 patch, I assume.

11 Q.   You don't know what link you're referring to there?

12 A.   Well, this -- when I did this up, it was in

13 reference to a document that you provided, so I sort of

14 went chronologically through that document.  So some

15 document that you submitted I think I was answering to

16 that.  So based on what I see there and what I recall,

17 I'm quite confident that it's related to ow-racing

18 and/or torn8oalley.com.

19 Q.   And was there one link or more than one link

20 involved in the download process of the two files that

21 are at issue in this case?

22 A.   There was two links.

23 Q.   Okay.  So your testimony is that is a typo and

24 should have said "links"?

25 A.   Semantics, if you will.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   All right.

2        Who is the part-time administrator that you're

3   referring to there?

4   A.   At that time it was one of two people.   Could have

5   been somebody named Rob Peterson or somebody named Joe

6   Barlow.

7   Q.   Okay.   Now, I just want to make sure I understood

8   your previous testimony correctly.   Are you saying

9   Peterson or Barlow had access to the torn8oalley website

10  but not the ow-racing website?

11  A.   No.

12  Q.   I thought you just said -- the sentence that says

13  the site hosts races, in my absence, other people have

14  to be able to have access to the sites.   You said that

15  referred to one site.   Did I misunderstand that?

16  A.   Yes, you did.

17  Q.   Okay.   That's both sites?

18  A.   Yes.

19  Q.   Okay.   Is it your position that one of those two

20  gentlemen reactivated the link which you had previously

21  taken down?

22  A.   That's my guess.   I don't know for sure because,

23  like I say, I was on vacation, so I don't know exactly

24  which one of those two may have done it.   I don't know

25  that that they, in fact, did it.   All I know is they had

PDF created with pdfFactory trial version www.pdffactory.com

1   access to the site during that time, and intuitively, it

2   would have been one or the other of those two guys.

3   Q.   So when you say affirmatively that it was a mistake

4   by a part-time administrator, you're just guessing

5   that's what happened?

6   A.   No, I know it was a mistake, because I had created

7   the actual html file, as it were, to -- that contained

8   those links to them, but I had taken them down.

9   Q.   Okay.  Now, you also, by the way, acknowledge that

10  at that same point of the link there was a pop-up or a

11  rollover that said, "bite me first"?

12  A.   Yes.

13  Q.   And who created the "bite me first," sir?

14  A.   I did.

15  Q.   Okay.  So your testimony is you created "bite me

16  first," and "bit me twice," I think, was the other one;

17  is that right?

18  A.   I don't recall what it said, but it was something

19  along those lines, yes.

20  Q.   And that was placed on the web page in the vicinity

21  of where the links ultimately were activated to download

22  the software, right?

23  A.   Say that again?

24  Q.   The graphic that popped up, "bite me first" and the

25  graphic that popped up "bit me twice first," were in the

PDF created with pdfFactory trial version www.pdffactory.com

1  vicinity on the web page where the ultimately activated

2  link caused the download; is that right?

3  A.   I don't actually recall.

4  Q.   Well, you're not claiming that the "bite me first"

5  or the "bite me twice first" -- that wasn't a mistake,

6  was it?

7  A.   No, I created those.

8  Q.   Okay.

9       You recall, sir, early in this case that we

10  served interrogatories --

11       MR. SCHWARTZ:  May I approach the witness, your

12  Honor?

13       THE COURT:  Yes, you may.

14  BY MR. SCHWARTZ:

15  Q.   -- on your counsel.  And in particular, if you take

16  your attention to interrogatory number 7, which is on

17  page 3 of what -- page 2, I'm sorry, of what I just

18  handed to you; is that right?

19  A.   Excuse me?

20  Q.   Is interrogatory 7 on page 2 of what I just handed

21  you?  I gave you a different version than what I have.

22       Do you have interrogatory 7 in front of you?

23  A.   Yes.

24  Q.   You see the question there:  "For each website you

25  identified in response to interrogatory number 6" -- and

1    that would be the websites to which you downloaded these

2    two files -- "identify all persons who contributed or

3    have contributed to its content or existing" -- "content

4    or existence, including but not limited to owners,

5    administrators, and contributing members.  For each such

6    person, identify his or her particular roles," so forth

7    so on?

8          You see your answer:  "I am solely responsible

9    for the existence of the two previously mentioned

10   websites.  I am also solely responsible for downloadable

11   content.  Registered members also contribute to the

12   content."

13         THE COURT:  Where are you reading from?

14         MR. SCHWARTZ:  I'm reading from the answer to

15   interrogatory 7.

16         THE COURT:  I see.

17   BY MR. SCHWARTZ:

18   Q.  And then you give a list.

19         You say, "In addition to torn8oalley, there's

20   one discussion forum administrator named TMan66, but he

21   only has access to discussion forums and FAQ portion."

22         And then you say, "As it relates to

23   ow-racing.com, there are two administrators" -- I'm

24   sorry -- "there are three administrators MaxTone,

25   TMann66 and JoeB."  But again, only for discussion forum

 1  administrative privileges.

 2          We go on, sir, the links that were on the

 3  ow-racing.com website, those weren't in the discussion

 4  forum, were they?

 5  A.   Say that again?  Sorry.

 6  Q.   The links that are the issue in this case, by which

 7  people could download a modified -- or at least an

 8  application that allowed people to modify NASCAR 2003,

 9  those were not in the discussion forum?

10  A.   If you're saying that the front page images that you

11  referred to previously, then, yes, that's a true

12  statement.

13  Q.   Well, isn't it true, sir, regardless of who

14  activated the links, that the links by which users were

15  able to download the files that you created that

16  modified NASCAR 2003, those active links were on the

17  first page, not the discussion forum page, of open-wheel

18  racing?

19  A.   When this came about, that's correct.

20  Q.   Right.  So -- okay.

21          And likewise, on torn8oalley -- were there links

22  posted on torn8oalley, by the way, to download these two

23  files?

24  A.   I don't believe so.

25  Q.   Okay.  Look at your interrogatory number 8.

PDF created with pdfFactory trial version www.pdffactory.com

1   "Identify all persons who are wholly or particularly" --

2   "partially responsible for posting NASCAR 2003

3   modifications for download on any of the websites."

4           Answer:  "I am solely responsible for the

5   downloadable content of the two previously mentioned

6   websites."

7   A.   Correct.

8   Q.   That's your answer, right?

9   A.   Yes.

10  Q.   You don't mention anybody else who might have had

11  partial responsibility while you were on vacation, do

12  you?

13  A.   No.  I said I am solely responsible for the

14  downloadable content.

15  Q.   Right.

16  A.   So I am solely responsible for the downloadable

17  content.

18  Q.   And that includes the files that are at issue in

19  this case, right?

20  A.   Yes.

21  Q.   Okay.

22          I'm going to give you, sir, with the Court's

23  permission, excerpts from your deposition transcript.

24          MR. SCHWARTZ:  These are already in the record,

25  your Honor.

```
 1            THE COURT:  These are separately marked as an
 2   exhibit?
 3            MR. SCHWARTZ:  We submitted, your Honor,
 4   excerpts from Mr. Robinson's deposition, as was required
 5   by the Court's scheduling order.  We are relying on them
 6   as evidence as permitted under, what is it, Rule
 7   36(a)(3).
 8            THE COURT:  I got it, as an admission statement.
 9            MR. SCHWARTZ:  So this cross-examination is in
10   addition to his admissions in his deposition transcript,
11   excerpts of which we filed through the ECF system on the
12   date they were due.
13   BY MR. SCHWARTZ:
14   Q.   Now, I ask you, sir, if you go to page 77 --
15   A.   What page, I'm sorry?
16   Q.   Page 77 of your deposition transcript.
17   A.   Okay.
18   Q.   And I ask you on line 21:  "Was there anybody else
19   who assisted you in making the modifications to the
20   open-wheel racing 2005 product?"
21            And you say, "No."
22            Do you see that?
23   A.   Yes.
24   Q.   And then the next question, I ask you about whether
25   there was a mistake in -- as you testified here today,
```

1    that these files were made available for public

2    download?

3              And you say, "That's right."

4              Now, would you please read for the record lines

5    6 through 14 of page 78?

6    A.   Read lines 6 --

7    Q.   You know what, we'll move this along.

8              MR. SCHWARTZ:   Your Honor, I incorporate into

9    the record lines 6 through 14.

10             Now, look at line 22, please.

11             "Okay.  Does anyone other than you have the

12   ability to modify the ow-racing.com site such as placing

13   links on it?

14             You say, "Currently?"

15             And I say, "No, at the time these links were

16   made live in August 2005?"

17             And you say, "I don't know.  There wasn't

18   supposed to be anybody else but" --

19             And then I ask you, "Don't you need to have some

20   kind of access code to be able to make those types of

21   modifications?"

22             And your answer:  "Well, you need to be able to

23   do so."

24             And you say -- and looking at line 13 through

25   15 -- No, I don't have any recollection or any e-mails

1    or anything suggesting you gave access to anyone.

2            Now, sir, when you were saying "gave access to

3    anyone," weren't you responding to myself when I was

4    saying, Who could have made those links live?

5    A.    To be quite honest with you, I don't recall the

6    context in which -- when you did the deposition, you

7    jumped all over the place so often that it was hard for

8    me to really keep up with what you were doing.

9            What I do know is that there were a couple of

10   individuals that had access to the ow-racing site.  At

11   the time when we took this deposition, I don't recall

12   giving them specific access to do anything on the front

13   page or anything like that, but, apparently, I did.  I

14   mean, that's the only way that that could have happened.

15           So in -- when I was leaving for vacation to go

16   to Montana, I probably overlooked something that gave

17   them more access than what I thought I was giving them

18   is really my only explanation as to why they would have

19   had the ability to make those links come back available

20   when they had been offline for, you know, four, five

21   months.

22   Q.    Now, you recall, sir, don't you, that you have

23   submitted a number of affidavits in this case before

24   this trial affidavit that we've just been looking at?

25   A.    I've submitted a lot of things.

1  Q.   That's right.   And would you agree with me that in

2  no affidavit prior to the trial affidavit that you just

3  submitted this last week you ever identified a part-time

4  administrator as being responsible for making those

5  links live?

6  A.   I may not have called anybody a part-time

7  administrator, but right on this back page -- one of

8  these pages we were just talking about I think we said

9  it was a mistake that it got put on there.   You asked

10  me, Does to anybody else have the ability to modify

11  ow-racing?   And I asked you, Currently?   You asked, At

12  the time.   You know.

13  Q.   But I'm asking you a question, sir, which is, before

14  your trial affidavit in this case, had you identified

15  anybody who had the ability to make those links live

16  until you just said in your trial affidavit that it was

17  some part-time administrator?

18  A.   Well, we talked earlier about these three

19  individuals mentioned here in -- somewhere, wherever you

20  were looking at.

21  Q.   I think you're referring to your response to

22  interrogatory number 7, but don't you agree with me,

23  sir, that as to those, it was just access to the

24  discussion forum and the FAQ section?

25       (Pause.)

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   I think you're trying to narrow it just a little bit

2   more than what really was there just by the way these

3   websites are constructed.  So giving somebody an

4   administrative privilege, if not done correctly, could

5   give them more access than what I may have intended.  So

6   to say -- to say what you're saying there, you know, I

7   don't really know.

8   Q.   Okay.  Are there any documents in your possession,

9   sir, that would reflect that it was actually another

10  person who made those links live other than yourself?

11  A.   Say that again?

12  Q.   Do you have any documents, any proof that you

13  authorized them by mistake or any type of digital record

14  or paper record that would support your position here

15  today that it was somebody other than you that made

16  those links live?

17  A.   No.

18  Q.   What makes you think that Tim McArthur was paid to

19  set up -- by First-Racing for purchase of his files?

20  A.   That was an assumption that I made based on my

21  analysis, as it were, of things that had been said and

22  done in the sim racing community subsequent to his

23  settlement, I guess, if that's what you want to call it.

24  Q.   So it was some kind -- you were basing it on some

25  kind of folklore?

```
 1   A.   No, to characterize it as folklore is ridiculous.
 2   Q.   Well, I want to know, what was the basis?  You made
 3   a representation under oath to this Court that Tim
 4   McArthur was paid for his files.  There's got to be a
 5   basis for that.
 6          MR. RYAN:   Objection.
 7   A.   That was my opinion.
 8   Q.   And based on what?
 9   A.   Based on an assumption I had.  Clearly, I didn't
10   have any inside knowledge of Tim McArthur being paid.  I
11   just made an assumption.  Usually when somebody talks
12   about a settlement, you know, I interpret sometimes to
13   mean there's a payment paid.
14          Whether or not there was a payment made, I don't
15   know; I don't care.  I assumed there was.  If there
16   wasn't, I was wrong.
17   Q.   Anything else in here that you assumed on a
18   similarly weak basis?
19   A.   I don't know.  Do you want to go into some of it?
20   Q.   No, I'm asking, you, sir.  You put this in an
21   affidavit to this Court --
22          THE COURT:   I think I've heard enough.
23          MR. SCHWARTZ:   Thank you.
24   BY MR. SCHWARTZ:
25   Q.   Have you ever used race2play.com?
```

1    A.    Yes.

2    Q.    And are you a subscriber to race2play.com?

3    A.    Currently I think I'm considered a guest.

4    Q.    Okay.  Would you tell the Court what race2play.com

5    is?

6    A.    It is an online gathering place that people race sim

7    racing games.

8    Q.    Okay.  So is NASCAR 2003 on race2play.com?

9    A.    Currently, I don't believe so.

10   Q.    Okay.  Let's assume with me for a moment that your

11   mod was never shut down by the Court or by your

12   agreement to take it down.  Let's assume it was

13   available from 2005 to the present.  Is there anything

14   that would have prevented your mod from being available

15   to play on race2play.com?

16   A.    That would be up to the people that run race2play,

17   not me.

18   Q.    Right.  But they could have, correct?

19   A.    I suppose.

20   Q.    Right.  So just so I can complete the picture, I

21   hope, in the Judge's mind, on race2play.com, tell me

22   what happens.  What goes on on that website?

23   A.    I just told you, people gather there to race online

24   games, much like they do at iRacing, the difference

25   being that iRacing is a web-based sort of deal, as I

1    understand it.   Race2play you have to own the software

2    that they're hosting a race for to be part of that

3    particular race.

4    Q.   Do you know who owns race2play.com?

5    A.   Yes.

6    Q.   Who does?

7    A.   Tim McArthur, and he has a partner.

8    Q.   Okay.

9         Now, let me just make sure I understand how it

10   was that the applications that were available for

11   download for that short period of time from your

12   website, how they actually worked.   I think you've

13   already testified that you needed to own a copy of

14   NASCAR 2003, you, the end user, the person who downloads

15   it, in order for your application to work at all; is

16   that right?

17   A.   That's correct.

18   Q.   And if someone downloaded your application and then

19   ran it, what happened?

20   A.   Which application?

21   Q.   Let's take, for example, the open-wheel racing --

22   let me just get the actual name of it, the owr2k5 file.

23   A.   Okay.

24   Q.   They download that file from your website and run

25   it.   What happens?

1   A.   You clearly demonstrated that during the deposition,

2   that -- because you did it or you had it or something,

3   and you downloaded, double clicked on it, installed it,

4   and it didn't work.

5   Q.   Right.  Are you saying that your open racing 2K file

6   didn't work?

7   A.   No.  You asked a question, what would happen if you

8   downloaded that file and double clicked on it after it

9   was installed.  It wouldn't work.

10  Q.   What was supposed to happen?

11  A.   What's supposed to happen is it gets installed

12  correctly into your NASCAR 2003 folder, directory,

13  whatever you want to call it, and then, and only then,

14  would the game work with owr2k5 that worked.

15  Q.   And what did it do when it worked?

16  A.   It allowed you to have an open-wheel racing

17  experience in an Indy-style race car.

18  Q.   And did it copy the NASCAR 2003 executable that was

19  residing on the end-user's computer?

20  A.   No.

21  Q.   Did it edit or modify that executable?

22  A.   No.

23  Q.   Then how did it create the experience that you've

24  just described?

25  A.   The executable was part of the install package that

1   somebody would ultimately install in their machine.

2   Q.   So you distributed an executable file that was

3   modified already for NASCAR 2003; is that right?

4   A.   Yes.

5   Q.   Okay.  And there was no operation of the open-wheel

6   racing or the owr2k5 file that did anything to the

7   existing file, the existing NASCAR 2003 file?

8   A.   Which existing file?

9   Q.   The one that the end user would have had on their

10  system already when they downloaded your file.

11  A.   There's hundreds of files that are part of 2003.

12  Which file are you referring to?

13  Q.   Did it modify any of them?

14  A.   I honestly don't specifically recall if we actually

15  modified any files that were already there.  Most of

16  what we included, as I recall, was new content, as it

17  were, to go along with the open-wheel experience, if

18  that's what you want to call it.

19  Q.   So -- I'm sorry.  What I'm trying to get at is when

20  someone was trying to run your open-wheel experience,

21  were they running the NASCAR 2003 software that they had

22  already installed or were they running some entirely new

23  software that you had distributed to them through the

24  download link?

25  A.   They're running both.  I mean, because we made use

PDF created with pdfFactory trial version www.pdffactory.com

1    of some of the existing components that were in NASCAR

2    2003, and we obviously had new components.

3    Q.    Okay.

4           Let me direct you to Exhibit C, which should be

5    in the binder in front of you.

6    A.    Excuse me?

7    Q.    Exhibit C.

8    A.    B or C?

9    Q.    C as in Charlie, please.

10    A.    Okay.

11    Q.    Just want to confirm, is this Exhibit C an e-mail,

12    at least the bulk of it, that you sent to Steve Myers in

13    around March 4, 2005?

14    A.    It appears to be, yes.

15    Q.    Okay.  And when you say, It does and will use highly

16    modified NR2000 physics, what do you mean by that?  I'm

17    looking at the fifth paragraph.

18    A.    Looking at what?

19    Q.    The fifth paragraph.  "It does and will use highly

20    modified NR2003 physics."  Do you see that?

21    A.    Yes.

22    Q.    What do you mean by that?

23    A.    Exactly what it says.

24    Q.    Okay.  Does that mean you're modifying the

25    executable, NASCAR 2003 executable?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    Okay.  And you don't claim, do you, that you somehow

3    needed to get confirmation from the copyright office

4    before you understood that First-Racing purchased the

5    copyright from Vivendi?

6    A.    Say that again?

7    Q.    Are you claiming that you didn't know that

8    First-Racing purchased the copyright from Vivendi unless

9    you could confirm it at the copyright office?

10   A.    As I recall at the time this e-mail was sent, I

11   don't think anybody knew that First-Racing or anybody

12   else other than Sierra, Papyrus, Vivendi, whoever, owned

13   the copyrights.

14   Q.    Okay.  But you say here that "the copyright you

15   purchased."  That's you talking to Steve Myers, right?

16   A.    Yes.

17   Q.    Okay.

18   A.    What did you say I just said?

19   Q.    Yeah, you in this e-mail said to Steve Myers, "the

20   copyright you purchased enables you to modify the

21   physics which then protects your version," right?

22   A.    I'm not sure where that is.

23   Q.    If you look at the paragraph that begins, "You

24   bought the rights to the code and objects, not the

25   entire product" -- it's one, two, three --

1  A.   I see it now.

2  Q.   And then keep going -- "The copyright you purchased

3  enables you to modify the physics, which then protects

4  your version of your own executable."

5  A.   That was based on a phone call that I had with him

6  previous to this e-mail where he said to me on the phone

7  that they had purchased the copyright.

8  Q.   Okay.

9  A.   I still at that point didn't have any proof other

10 than what he said that they, in fact, did own the

11 copyright, because he was representing First-Racing.  To

12 the best of my knowledge, at that point, aside from

13 things that had gone on in the sim racing community, the

14 assumption on my part was that Sierra, whoever, still

15 actually owned them.  I mean, anybody could say -- I

16 could tell you I owned them.

17 Q.   Well, let's in --

18 A.   But, in fact, I didn't.

19 Q.   Let's assume for a moment iRacing didn't own them.

20 Would that make it anymore legal what you did under

21 copyright law?

22 A.   I don't know.  All I know is that in 2004 when the

23 game -- you know, sometime in April of 2004, the product

24 had pretty much been abandoned.  And in fact, Project

25 Wildfire came online at some point and basically

1   reiterated the fact that the game had been abandoned by

2   Sierra, they weren't going to produce anything, Papyrus

3   wasn't doing anything, and that it could be inferred

4   from the mission statement on Project Wildfire's

5   website, in fact, that they were going to distribute

6   tools so that people could enhance and modify the game

7   and continue down the road of keeping NASCAR 2003 alive,

8   which is when I undertook the whole effort of coming up

9   with something related to open-wheel racing.

10  Q.   Sir, in your affidavit you say that in September

11  2003 product -- this is paragraph 10 --

12  A.   I'm not sure I have that here.

13  Q.   Here.

14       MR. SCHWARTZ:   I can hand the witness another

15  copy of his affidavit with the Court's permission.

16  A.   What am I looking at?

17  Q.   Paragraph 10, page 4.

18  A.   Okay.

19  Q.   You say, "Project Wildfire released the CTS mod that

20  used modified physics."  What's your basis for saying

21  that?

22  A.   Statements on Project Wildfire's website.  They, in

23  fact, admitted to having modified physics for the

24  Craftsman Truck Series.

25  Q.   Modified from what, sir?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Modified from the original game.

2   Q.   Well, you heard Mr. Myers testify that there were

3   additional physics models downloaded to NASCAR 2003

4   through a patch.  Do you remember that?

5   A.   Mm-hmm, and that's --

6   Q.   Is that the modified physics you're talking about?

7   A.   Yes.

8   Q.   So that was what Sierra itself released to the game

9   through a patch, right?

10   A.   Sierra did not release the CTS model.

11   Q.   Didn't that come down through a patch distributed --

12   A.   No.

13   Q.   Okay.  Well, let me take that back.

14        The physics models that the CTS mod was based on

15   were a part of the patch that Sierra released to NASCAR

16   2003, right?

17   A.   I don't believe that's true.

18   Q.   Do you know one way or another?

19   A.   Based on my knowledge, Sierra released a patch, as I

20   recall, in September of 2003 that fixed various bugs

21   associated with the game that we had been playing from

22   February, whenever it was, to that point.  And that

23   patch fixed those bugs and also, apparently, gave the

24   ability to unlock other physics that were now part of

25   the game.

1    Q.   When you say "apparently," you heard Mr. Myers

2    testify earlier today how that patch was distributed,

3    didn't you?

4    A.   Yes.

5    Q.   And you heard him testify that there were additional

6    physics models included in that patch?

7    A.   Yes.

8    Q.   Isn't that what is in the -- I don't know if you

9    read the blog that your attorney submitted to the Court

10   today, but isn't that what the blog says?

11   A.   Isn't -- say it again?  Sorry.

12   Q.   That Mr. Myers said in his blog, as was confirmed

13   today in his testimony, that he caused additional

14   physics models to be released into the NASCAR 2003

15   product through the patch download?

16   A.   Yeah, I think he said that.  But I think what he

17   meant -- or at least my interpretation of what he meant

18   is that, yeah, there was a patch and it had the ability

19   to have additional physics.  That release of the patch

20   didn't enable the CTS mod physics, it didn't enable the

21   Trans Am mod physics just by downloading that patch.

22   Q.   Do you know that or just surmise?

23   A.   I know that for a fact.  Because just -- in fact,

24   you even, during my deposition, proved that, because

25   your game would not operate until you downloaded the

1   patch, because you had to get an update on your

2   computer.  That same patch is what he's talking about.

3   It had the capability of the additional physics, but

4   just downloading that patch did not give you the CTS

5   mod, the Busch Grand National mod, and whatever -- the

6   TA -- so-called PTA mod.

7   Q.  Sir, my question is:  Is it your testimony that, in

8   fact, Project Wildfire modified the executables that

9   were provided to it and all other NASCAR 2003 licensees

10  through that patch?

11  A.  Say that again?  Because I think you're confusing

12  the issue.

13  Q.  I don't think I am confusing the issue, sir.

14  A.  Repeat the question for me.

15  Q.  The question is:  Is it your testimony that Project

16  Wildfire modified the executables, modified the physics

17  engines that were installed in NASCAR 2003 by means of

18  the patch that Mr. Myers previously testified to?

19          MR. RYAN:  Objection.

20          THE COURT:  Overruled.  Go on.

21  A.  Do I think that Project Wildfire modified the

22  physics?

23  Q.  Yes, that was provided to the NASCAR 2003 licensees

24  through the patch that Mr. Myers already testified to?

25          MR. RYAN:  Objection.

1          THE COURT:  Overruled.

2    A.   Yes, I think that was my assumption at the time.

3    Q.   It was your assumption.  Okay.

4          Do you have anything to demonstrate that Project

5    Wildfire modified those executables other than your

6    assumption?

7    A.   Their own words on their website.

8    Q.   You want to show us these words, sir?

9          Let me direct your attention to the exhibit that

10   you submitted for this proposition, Exhibit 2 --

11         THE COURT:  Is it 2 to his deposition?

12         MR. SCHWARTZ:  It's Exhibit 2 to his transcript.

13         THE COURT:  To the deposition transcript.

14         To the affidavit.

15         MR. SCHWARTZ:  To the affidavit.  I apologize,

16   your Honor.

17   BY MR. SCHWARTZ:

18   Q.   Do you have Exhibit 2?

19         MR. SCHWARTZ:  I don't know if he does, your

20   Honor.  I just gave him --

21   A.   You just handed me --

22   Q.   I handed you the transcript.

23         This is Exhibit 2, at least as received from

24   your counsel.

25         THE COURT:  It's the website, it says, "Project

1    Wildfire, the tradition continues"?

2          Mr. Schwartz, is that what you're showing him?

3          MR. SCHWARTZ:   I gave him my copy, your Honor.

4    Mr. Ryan didn't provide a set of his exhibits.

5          Yes.   "The tradition continues."

6    BY MR. SCHWARTZ:

7    Q.   Where on it does it say here that Project Wildfire

8    modified an executable?

9    A.   The second or third sentence of the mission

10   statement says, However, they provided the sim racing

11   community the ability to modify the simulation having

12   added three new physics engines.   It says it right

13   there.

14   Q.   It says they -- who's they in that sentence?

15   A.   Papyrus.

16   Q.   Papyrus.   So isn't that consistent with what

17   Mr. Myers just testified, is that the physics engines

18   were downloaded through the patch to everybody who was a

19   NASCAR 2003 subscriber?

20   A.   The capabilities of using those physics was

21   downloaded through the patch, yes.   The CTS mod, which

22   is what you were referring to, I think, a few minutes

23   ago, was not part of that patch.

24   Q.   I'm not talking about the mod, I'm talking about the

25   physics mod that supports the CTS mod.

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   It was my understanding, based on Project Wildfire's

2    own websites, that they modified the -- among other

3    things, the executable to support the CTS mod.

4    Specifically, I remember there having to be a distinct

5    pattern in which you had to download all these mods, the

6    GNS mod, the CTS mod.  If you didn't do it in a certain

7    order, it would break other parts of the game.  And, as

8    I recall, that was due to the way they modified the

9    physics for each of the mods.  Because, if I'm not

10   mistaken, the GMS mod was released prior to the CTS mod

11   that you were referring to a minute ago --

12   Q.   So is -- I'm sorry.

13            THE COURT:  I'm not sure I understand.

14            What difference would it make if all of these

15   mods could only operate if you also had the patch that

16   had been released by Papyrus and if that patch was

17   subject to the EULA that everybody signed?  What

18   difference does it make?

19            In other words, whatever modifications there

20   were could only be run if they were -- if someone also

21   had the patch; is that fair to say?  The patch made it

22   possible --

23            THE WITNESS:  Which modification?

24            THE COURT:  The CTS mod, for example.  Those

25   were mods that required this patch, correct?

1           THE WITNESS:  That's right.

2           THE COURT:  And the patch had been released by

3    Papyrus.

4           THE WITNESS:  Papyrus, Sierra.

5           THE COURT:  So the legal question -- this is for

6    me to decide -- is whether or not that was subject to

7    the initial EULA for anybody who had the NASCAR 2003

8    software.

9           Okay, go on.

10          MR. SCHWARTZ:  Your Honor, I think I've

11   exhausted it with this witness.  I personally don't

12   think it's relevant, although though your Honor has been

13   taking a lot of testimony on it.  If your Honor desires,

14   I can recall Mr. Myers to clear up this question about

15   what was actually included in the patch, since

16   Mr. Robinson disagrees with what Mr. Myers testified.

17          THE COURT:  And link this to why this is

18   relevant?

19          MR. SCHWARTZ:  My problem is, I'm responding to

20   an argument in this case that says that because this

21   entity, Project Wildfire, released mods that we contend

22   were just graphic mods using existing physics engines,

23   and therefore, there was no modification of the

24   executables.  They're arguing that somehow induced

25   Mr. Robinson to violate copyright law and somehow

1    justifies him doing what he did.

2         THE COURT:  But you already have testimony that

3    the only thing that was released were modifications that

4    affected the graphics and nothing more.  So you have

5    that testimony --

6         MR. SCHWARTZ:  But Mr. Robinson just

7    contradicted that testimony now --

8         THE COURT:  So the question is who I believe.

9         MR. SCHWARTZ:  Yes.

10        THE COURT:  Thank you, Mr. Robinson.

11        Anything further?

12        MR. SCHWARTZ:  That's it, your Honor.

13        THE COURT:  Thank you very much.

14        Anything further, Mr. Ryan?

15        MR. RYAN:  No questions, your Honor.

16        (End of testimony of Mr. Robinson.)

17              *   *   *   *   *   *   *   *   *

18

19

20

21

22

23

24

25

```
 1                - - - - - - - - - - - -

 2                    CERTIFICATION

 3          I certify that the foregoing is a correct

 4     transcript of the record of proceedings in the

 5     above-entitled matter to the best of my skill and

 6     ability.

 7

 8

 9

10     /s/Debra M. Joyce                    _____
       Debra M. Joyce, RMR, CRR            Date
11     Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



INDEX

WITNESS                                                        PAGE

TIM McARTHUR

    Cross-Examination by Mr. Schwartz                            3

TIM ROBINSON

    Cross-Examination by Mr. Schwartz                           12

PDF created with pdfFactory trial version www.pdffactory.com



PDF created with pdfFactory trial version www.pdffactory.com