UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

iRACING.COM MOTORSPORT SIMULATIONS LLC, )
a Delaware Limited Liability Company, Plaintiff )
)
V. ) Civil Action No.
) 05-11639 NG
TIM ROBINSON, individually and d/b/a )
www.ow-racing.com and www.torn8oalley.com, )
Defendant )
--------------------------------------------------------------------

DEFENDANT TIM ROBINSON'S POST-TRIAL MEMORANDUM

Pursuant to leave granted by the Court in its Briefing Order of March 4, 2009, the defendant Tim Robinson respectfully submits the following:

A. Copyright Infringement

1. Fair Use: Did Robinson's infringement have an effect on the potential market for NASCAR 2003 and/or its derivative works?

What was the extent of the market harm caused by his infringing conduct, and would unrestricted and widespread conduct of that nature have a substantially adverse impact on the potential market for the original or derivative works? See Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 190 (D. Mass. 2007); see also Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 568 (1985).

*Sierra/Vivendi suffered no market harm*

The game was pulled off the market effective April 1, 2004, because Sierra/Vivendi, the then-owner of the game, had lost the license rights to the NASCAR name and therefore could no longer market the NASCAR2003 game or, for that matter, any other game featuring NASCAR.

Long before Sierra/Vivendi pulled the NASCAR2003 game off the market, they knew that the NASCAR2003 game was to be the last NASCAR game that Sierra/Vivendi would

Page -1-

release. Even before release of the NASCAR2003 game to the retail market, the person responsible for developing the series of NASCAR games over the years, David Kaemmer, had left Sierra/Vivendi's employment; he was serving only as a consultant.

In the summer of 2003, while NASCAR2003 was still available for retail purchase, Steve Meyers of Sierra/Vivendi, with the blessing of his superior, established a group, "Project Wildfire", dedicated to enabling the sim community to continue to develop and to enhance the NASCAR2003 game.[1] The August 20, 2003 notice on the Project Wildfire website reads in part:

> We know that some of you have figured out how to unleash the PTA physics but we're still going to release an installer that *unlocks the physics so that you can start playing with them*. This is basically a no frills install but we're working hard to bring you a full blown mod in the near future. [Emphasis supplied].

By Sierra/Vivendi's release of files and tools to Project Wildfire,, Sierra/Vivendi led Modders in the Sim Community to believe, and the general consensus was, that people could basically do whatever they wanted to the sim. From August 2003, while the NASCAR2003 game still was available for retail purchase, Project Wildfire released a very substantial number of files and tools, essentially all of which would constitute violations of Sierra/Vivendi's EULA if Sierra/Vivendi had not granted Project Wildfire permission to create files and to post files

---

[1] iRacing has not been candid with the Court about Project Wildfire:

In his blog on the iRacing web site Steve Meyers disclosed: "Rich [Reilly, Papyrus General Manager]also let me start the infamous Project Wildfire as a final thank you to all our loyal customers. I started this group and had these physics models made because I wanted the commubnity to have a legal way tocreate somethjing for themselves to contribute to the community." Steve Meyers' first blog on iRacing web site.

In iRacing's Motion in Limine to exclude testimony relating to Project Wildfire (Docket No. 106), iRacing suggests that it knew very little about the either the formation or purpose ofProject Wildfire: "Project Wildfire . . . <u>apparently</u> was a group of a small number of 'sim racing enthusiasts' formed in 2003, <u>purportedly</u> 'for the express purpose of continung to enhance NASCAR2003.'" Emphasis supplied.

created by others in the sim community.[2]  With Project Wildfire releasing mods, track editing tools, and other editing tools, it was widely believed that "modding" was not just OK, it was being encouraged. Project Wildfire continued to release and to post numerous files, including new mods using new physics, until after Sierra/Vivendi were required to withdraw the NASCAR2003 game from retail sale in April 2004 when it lost its NASCAR license.

After April 1, 2004, the NASCAR2003 game no longer was available for sale and support for the game was essentially abandoned by Sierra/Vivendi. It was not until after Sierra/Vivendi had to pull the NASCAR2003 game off the market, and it was not until almost a year after Project Wildfire had started posting files on its web site with Sierra/Vivendi's knowledge and support, that Robinson first undertook to work on creating any files.

*iRacing suffered no market harm*

When iRacing purchased the copyright to the NASCAR2003 game, it purchased with full knowledge that Project Wildfire had been releasing tools and files and had been encouraging the sim community to create files for about a year.  During all the time that Project Wildfire was creating, releasing and posting files that by necessity involved someone's violation of the terms of Sierra/Vivendi's EULA, Project Wildfire's senior advisor was John Henry.  He therefore knew, authorized and encouraged Project Wildfire's work.

About the same time Robinson first undertook to work on creating any files, Project Wildfire stopped releasing new files and removed all of the old files from its web site.  The

---

[2] Steve Meyers states that iRacing has no objection to creation of certain files, such as tracks and car paint, but even track files and car paint files require that the creator either violate the EULA or use tools that were created by violating the EULA.  By its terms the EULA is not limited in scope just to the file containing the physics.

"Press Release" notice posted on Project Wildfire's web site did not disclose that there had been any change in Sierra/Vivendi's ownership of rights to the NASCAR2003 game. Rather, it stated that Project Wildfire, "the internet based creator of many popular NR2003 modifications" now was going to begin working "on an exciting new racing experience."

> **Project Wildfire (PWF) Press Release**
>
> Project Wildfire, the internet based creator of many popular NR2003 modifications, is pleased to announce that we have been signed on to help in the creation of a retail racing product, We will begin work on an exciting new racing experience immediately, We are very proud of what we have achieved and are equally thrilled that a development studio has recognized our talents, We look forward to discussing our future plans with you, and when the time is right we will provide you with additional details.
>
> Our site will remain active and our forums will remain up. However, we will be removing all downloadable content from our site.
>
> Thanks for making this a very enjoyable experience for us all. The tradition will continue",
>
> -The Project Wildfire Staff

There was no disclosure that the "exciting new racing experience" would be a re-hash of the NASCAR2003 game. There was no disclosure that John Henry had acquired any rights to Sierra/Vivendi's copyright. There was no disclosure that now it would be unlawful for anyone to create any new files for the NASCAR2003 game. By then, in addition to Project Wildfire's creation "of many NR2003 popular modifications" numerous other groups had created new files for use with the NASCAR2003 game including some transformative works as well. The implication from Project Wildfire's Press Notice was that they were going to produce a new transformative work, so they had no further interest in the NASCAR2003 game, but that sim racers still using the NASCAR2003 game were free to continue to do whatever they wished with that game.

There was no hint that John Henry, who for the better part of a year had encouraged sim racers to create and freely release and share files of all types and description that modified the NASCAR2003 game, now was asserting that he owned them all and that now it was illegal for

Page -4-

anybody to create files.

Thus, the context in which Robinson undertook to participate in developing files that would give something back to others in the sim racing community was: (a) the NASCAR2003 game was no longer available for retail sale; (b) Sierra/Vivendi had lost rights to the NASCAR license and had no plans ever to sell another NASCAR game; (c) Sierra/Vivendi had, through the vehicle of Project Wildfire, given its blessing and support to letting the sim racing community create new files and modify the NASCAR2003 game in whatever ways they wished; (d) Project Wildfire and its senior advisor John Henry created, released and posted files modifying the NASCAR2003 game without hinting in any way that there were any restrictions on what was permissible.

Robinson and those working with him took a strictly stock car racing game and completely changed the cars, tracks and physics into an Open wheel game. The resulting file clearly added to the original "a further purpose or different character, altering the first with new expression, meaning, or message" and thus by definition was transformative. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 1994).

The transformative works that Robinson posted never have had, and could not have had, any impact on the market for the NASCAR2003 game. They could not have any impact on the NASCAR2003 game because (i) the NASCAR2003 game still cannot lawfully be sold, and (ii) Robinson's files cannot be used unless one has a valid copy of NASCAR2003 already installed on the computer.[3]

---

[3] The NO-CD file that Robinson created did not permit one to run the NASCAR2003 game. There already were (and still are) a slew of NO-CD files available on the internet to permit one to do that. Robinson's NO-CD file permitted one to run his transformative file which could not be run unless one had a valid copy of NASCAR2003 already installed in their computer. Plaintiff's attorney demonstrated this during Robinson's deposition when he tried to

The transformative works that Robinson posted also never has had any impact on the market for iRacing's online program.  Robinson's files could not have had any impact on iRacing during the only times that they were posted in 2004-2005, because iRacing did not offer any product to the general public then, or until more than three years later, in the summer of 2008.  By the summer of 2008 the NASCAR2003 game had not been available for retail sale for over four years, and therefore Robinson's files could not attract new users to NASCAR2003 and away from iRacing's product.

Robinson's files could not have any impact on iRacing for the additional reason that the product that iRacing did commence offering in the summer of 2008 does not compete with the NASCAR2003 game.  iRacing's web site describes its product as "Leading Edge Driver Development Software," "Professionally Sanctioned Global Competition," and "The Next Generation of Racing is Here."  NASCAR2003 is not a leading edge driver development software, does not give one access to professionally sanctioned global competition and, being more than five years old cannot qualify as the "next" generation of racing.  According to iRacing's web site, iRacing.com uses "pioneering, proprietary application of three-dimensional laser scanning technology."

So when iRacing finally released its product offering in 2008, the choice that a sim racer would have to make is between (i) iRacing's on-line subscription based state-of-the-art product offering access to professionally sanctioned global competition, or (ii) acquiring for a one time charge a copy of a 5-year old NASCAR2003 game no longer available at retail, loading both the game and Robinson's files, and still not having access to iRacing's "Professionally Sanctioned Global Competition."

---

run Robinson's files without having a valid copy of NASCAR2003 installed..

The fact that iRacing never took steps to stop Robinson's Open Wheel Sprint Car (OWSC) mod when it first was released in September of 2004 further evidences that iRacing did not consider that it violated its rights.  Robinson's mod was widely publicized and made available free of charge to anyone who wanted it.  iRacing never made any attempts to stop the release of that mod, knowing full well that the NASCAR2003 community was downloading it. Robinson even told them about the mod in his application to become a "beta" tester.  They still chose not to take any action at that time.  Clearly, iRacing didn't have any issue with the mod being released with modified physics, and their silence shows that they had no concern about harm to any potential  market.

As noted earlier, Project Wildfire, a group of mostly former Papryus employees, encouraged modding of the game.  In fact, Steve Myers admits through his own iRacing blog that he set up Project Wildfire and gave them tools to further modify NR2003, a fact that he previously denied doing. John Henry, as "Senior Advisor" to the Project Wildfire team as well certainly knew and encouraged modifications to the game. All of this occurred in 2003 and 2004 when the sim racing community was led to believe that modding of NR2003 was permissible and in fact encouraged.

Notwithstanding the creation of this climate, it was not until March of 2005, that all of a sudden, iRacing claimed they owned the copyrights, and that modders were infringing on their property. If iRacing truly thought or cared that modders were violating or infringing on their property it seems reasonable to think that they would have stepped up to the plate immediately when modders released mods to the NASCAR2003 game, not wait until nearly 2 years after Sierra/Vivendi or the former Papryus Design Group had all but abandoned the product.

iRacing can hardly claim that anything Robinson did would have or had an effect on their

potential market, considering they had no product competing against it, and didn't have a product until late summer of 2008 almost 3 full years after this action was brought about.

In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes. Clearly Robinson's work was non-commercial in nature. Everything Robinson made available was free of charge for download by anyone that desired the files. Additionally, Robinson doesn't have advertisers paying for anything. Robinson was, as most in the sim racing community are, simply doing something to give back to the community to which he belongs.

Additionally, the court should look to whether the new work is "transformative" and adds a new meaning or message. To be transformative, a use must add to the original "with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell, supra, 510 U.S. at 579. Clearly, creating an Indy Style Open Wheel car, with all its peculiar characteristics and substituting it for the NASCAR style car, adds a new meaning with a further purpose and character.

2. Willfulness: If Robinson infringed iRacing's copyright, was his infringement willful in that he knew or should have known that his conduct constituted infringement? See Fitzgerald, 491 F. Supp. 2d at 190.
   a. At what point was Robinson on notice that iRacing owned the copyright to NASCAR 2003?

3. Damages: If Robinson infringed iRacing's copyright, he is liable for statutory damages of $750 to $30,000. 17 U.S.C. § 504(c)(1). If his infringement was willful, I can impose statutory damages up to $150,000. Id. § 504(c)(2). If Robinson proves that he was not aware and had no reason to believe that his acts constituted infringement, I may reduce the award to as low as $200. Id. In each scenario, what amount of damages is warranted if not the minimum or maximum? On what basis should an intermediary figure be selected?

There was absolutely no willfulness by Robinson, or reason for him to believe that his

conduct could be considered to be infringement on the NASCAR2003 copyright.

As noted above, the entire sim racing community had reason to believe that modding of NASCAR2003 was considered to be okay both by Sierra/Vivendi and the Project Wildfire group that would become part of the nucleus of iRacing.com. Robinson did not even begin the modding of NR2003 until the middle of 2004, when, like others, the widely held belief was that NR2003 was defunct and obsolete and left in the public domain. The fact that Project Wildfire encouraged modding by releasing tools and files to the general public for nearly a year, with Sierra/Vivendi's knowledge and support, reinforced that belief.

Further, when Robinson released his OWSC mod, not one attempt was made by Sierra/Vivendi or by iRacing.com to stop him from continuing to release his files, even after Robinson himself disclosed them to iRacing.com. There is clearly no possible way that Robinson could have known, and no reason for him to think, that what he was doing could even remotely be considered infringement or was willful in any way. In fact, with the release of the tools to modify NASCR2003, their release of mods of their own, their knowledge of Robinson's mod, their silence in the face of it, Robinson believed he was in a climate where such modding was legitimate and encouraged. Under this climate, Robinson had no objective reason to think his mod was inappropriate.

It is clear that the first notice Robinson was given that someone other than Sierra/Vivendi was claiming any rights in the NASCAR2003 copyright was not until after all of the mods had been completed and already been publicly posted. Robinson's files were posted before he had any notice that John Henry had turned from promoting derivative works to claiming ownership of them. Even after Myers wrote claiming that Robinson was allegedly infringing on the NASCAR2003 copyright, it still was not evident that iRacing owned the copyright. A search of

the US Copyright database in March 2005 clearly showed the rights to still belong to Sierra/Vivendi at that time.  It was not until the middle of 2005 that iRacing.com filed notice of its ownership to the copyright to NASCAR2003.

4.  <u>Injunctive Relief:</u> On what basis is injunctive relief warranted in this case?  What evidence suggests that Robinson does or does not pose a threat of future infringement to iRacing?

When iRacing asked Robinson to take down his file while Robinson was traveling, Robinson voluntarily removed the link to the file on his web site in March 2005 upon his return home, even though he received nothing confirming that iRacing had acquired any ownership interest in Sierra/Vivendi's copyright, and even though the Copyright Office records indicated that Sierra/Vivendi still owned the copyright on NASCAR2003 .  Although the file still resided on the file server, the link to the file remained unavailable to the public over the course of several months.   While Robinson was traveling in August 2005 the link was restored briefly, which triggered filing of this lawsuit; but Robinson again removed the link when he returned home.  The file has not been posted since.

All of Robinson's work on mods occurred during the time frame when the sim community  had been led to believe that Sierra/Vivendi gave the mod community rights to do whatever they wished with the NASCAR2003 game.  In sum and substance, by its cooperation and support of Project Wildfire, Sierra/Vivendi was responsible for inducing members of the sim community to infringe Sierra/Vivendi's copyright and violate its EULA.[4]   It was only after

---

[4] A party "is liable for contributory copyright infringement when it 'with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another.' <u>In re Aimster Copyright Litig</u>., 252 F.Supp.2d 634, 649 (N.D. Ill. 2002); <u>aff'd,</u>  334 F.3d 643 (7th Cir. 2003). "  <u>Monotype Imaging, Inc. v. Bitstream Inc</u>. 376 F. Supp.2d 877, 883 (N.D.Ill. 2005).

Robinson's mods were completed and posted, in reliance on this general understanding in the sim community, that iRacing as a successor owner of the copyright, endeavored to assert that all such work violated the NASCAR2003 copyright. In essence what iRacing sought to do was to "restore" the copyright that Sierra/Vivendi had demonstrated no interest in protecting. See 17 U.S.C. § 104A. In such a situation the copyright may not be enforced as against "reliance parties" for any alleged infringement prior to the time the owner gives notice of its intent to "restore" the copyright. Even then, "reliance parties" only are liable for infringement that occurs more than twelve months later. 17 U.S.C. § 104a(d)(2). No such infringing activity occurred here.

      The NASCAR2003 game, as such, is "history" and hence, so, too, is any meaningful new audience for Robinson's OWSC file. Nothing that Robinson has done, or that he could do, with the NASCAR2003 game would have any adverse impact on the distinctly conceptually different so-called "derivative" game that iRacing is marketing. Additionally, the statutes give iRacing adequate remedies at law for any future violations. Injunctive relief is not warranted here. See e.g., Phillips v. The Constitution Publishing Co., 72 U.S.P.Q. 69, 70.

B. DMCA

1.  Robinson violated the DMCA. Under 17 U.S.C. § 1203(c)(3)(a), statutory damages are $200 to $2,500 per act of circumvention, device, product, component, offer, or performance of service. How many such acts did Robinson commit? What amount of damages should I assign for each act?

"[Section] 504(c)(1) allows for one award of statutory damages per work, regardless of the number of infringements of that work. Additionally, § 504(c)(1) provides that, '[f]or the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.' The Copyright Act defines a compilation as 'a work formed by the collection and assembling of preexisting materials or data. . . .' The Copyright Act defines a derivative work as 'a work based on one or more preexisting works . . . in which a work may be recast, transformed, or adapted.' Under the last sentence of § 504(c)(1), the so-called one work rule, only one award of statutory damages could be made for the infringement of an anthology of 10 short stories or a computer program that had five major releases. " Computer & Internet Lawyer Journal, Vol. 25 No. 11, p. 6 (Nov. 2008).   Thus, "courts consistently have ruled that a record label could receive only one award of statutory damages for the infringement of a compact disc that contained numerous tracks assembled by the label."  Ibid. , citing to UMG Recordings, Inc. v. MP3.com, Inc., 109 F.Supp.2d 223 (S.D.N.Y.), Arista Records v. Launch Media, 2006 WL 2591086 (S.D.N.Y.).

"[T]he one work rule was a compromise between competing views of how statutory damages should work under the 1976 Act. . . . . Section 504(c)(1) as enacted balanced the Copyright Office's initial proposal of one award for all infringements of all works with some owners' preference for one award for each work infringed. By allowing one award for each work, but then defining compilations and derivative works as a single work, the provision discouraged

infringements of multiple works, while ensuring that statutory damages would not be 'pyramided to an exorbitant total.' . . . . The statutory damages provision, including the one work rule, was consciously designed to provide courts with broad discretion of a range of damages (then from $100 to $50,000); defendants with a degree of certainty concerning the limit of their exposure; and copyright owners with the option of pursuing actual damages if statutory damages did not adequately compensate them for their injury."  Id. at p. 8 (footnotes omitted)..

As demonstrated above, Robinson was lulled and encouraged by NASCAR2003's predecessor owner Sierra/Vivendi, and John Henry's predecessor entity, Project Wildfire, into believing that what he did was lawful.  Robinson had no reason to believe otherwise.  If Robinson is to be held liable to anyone for violation of the DMCA, at most his liability should be limited to $200.00.

There is the separate issue of just who would be entitled to any damages for Robinson's violation of the DMCA.  Any violation of the act occurred when Robinson created the NO-CD to operate his Open Wheel file.  If that occurred prior to iRacing owning the copyright, then any claim under the DMCA resided with Sierra/Vivendi, not with iRacing.  Unless there was an assignment of such a claim, iRacing's purchase of the copyright would not automatically give it ownership of Sierra/Vivendi's preexisting claims.

Additionally, when the anticircumvention provisions went into effect in October 2000, the Copyright Office was given authority to identify and to permit certain uses that otherwise would expose a person to penalties. 17 U.S.C. § 1201(a)(1).  Among the uses that the Copyright Office exempted, and were in effect during 2004 and 2005 were:

> (2) Computer programs protected by dongles that prevent access due to malfunction or damage and which are obsolete.

> (3) Computer programs and video games distributed in formats that have become obsolete and which require the original media or hardware as a condition of access. A format shall be considered obsolete if the machine or system necessary to render perceptible a work stored in that format is no longer manufactured or is no longer reasonably available in the commercial marketplace.

37 C.F.R. § 201.40. [5]

> Definitions. . . . .(2) "Obsolete" shall mean "no longer manufactured or reasonably available in the commercial marketplace."
>
> (3) "Specialized format," "digital text" and "authorized entities" shall have the same meaning as in 17 U.S.C. §121.

NASCAR2003 was distributed via CD-ROM. CD-ROM's and CD-players go bad over time, due to constant access, scratches, or failed hardware associated with the CD reader itself. In creating the OWSC NOCD patch, Robinson simply provided interested users with a method of allowing a legitimate owner of NASCAR2003 to use the Open Wheel Sprint Car program continue to enjoy the purchased NR2003 game without fear of failing CD-ROMS or failing CD readers/players.

Definition 2 clearly states what obsolete is, specifically, "no longer manufactured or reasonably available in the commercial marketplace." NASCAR2003 was pulled from the marketplace by April 2004, and was clearly no longer being manufactured. Sierra/Vivendi and iRacing.com were not responsible for any future support, and replacement disks were no longer being offered. The Librarian of Congress 2003 exemptions clearly allow for just this situation, i.e. the creation of NOCD patches. NOCD patches allow users who otherwise would not be able

---

[5] The exemptions were amended in 2006.

to, to continue utilizing their software, even though that title is no longer available, or not manufactured, or their own CD has become obsolete.

The OWSC NOCD patch still requires the user to have a valid copy of NR2003 installed on the computer in order to operate. The NOCD also allows the user to essentially archive their original information, and to further preserve the copy of the game which they have purchased.

A simple Google search for "nr2003 no cd patches" discloses innumerable results. In view of iRacing's widely publicized lawsuits, it is highly unlikely that so many sites still would be offering NOCD's if they were not legal; and it is highly unlikely that iRacing.com has requested all of the sites still carrying no-cd patches to remove them.

No damage could possibly have been done to the NASCAR2003 game by Robinson releasing a NOCD patch, because one still could not run the original NASCAR2003 game using Robinson's NOCD patch. The NOCD patch does not change or modify NASCAR2003 itself. The NOCD patch only allows one to run Robinson's file, and then only if one already has a legitimate copy of NASCAR2003 installed.

### C. Breach of the EULA

1. Robinson breached the EULA he signed in February 2003. That EULA is governed by California law. See 2008 Order, at 17 (document # 60). By what reason, if any, should iRacing not be awarded nominal damages?

The End User License Agreement (EULA) was a license agreement that purchasers of the NASAR2003 game had to click on and to accept the first time they sought to use the NASCAR2003 game they already had purchased. The agreement was between the purchaser, Robinson, and Sierra/Vivendi. The EULA is separate from the copyright. At the time when Robinson started work on creating new files, the rights to pursue claims for violating the EULA

belonged to Sierra/Vivendi. It was not until long after Robinson finished the files, that iRacing sought permission from Sierra/Vivendi to enforce the EULA. That permission did not include an assignment of claims for prior violations of EULA.

As stated before, Project Wildfire encouraged people to mod NASCAR2003, even distributed mods themselves which violated the terms of the EULA. iRacing.com violated the EULA for every beta tester that ever installed their so-called beta. By simply installing the files distributed via email to beta testers, they were essentially telling you to violate their own EULA.

Any claim for damages for violation of the EULA would belong to Sierra/Vivendi. In the circumstances of this case, where Robinson took no action inconsistent with the EULA until after the NASCAR2003 game had been pulled from the market and both Sierra/Vivendi and Project Wildfire, John Henry's predecessor entity, had encouraged the sim racing community to do as they wished with the game, it would be inequitable to award any damages.

### D. Breach of the CDA

1. Did Robinson breach the CDA he signed in January 2005 when he posted on racing web forums on March 19, 2005, June 5, 2005, or any other occasion? Did his revelations about the existence of the new game or of the beta testing, the number of testers, the plan to grow the beta testing, the regional teams feature, or the addition of a low horsepower car to the game constitute "information" under the CDA?

2. If Robinson breached the CDA, is there any reason not to award iRacing nominal damages?

The Confidential Disclosure Agreement (CDA) defines as the "Information" that it seeks to protect "valuable and confidential information" relating to its tentatively titled product, "FIRST-Racing,net", (the "Product") including but not limited to specifications and product features of said Product." It is axiomatic that non-valuable, non-confidential information, and information not relating to iRacing's "Product" is not protected.

iRacing never sent or gave any "valuable" or any "confidential" information to Robinson, and never shared any "valuable" or any "confidential" information with Robinson about any new "Product" during the brief period of time that Robinson served as a "beta tester" in January 2005. In fact, while iRacing characterized what they were doing as "beta testing" iRacing did not have any "Product" in December 2004 - January 2005 to "beta test." iRacing did not have a "Product" sufficiently developed to conduct genuine "beta testing" until over three years later, in the summer of 2008.

During January 2005, what iRacing was conducting was a "focus group." The product (with a small "p") that iRacing made available to Robinson and others and that iRacing used for its focus group was an already-existing mod that already was available to, and in use by, the sim community. The specifications and product features of that program already were available to the sim community.

iRacing's suggestion that the mere fact that they were conducting a focus group, or how they were conducting that group was itself "confidential" is unfounded. What the CDA lists as "confidential" is only the "specifications and the product features" of its new "Product" and then only those that are confidential. The CDA says that iRacing "will disclose such of the information as it deems necessary to facilitate its beta testing." Thus, the outside scope of "disclosure" that would be "confidential" is "disclosure" made before the commencement of beta testing.

Virtually everything Robinson said about iRacing's so-called "beta testing" was common knowledge among the sim racing community. Clearly the sim racing community knew beta testing was taking place, because iRacing made an open call for beta testers in December of 2004 on its own web site. Surely iRacing cannot seriously suggest that it was "confidential" that their

product would involve people racing against other people.  And Robinson could not have commented on any new "Product" because he was simply provided with only the modified .exe of the same game he already owned.  He had no knowledge of a "new game" and was only part of the beta test for less than a month, beginning in January of 2005.  iRacing has not pointed to any way that any "confidential" information about their real "Product" was harmed or compromised by Robinson's comments. His comments cannot seriously be considered "information" in the context of what the CDA purported to protect.  Simply put, he didn't have any information to give away.

## Conclusion

Upon the foregoing points and authorities the defendant Tim Robinson respectfully submits that his work, undertaken when Sierra/Vivendi owned the copyright, was "fair use" and not a "willful" violation of the NASCAR2003 copyright; that any remedy for violation of the DMCA or EULA belong to Sierra/Vivendi; and that he did not breach the provisions of iRacing's CDA.

By his attorneys,

JOSEPH F. RYAN BBO# 435720

Digitally signed by JOSEPH F. RYAN BBO# 435720
DN: cn=JOSEPH F. RYAN BBO# 435720, o=LYNE WOODWORTH & EVARTS LLP, ou, email=JRYAN@LWELAW.COM, c=US
Date: 2009.03.18 16:05:54 -04'00'

Joseph F. Ryan BBO# 435720
Lyne Woodworth & Evarts LLP
12 Post Office Square
Boston, MA 02109
Telephone 617/523-6655 - Telecopy 617/248-9877
E-mail: Jryan@LWELaw.com