UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IRACING.COM MOTORSPORTS SIMULATIONS, LLC,** ) ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. 05cv11639-NG** |
| ) | |
| **TIM ROBINSON,** ) | |
| **Defendant.** ) | |
| **GERTNER, D.J.:** | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**
May 28, 2009

I.    **INTRODUCTION**

iRacing.com Motorsports Simulations, LLC ("iRacing") is a video game company that

owns the copyright to the PC-based racing simulator NASCAR 2003 and that developed the

online simulator iRacing.com.  It brings suit against Tim Robinson, alleging (a) that he reverse-

engineered NASCAR 2003, (b) that he modified the game, (c) that he made those modified

versions available for download online, (d) that he circumvented security measures that prevent

persons who do not own the game disc from playing it, and (e) that he revealed to the public

secret information about an early version of iRacing.com.  Plaintiff's claims sound in copyright

infringement under 17 U.S.C. § 501(a), violation of the Digital Millennium Copyright Act

("DMCA"), 17 U.S.C. § 1201(a), breach of the End User License Agreement ("EULA") that

Robinson signed when he first installed NASCAR 2003, and breach of the Confidential Disclosure

Agreement ("CDA") plaintiff signed when he became a beta tester for iRacing.

On May 25, 2007, in response to iRacing's motion for partial summary judgment, I found

that Robinson did in fact violate the DMCA by creating a program, the "NO-CD patch," to

circumvent iRacing's anti-piracy measures. As to copyright infringement, I found that iRacing had established a prima facie case because "Robinson, without authorization, reverse-engineered NASCAR 2003 and distributed modifications of it," Mem. & Order re: Pl.'s Mot. for Partial Summ. J. ("2007 Order"), at 10 (document # 60), but I declined summary judgment because there were contested issues with respect to Robinson's "fair use" affirmative defense. Specifically, I found that although three of the four factors involved in the fair use test weighed against a finding of fair use, factual questions remained open as to the effect of Robinson's alleged infringement on iRacing's potential market. See id. at 23-24.

On September 24, 2008, I granted summary judgment for iRacing on Robinson's breach of the EULA in reverse engineering NASCAR 2003, but I declined to issue declaratory judgment on iRacing's possession of a valid copyright and the enforceability of the CDA against Robinson solely because those issues were uncontested. See Mem. & Order re: Mot. for Summ. J. ("2008 Order"), at 2-3 (document # 78).[1]

I presided over a bench trial on February 5, 2009, on the remaining issue of liability for copyright infringement and on damages on all counts. On March 4, 2009, I issued a briefing order to clarify the open questions and allow the parties a final opportunity for argument. Having reviewed the trial testimony, the exhibits, and the supplementary briefs, I now resolve all that remains of the case.

## II.    FACTS[2]

---

[1] As I indicated, the problem was purely "a technical one." 2007 Order at 2. A court lacks the power to "declare" anything unless there is a case or controversy. It is undisputed that the plaintiff and its predecessors owned the copyright since 2003. There is no contest as to the validity of that copyright. See id. at 7-10.

[2] The bulk of these findings are taken from my 2007 and 2008 orders. As I explained in my electronic order of December 16, 2008, these facts "are taken as established for the purposes of trial" under Fed. R. Civ. P.

-2-

## A.    The Software

In February 2003, a software company called Papyrus released a video game titled

NASCAR 2003. The game, a simulation of NASCAR racing, received strong reviews and

became popular. On March 24, 2003, Papyrus and its parent company, Sierra, filed an application

to copyright NASCAR 2003. Ex. A to Kaemmer Aff. (document # 53-2). The software was

registered as copyright number PA-1-266-286. Kaemmer Aff. ¶ 3 (document # 53).

In May 2004, Papyrus ceased operations and on May 28, 2004, all rights in the software

were transferred to a company called First, LLC ("First"). Ex. B to Kaemmer Aff. (document #

53-3). On May 10, 2005, First changed its name to iRacing.com Motorsport Simulations, LLC

("iRacing"), the plaintiff in this action. Ex. C to Kaemmer Aff. (document # 53-4).

At the heart of NASCAR 2003 is a file called NR2003.exe. This file is an "executable,"

meaning that it is the program that a user's computer runs in order to play the game. NR2003.exe

consists principally of the game itself -- the code that runs the racing simulation -- but it also

includes a copy-protection program called SecuROM. Delong Aff. ¶ 12 (document # 52). When

a user runs NR2003.exe, SecuROM automatically checks to see whether the game's CD is in the

computer's drive; if the CD is missing, NR2003.exe shuts down. Id.

The first time NR2003.exe is run, the user is presented with an End User License

Agreement ("EULA"). Kaemmer Aff. ¶ 7. If the user does not signal, by clicking a button, that

she agrees to the terms of the EULA, the game shuts down. Id. The EULA provides in part:

> You may not, in whole or in part, copy, photocopy, reproduce,
> translate, reverse engineer, derive source code, modify,

---

56(d) (instructing courts to clarify the issues for trial after findings have been made in partial summary judgment
orders). Accordingly, this section cites to the summary judgment materials upon which those orders were based.

disassemble, decompile, create derivative works based on the
Program, or remove any proprietary notices or labels on the
Program without the prior consent, in writing, of Sierra.

The Program is licensed to you as a single product.  Its component
parts may not be separated for use on more than one computer.

You are entitled to use the Program for your own use, but you are
not entitled to . . . sell, grant a security interest in, or transfer
reproductions of the Program to other parties in any way, nor to
rent, lease or license the Program to others without the prior
written consent of Sierra.

Ex. A to Am. Complaint (document # 18-2).

## B. Defendant's Modifications

Defendant Robinson is a user of online racing games.  Robinson Trial Aff. ¶ 2 (document

# 96).  He previously managed an online message board about racing simulations and ran websites

that hosted multi-user auto races.  Robinson Depo. at 29-30, 43-45 (document # 51-2).  In

February 2003, Robinson purchased a copy of NASCAR 2003 at a retail store in Texas.

In December 2004, First asked a number of users and programmers, Robinson among

them, to test the unreleased beta version of NASCAR 2003.  Myers Trial Aff. ¶ 4 (document #

98).  As part of the arrangement, Robinson was given a copy of NASCAR 2003 1.2.0.1 ("beta

version") to play and evaluated for First.  Id.  In addition, Robinson signed a Confidential

Disclosure Agreement ("CDA") in which he promised not to share any information about the beta

version to any third party or let any third party have access to it.  Trial Ex. A.  The agreement

provided that he would be liable to First for any damage arising from his "release of or

dissemination of confidential information, proprietary information, intellectual property or

software."  Id.

-4-

### 1.    The 2004 Modification

In the summer of 2004, Robinson became part of a group of people who designed the

OWSC modification, or "mod," of NASCAR 2003. This group used software tools to modify the

NR2003.exe file and save the modified file as OWSC.exe ("2004 mod"). The "OW" stands for

"open-wheel" racing, a form of auto racing using cars built differently from those in NASCAR

racing.[3] Robinson's role was to provide the web space and test servers for the group. Robinson

Trial Aff. ¶ 17. He also made this mod available as a game called OW Racing 2004 for download

on two websites he owned and operated: www.Torn8oAlley.com and www.OW-Racing.com. Id.

¶ 18. The file was available on his sites from September 4, 2004, until March 15, 2005. Robinson

Depo. at 99-100.

### 2.    The 2005 Modification

Robinson himself also used a tool called Ultra Edit, which allowed him to view the code

that made up the NASCAR 2003 software, to create another mod. He combed through over a

million lines of code to locate the few lines that governed the simulation of the NASCAR

vehicles' physical properties -- "spring rates, shock rates, weight distribution, maximum weight

allowed, gas, fuel cell size, fuel cell location, and front and rear wing adjustments." Robinson

Depo. at 208-11, 226-28. Then, by trial and error, he changed these lines of code to simulate the

properties of open-wheel cars rather than NASCAR cars (i.e., he would change the numbers in

the code, save the new version, and then run the game to see the results, repeating the process

---

[3] "An open-wheel sprint car ('OWSC') is a single-gear car. Indy Racing League cars are 6-gear cars. A NASCAR is a 4-gear car." Robinson Aff., Ex. A to Def.'s Opp. to Mot. for Summ. J. ("Robinson Aff.") at ¶ 9 (document #56-3).

until the cars performed in compliance with the new programming). Id. at 208-11, 216-17, 233-38.

The result of his labors was a file called owr2k5_v1.0.0.1.exe ("2005 mod"). Delong Aff. at 27. He created a beta version in June or July of 2004, Robinson Trial Aff. ¶ 13-14, released a version to the public via his websites in September 2004, id. ¶ 14, and released the final enhanced version to the public in early 2005, Joint Pretrial Mem. at 12 (document # 85). The 2005 mod, like the 2004 mod, is an open-wheel racing game whose code is identical to NR2003.exe with select lines of code altered. Robinson made the game available for download on his website OW-Racing.com, and subsequently placed links to that download location on his other two sites, Torn8oAlley.com and FIRST-RACING-SUCKS.com. Robinson Depo. at 85-87, 141-42.

### 3. The NO-CD Patch

In response to requests on OW-Racing.com by gamers who were using the 2004 mod, Robinson located a pirated version of NASCAR 2003 somewhere on the internet that had been modified so that SecuROM no longer operated. Robinson Depo. at 112-14, 157. He compared the code of this pirated version with the legitimate version he had bought; by identifying the differences in the code, he isolated the lines of code that operated to shut down SecuROM. Id. He then modified this section of code to create a program, "OWSC_NOCD," that would allow a user to play the 2004 mod without a store-bought CD. Robinson Trial Aff. ¶ 19-20.[4] Nevertheless, he claims that a user had to have a valid copy of NR2003.exe installed to use the 2004 mod, that the NO-CD patch worked only with the 2004 mod, and that the NO-CD patch

---

[4] Robinson explained the process another way in his trial testimony. He stated that he created his patch by modifying one of the many NO-CD files that were available online for the original NASCAR2003 game. Robinson Trial Aff. ¶ 20. Whichever explanation is true, the outcome is the same: his NO-CD patch violated the DMCA.

would not allow a user to play the original NR2003.exe game without a disc. Id. At trial,
however, it became clear that a user who did not own a copy of NASCAR 2003 could play the
2004 mod: she could borrow the installation disc from a person who had purchased the game,
install it on her computer, install one of Robinson's mods, and then install Robinson's NO-CD
patch to play the open-wheel version of the game without a disc. Testimony of Tim McArthur,
Trial Tr. at 85-86.

## C.    First/iRacing's Reaction

First sent Robinson a cease-and-desist letter on March 4, 2005, informing him that
OWSC.exe, owr05.exe, and the NO-CD patch were infringements of its copyright. The company
requested that he stop making these files available on his websites. Trial Ex. B. He complied, see
Trial Ex. E, but by August 2005 he was again offering the 2005 modification and the NO-CD
patch for download on his websites, see Myers Trial Aff. ¶ 21. Counsel for the plaintiff then sent
a cease-and-desist letter to OW-Racing.com's internet service provider on August 3, 2006. Id. ¶
23. On August 5, 2005, First -- now called iRacing -- filed this action.

## D.    Launch of iRacing.com

After years of work, iRacing finished its first commercial product, an online subscription-
based auto racing simulation that it called iRacing.com. Kaemmer Trial Aff. ¶ 17. The product
included open-wheel race cars. Trial Ex. D (screen shots of open-wheel cars). The game's first
subscribers, who had tested a preliminary version, gained access to the service on June 11, 2008.
A general launch followed on August 26, 2008. Kaemmer Trial Aff. ¶ 18.

## III.    LEGAL ISSUES

-7-

Having disposed of several legal issues on summary judgment, I now confront the

outstanding questions, namely: (1) the impact of the "Effect on Potential Market" fair use factor,

and, if I conclude there was no fair use, the remedy for Robinson's copyright infringement; (2)

iRacing's damages under the DMCA claim; (3) iRacing's damages for breach of the EULA; (4)

whether Robinson breached the CDA, and, if he did, (5) the damages for that breach.

## A.     Copyright Infringement

It is undisputed that iRacing and its predecessors have owned the copyright to NASCAR

2003 since 2003 and that Robinson, without authorization, reverse-engineered the game and

distributed mods of it that contained 99.9% of the original code. 2007 Order at 10. As I held on

summary judgment, this is enough to make out a prima facie case of copyright infringement. Id.

(citing Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000)). My earlier

findings leave four questions open on the copyright claim: First, whether Robinson can make out

the affirmative defense of fair use; second, if not, whether his infringement was willful; third, what

damages should be awarded; and fourth, whether injunctive relief is warranted.

### 1.     Fair Use

To avoid stifling the very creativity that the copyright law is meant to foster, Congress

codified the common law doctrine that exempts certain uses of copyrighted material as

noninfringing "fair use." See 17 U.S.C. § 107; Campbell v. Acuff-Rose Music, Inc., 510 U.S.

569, 577 (1994). The Copyright Act identifies four factors to be considered in determining

whether use of a work constitutes fair use: "(1) the purpose and character of the use, including

whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the

nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation

to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." § 107. I have already held that the first three factors weigh against a finding of fair use in this case. 2007 Order at 20. I did not decide the impact of the fourth factor, the effect on the plaintiff's potential market, which the Supreme Court has described as the "single most important factor of fair use." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 566 (1985).

I now conclude that Robinson's conduct likely had an adverse impact on iRacing's potential market for products derived from NASCAR 2003. Robinson argues that his mods could not have impacted the original game's market because Sierra's license to use the NASCAR trademark expired on April 1, 2004, and the game was pulled from store shelves at that point. The fact that Robinson's mods did not compete with NASCAR 2003, however, does not end the inquiry. The analysis must take into account potential harm to the market for derivative works. See Harper & Row, 471 U.S. at 568; see also Salinger v. Random House, Inc., 811 F.2d 90, 99 (2d Cir. 1987) (weighing a use's impact on the market that would exist for a product that the copyright-holder did not yet plan to sell because he was "entitled to protect his opportunity" to do so in the future).

The evidence shows that as far back as May 2004, when First purchased the rights to NASCAR 2003, its founders intended to develop a version of the game with the open-wheel feature for commercial release. Kaemmer Trial Aff. ¶ 9. This feature was a vital part of First's business strategy, as Formula One racing -- which involves open-wheel cars -- is the world's most popular form of auto racing in real life. Id. Moreover, First knew that the NASCAR 2003 source code could be modified to add open-wheel cars to the game, as NASCAR 2003 used substantially

the same code as Grand Prix Legends, a predecessor game that included open-wheel capability.
Id. By late 2004, First was developing a test version of NASCAR 2003 that featured open-wheel
races. Id. That version eventually became the web-based auto racing game iRacing.com.

iRacing.com is clearly a "derivative work" of NASCAR 2003. See 17 U.S.C. § 101 ("A
'derivative work' is a work based upon one or more preexisting works . . . ."). David Kaemmer,
who founded both Papyrus and First and who is now CEO of iRacing, testified that 65% of the
source code for the online game is taken from the NASCAR 2003 code. Trial Tr. at 64-65.
Kaemmer also testified that the NASCAR 2003 customer base is the primary market for
iRacing.com. Kaemmer Trial Aff. ¶ 21.

I find Kaemmer's testimony reliable. iRacing represents the next generation of auto racing
simulation, and NASCAR 2003 fans would be the natural consumers for that product. A major
upgrade in that game, one that First/iRacing had been planning since 2004, was the ability to race
using open-wheel cars. Available for download on the internet for at least several months,
Robinson's mods allow users -- including those who own a legitimate copy of the NASCAR 2003
and those who do not[5] -- to race with such cars without signing up for iRacing's paid service.

Plainly, then, "unrestricted and widespread conduct of the sort engaged in by the
defendant would [have] result[ed] in a substantially adverse impact on the potential market" for
iRacing.com. Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007). Like
the first three factors, the fourth weighs against a finding of fair use. I therefore find that
Robinson's conduct constituted copyright infringement.

### 2.   Willfulness

---

[5] See discussion of how both disc owners and non-owners could play the mods, supra Part II.B.3.

iRacing has elected for statutory damages under the Copyright Act, as opposed to actual damages. The Act sets damages at between $750 and $30,000 for infringement. 17 U.S.C. § 504(c)(1). If Robinson was not aware and had no reason to believe that his acts constituted infringement, I can reduce the award to as low as $200. On the other hand, if Robinson's infringement was willful in that he knew or should have known that his conduct constituted infringement, Fitzgerald, 491 F. Supp. 2d at 190, I can impose enhanced damages up to $150,000. 17 U.S.C. § 504(c)(2).

Robinson's main argument against willfulness depends on evidence about an entity called Project Wildfire -- evidence that was presented at the eleventh hour, but that I nonetheless admitted insofar as it might bear on willfulness or lack thereof. See Briefing Order at 8 (document # 111). According to Robinson, a group of developers and beta testers formed Project Wildfire in 2003 when they learned that Sierra, which owned NASCAR 2003 at the time, was not going to continue to develop the game. This group was convened by Steve Myers, then an associate producer at Papyrus and now executive vice president at iRacing. As Myers later explained in an October 2008 blog post:

> Rich [Reilly, general manager of Papyrus] also let me start the infamous Project Wildfire group as a final thank you to all our loyal customers. I started this group and had these physics models made because I wanted the community to have a legal way to create something for themselves to contribute to the community. This group was entirely on their own after I put them together and we told them how to find the physics models. I knew most of the guys as they had been former employees, contractors or testers for us. . . . I had seen their work on a truck mod they did for NASCAR Heat that was impressive so I emailed John [Henry] and started a conversation with him. John told me he would only want to join the team if he could bring along Kevin. . . . .

-11-

Trial Ex. M. Myers testified at trial that he gave Project Wildfire editing tools, including one called Sandbox, that allowed users to modify the game's graphics. Trial Tr. at 39-41. John Henry, co-founder of First/iRacing, served as a senior advisor to Project Wildfire and was aware of its activity. Project Wildfire Interview, July 22, 2003, Ex. 3 to Robinson Trial Aff. (document # 96-2). From mid-2003 to mid-2004, Project Wildfire released a number of new graphical enhancements and mods to the public.[6] Robinson Trial Aff. ¶ 10-11. Robinson claims that based on these facts, he was under the impression that Papyrus had sanctioned the modification work that he later undertook. Id. ¶ 9.

While the evidence, at least before July 3, 2004, may be somewhat ambiguous as to whether it was reasonable, in light of Project Wildfire's work, for Robinson to believe his mods did not constitute infringement, this does not save him from a finding of willfulness for three reasons: First, Myers testified at trial, and I credited his testimony, that the tools given to the group were for graphics only. Second, no one at Sierra, the true owner of NASCAR 2003 during Project Wildfire's genesis and lifetime, ever sanctioned the modification of executable files, which contained the physics model[7] for the game. Trial Tr. at 58-59. Third, and most importantly, Robinson's core acts of infringement occurred after he had notice of iRacing's copyright. Project Wildfire announced that it would remove all downloadable files from its website on July 3, 2004.

---

[6] Team Redline is another development cohort that released a mod as late as 2005. Robinson Trial Aff. ¶ 31. There was insufficient evidence adduced at trial to conclude that that group's conduct was sanctioned or encouraged by Papyrus, Sierra, or First.

[7] The physics model makes the game-playing experience realistically simulate the driving experience. It includes variables such as track temperature, weight of the car, and thrust values for the car. It is separate from the graphical features of the game, such as the color of the car or the scenery. See Trial Tr. at 10-11.

-12-

Robinson Trial Aff. ¶ 16.[8] The group indicated in a press release that it had been "signed on to help in the creation of a retail racing product" and that it would "begin work on an exciting new racing experience immediately." Ex. 8 to Robinson Trial Aff. (document # 96-3). That summer, Robinson worked on both the 2004 and 2005 modifications. Robinson Trial Aff. ¶¶ 13-14, 17.

On March 3, 2005, Dave Kaemmer posted on iRacing's website an open letter to NASCAR 2003 users, notifying them that iRacing had purchased all of the rights to NASCAR 2003, including copyrights, and had invested substantial funds into the product. The letter stated in unequivocal terms that the copyrights were a significant part of that investment and that iRacing would enforce them against any infringers. It further listed activities that it believed did not violate its copyrights, including the creation of new car graphics and sounds, and others that it believed did constitute copyright infringement:

> Hacking, as the term is used in this letter, is any act involving our intellectual property not expressly permitted in our end user license agreement (or otherwise expressly authorized by us). Without limitation, hacking includes reverse engineering, disassembling, or modifying the object code for any executable. . . . We will not tolerate . . . the hacking of our executables, distribution of hacked executables, creating tools intended to hack our executables or distribution of such tools. . . . If you are hosting any files that violate these rights, we respectfully ask that you remove them immediately and ensure that they do not get put back up.

Trial Ex. AA. Robinson conceded that he had read the letter. Robinson Depo. at 61-66. By that point, he had already created two mods. As described above, his 2004 modification had been available on his websites since September 4, 2004, and his 2005 modification been made available on the same sites from early 2005.

_____

[8] All rights to the software had been transferred to iRacing on May 28, 2004.

The day after Kaemmer posted his open letter, Myers expressly wrote to Robinson an email requesting that he remove all infringing content from his websites, OW-Racing.com and Torn8oAlley.com. Trial Ex. B. Robinson responded the same day, stating "we believe we are not infringing on anything." Trial Ex. C. On March 7, 2005, Myers again emailed Robinson, noting that the content remained online. Robinson then took down the files and, finding no link between iRacing and NASCAR 2003 in the national copyright database, asked Myers for proof that iRacing owned the copyright; Myers told Robinson to have his lawyers contact iRacing's lawyers.[9] Trial Ex. E. In March 2005, Robinson posted several relevant comments to a website he had started after receiving Kaemmer's letter, www.FIRST-RACING-SUCKS.com. On March 19, he wrote that he would "continue down the path of being able to release the updated OWR05 mod" and "continue work on the OWSC mod primarily." Trial Ex. F. He also stated, "it is completely legal for you or me to reverse engineer, or otherwise disassemble code." Id.

In August 2005, iRacing discovered that Robinson was again distributing the infringing files on his websites via download links. When a user moved her cursor, using the mouse, over the download links, graphic images of "Bite Me FIR$T" and "Bite Me TWICE FIR$T" appeared before the user clicked to begin the download. Counsel for iRacing sent Robinson a take-down letter on August 3, 2005, but still he did not disable the download links.[10] On this record, I find that Robinson's infringement was willful.

---

[9] Though iRacing did not register its copyright with the Copyright Office until June 28, 2005, registration is not necessary to confer copyright protection.

[10] Robinson claimed at trial that a part-time administrator had reactivated the links without Robinson's knowledge while he was on vacation. Robinson Trial Aff. ¶ 40. That testimony is directly contradicted by his statement in his deposition that no other party had the ability to modify his websites. Robinson Depo. at 78-79.

### 3.    Amount of Damages

The statutory damages provided in the Copyright Act are to be assessed for each infringed

work (here, NASCAR 2003), not each act of infringement (here, the mods). Venegas-Hernandez

v. Sonolux Records, 370 F.3d 183, 192 (1st Cir. 2004). Because Robinson's conduct was willful,

the damage award may be up to $150,000.  17 U.S.C. § 504(c)(2).  A district court has wide

discretion in setting the precise amount of enhanced damages. See Fitzgerald Publ'g Co. v.

Baylor Publ'g Co., 807 F.2d 1110, 1116 (2d Cir. 1986).

Relevant factors that a court should consider in awarding damages include the need to

deter future violations, the size of the defendant's infringement operation, and the defendant's

lack of respect for others' copyrights. See Venegas-Hernandez, 370 F.3d at 195-96.  The level of

reverse engineering and unauthorized modification that went on with respect to the game in this

case, NASCAR 2003, clearly underscores the need to deter infringers.

At the same time, there is no evidence as to how many people downloaded Robinson's

files, or, more to the point, how many have opted to engage in open wheel race simulation using

the mods rather than pay to participate in iRacing.com.  This makes selecting a damage award

exceedingly difficult.

It is helpful to consider awards made in other cases.  In Nintendo of Am., Inc. v. Dragon

Pac. Int'l, 40 F.3d 1007 (9th Cir. 1994), the defendant sold about 3,100 multi-game Nintendo

cartridges that included thirteen copyrighted games.  The Ninth Circuit affirmed the award of

$5,000 in statutory damages for each of the infringed works, for a total of $65,000.  In Dream

Games of Ariz., Inc. v. PC Onsite, 2009 WL 861498 (9th Cir. Apr. 2, 2009), the defendant

created an infringing version of a video bingo game that directly competed with the plaintiff's

-15-

original in bingo parlors for three months. There, a jury awarded $25,000 in statutory damages for willful infringement. In <u>Cent. Point Software, Inc. v. Nugent</u>, 903 F. Supp. 1057 (E.D. Tex. 1995), the court awarded $10,000 in damages for each of three software packages that a computer bulletin board operator made available to subscribers, who paid a monthly registration fee to access the pirated software.[11]  These cases make clear that iRacing's request for the $150,000 maximum is excessive.

iRacing has invested a considerable amount of money and several years of effort into its recently released online racing simulation. With his repeated violation of iRacing's copyright, and indeed his failure to engage fully in this lawsuit until the eleventh hour,[12] Robinson has demonstrated next to no respect for the plaintiff's legal rights. At the same time, however, I cannot easily dismiss the possibility that while Robinson's mods may have narrowed the market for iRacing.com, he did not profit from them, and they also may have helped preserve or enhance demand for the plaintiff's new game -- a product released more than four years after NASCAR 2003 had been discontinued. Balancing these considerations and considering the judgments handed down in other cases, I consider an award of $15,000 in statutory damages to be just.

### 4.    Injunctive Relief

"A finding of liability for copyright infringement, combined with the threat of future infringement, justifies the imposition of a permanent injunction." <u>Cipes v. Mikasa, Inc.</u>, 404 F.

---

[11] At that time, the maximum statutory damages for willful infringement was $100,000.

[12] For example, Robinson attempted to relitigate breach of the EULA by raising previously available evidence about Project Wildfire more than four months after I decided that issue at summary judgment. See 2008 Order at 11-17. Robinson failed to serve his proposed findings of fact and conclusions of law with respect to his fair use defense by the court-ordered deadline of January 6, 2009, or by the extended deadline of January 21, 2009. See Pl.'s Letter of 1/27/09 (document # 87). Robinson also attempted to introduce at trial a variety of exhibits that he failed to produce to the plaintiff during discovery. See Pl.s' Mot. in Limine (document # 102).

-16-

Supp. 2d 367, 371 (D. Mass. 2005). As explained above, Robinson clearly infringed iRacing's

copyright in NASCAR 2003. There is also ample evidence that Robinson may continue to

infringe that copyright in the future. Once already, he re-posted his open-wheel mods after

receiving actual and constructive notice that iRacing owned the copyright to the original game.

On November 15, 2005, Robinson stated under oath at his deposition that he wished he had kept

his notes regarding his modifications because he would "like to modify it some more with

different models." Robinson Depo. Tr. at 239-240. He has also demonstrated considerable

disdain for iRacing's attempt to enforce its copyright, taunting iRacing with his FIRST-RACING-

SUCKS.com website and its "Bite Me FIRST" graphics. While he is certainly free to express his

anger with the plaintiff, his conduct suggests that injunctive relief is warranted.

### B.    DMCA

Robinson violated the DMCA when he created and distributed his NO-CD patch, a device

that circumvents the SecuROM security measure within NASCAR 2003. 2007 Order at 23.

Under 17 U.S.C. § 1203(c)(3)(a), statutory damages are $200 to $2,500 per act of circumvention,

device, product, component, offer, or performance of service. Each download of the patch

constitutes an act of circumvention. See Sony Computer Entm't Am., Inc. v. Filipiak, 406 F.

Supp. 2d 1068 (N.D. Cal. 2005) (finding 7,194 violations where defendant sold 7,194

modification chips that allowed PlayStation users to play illegal copies of games and to copy

those games).

There is no way to tell how many people downloaded Robinson's NO-CD patch. Instead

of suggesting a figure for the number of acts of circumvention, defendant attempts to relitigate the

issue of whether NO-CD patches are legal. That issue is closed. Plaintiff points out that OW-

Racing.com had over 1,400 registered members and Torn8oAlley.com had over 1,000 members. Robinson Depo. at 127, 142. Accordingly, I will accept its estimate that at least forty users downloaded the patch, but I will set the damages at $250 per download, rather than the $2,500 it recommends.[13] This entitles iRacing to an award of $10,000 under the DMCA.

### C.     Breach of the EULA

I found in my second summary judgment order that Robinson breached the EULA by reverse engineering NASCAR 2003. See 2008 Order at 17. Robinson had an opportunity to fully litigate this issue at that time. Though he claimed that Project Wildfire's work was sanctioned by Papyrus, he made the claim at trial for the first time. This evidence was available years ago and cannot be raised now in an attempt to reopen the issue.[14] iRacing seeks only nominal damages on this count of the complaint. Accordingly, I award $1.00 for breach of the EULA.

### D.     Breach of the CDA

When Robinson became a beta tester for First in December 2005, he signed the CDA. In so doing, he agreed to the following provision:

> Without prior written consent of [First], [Robinson] shall neither disclose to any third party any or all of the Information disclosed by [First] hereunder, including the existence of the Product, or permit any such third party to have access to such Information . . . . Such obligations of confidentiality shall continue until such a time as the Information becomes public knowledge without fault on the part of [Robinson].

---

[13] To be sure, there is precedent for enhancing the per-device damages even more where the defendant distributes the device in question after being notified that it constitutes infringement. See, e.g., Sony Computer Entm't Am., Inc. v. Divineo, Inc., 457 F. Supp. 2d 957, 967 (N.D. Cal. 2006) ($800 per device). Here, however, it is not reasonable to assume that anywhere close to forty people downloaded Robinson's NO-CD patch during the few days in August in which the file was back online.

[14] As explained above, supra Part III.A.2, I did allow evidence about Project Wildfire to be admitted for any bearing it might have on the willfulness issue. See Briefing Order at 8 (document # 111)

-18-

Trial Ex. A.

Robinson clearly breached the CDA in the summer of 2005. On June 5, 2005, he posted

to his site, FIRST-RACING-SUCKS.com:

> When I quit the beta testing, there were about 15 regional teams,
> each with about 10 people on them. I know this, because I painted
> the cars for Team Texas initially. That is a far cry from 500....
> Their plans may be revolutionary, but while I was testing, it was
> nothing more than a modified .exe to drive a tricked up IROC car
> with very low HP in the 'FPA' and 'FPB' groups as they called them.

Trial Ex. H. Another user then wrote, "Well, Mr. Robinson, I think you blew the hell out of your

NDA."[15] Id. Robinson responded on June 6, 2005, "I didn't really blow my NDA. . . . And if I

did, big whoop! Even they have said publicly that anything going on when I was involved would

be nothing like what the finished product would be like." Id.

While I do not agree with iRacing that disclosing the fact of the testing itself was a breach

-- indeed, Robinson filled out an application after seeing a First advertisement soliciting beta

testers -- Robinson plainly revealed much that was unknown to the public. He disclosed the

number of testers involved (ten people on fifteen teams), the use of regional teams in the testing

phase, and perhaps most crucially, the contemplated feature of driving a beginner car with low

horsepower.[16]

Robinson offers two defenses, both of which are unavailing. First, he argues that the

contract prohibits only disclosure of "valuable and confidential information" relating to the

---

[15] NDA, short for Non-Disclosure Agreement, is another name for a CDA.

[16] Kaemmer testified at trial that this innovation could make the game more realistic: "We wanted to test what people would think about driving a car with low horsepower, because that's how people start racing in the real world. Most simulations up to that point had been simulating the most advanced form of racing, but we wanted to sort of teach people the ropes the same way that they would learn in the real world and were interested to find out, is that something they would find compelling." Trial Tr. at 77.

product being tested and that the information revealed by Robinson was not "valuable." It is not fair to say, however, that the structure of the testing and the addition of a low horsepower car are not valuable pieces of information. Both could be of use to competitors. And further, the company had an interest in keeping potentially unpopular features from its target subscribers so as to avoid creating negative buzz about the game.

Robinson next argues that information about the testing, rather than the game itself, was not actionable because the contract protects only information about the product features and specifications. This misreads the contract. The contract defines "information" as "information relating to its tentatively titled product, 'FIRST-Racing.net' . . . including but not limited to specifications and product features of said Product." Trial Ex. A. This language is broad enough to cover information about the testing. Even if it were not, Robinson still violated the CDA by disclosing information about a car featured in the game.

As with breach of the EULA, iRacing seeks only nominal damages on this count. I award $1.00 for Robinson's breach of the CDA.

## IV.   CONCLUSION

For the reasons stated above, I find Robinson liable for willful copyright infringement, violation of the DMCA, breach of the EULA, and breach of the CDA. Judgment is entered for **THE PLAINTIFF** in the amount of **TWENTY-FIVE THOUSAND TWO AND 00/100 ($25,002.00) DOLLARS**. Defendant is also hereby **PERMANENTLY ENJOINED** from infringing iRacing's copyrights by distributing the NO-CD patch or any modifications of NASCAR 2003. Plaintiff may file post-judgment papers regarding the collection of attorneys fees by June 6, 2009. Defendant's opposition is due by June 16, 2009.

**SO ORDERED.**

Date: May 28, 2009

/s/Nancy Gertner

**NANCY GERTNER, U.S.D.C.**

-21-